SUMMONS ISSUED



PRYOR CASHMAN LLP
James S. O'Brien, Jr.
jobrien@pryorcashman.com
Saritha Reddy
sreddy@pryorcashman.com
Attorneys for Plaintiff
7 Times Square
New York, New York  10036-6569
(212) 421-4100

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x

THE GREAT ATLANTIC & PACIFIC TEA
COMPANY, INC.,

                Plaintiff,

      - against -

THE STOP & SHOP SUPERMARKET COMPANY, LLC
and FRANK R. VITALE,

                Defendants.

-----------------------------------------------------------------------x

**CV11 - 1641**

Civ.

**COMPLAINT**

**BLOCK, J.**

**AZRACK, M.J.**

     Plaintiff The Great Atlantic & Pacific Tea Company, Inc. ("A&P"), as and for its

Complaint against defendants The Stop & Shop Supermarket Company, LLC ("Stop & Shop")

and Frank R. Vitale ("Vitale"), allege as follows:

## NATURE OF THE ACTION

     1.     A&P, which presently is under Chapter 11 bankruptcy protection and is in the

midst of implementing a massive restructuring plan, seeks injunctive relief against Vitale (who

was the second most senior operator at A&P and one of only two Regional Vice Presidents until

his abrupt resignation on February 14, 2011) and his new employer, Stop & Shop, which is one

of A&P's major competitors, to enforce the terms of two separate agreements in which Vitale agreed that he would not go to work for a competitor like Stop & Shop for 18 months following his departure from A&P. By going to work for Stop & Shop, Vitale has violated the restrictive covenants contained in those agreements. Vitale has further violated his agreements with, and breached his fiduciary duty to, A&P by disclosing to Stop & Shop trade secrets, proprietary information and key elements of A&P's restructuring strategies and other confidential information.

2.      Stop & Shop, by employing Vitale with knowledge of his agreements with A&P and accepting from him A&P's trade secrets, proprietary information, key elements of A&P's restructuring strategies and other confidential information, has tortiously interfered with A&P's contracts with Vitale, misappropriated A&P's trade secrets and confidential information, and aided and abetted Vitale in his breach of the fiduciary duty he owed to A&P.

3.      The above breaches of contract and fiduciary duty by Vitale and the improper and tortious activities engaged in by Stop & Shop have caused and will continue to cause A&P irreparable harm and severe damage to its business for which A&P has no adequate remedy at law. Accordingly, A&P seeks to enjoin Vitale from breaching his contractual and fiduciary obligations and Stop & Shop from continuing to tortiously interfere with A&P's contracts by inducing A&P's senior managers from breaching their contractual and fiduciary obligations.

## THE PARTIES

4.      Plaintiff A&P is a Maryland Corporation with a principal place of business at 2 Paragon Drive, Montvale, New Jersey 07645.

5.      Defendant Stop & Shop is a Delaware Corporation with a principal place of business at 1385 Hancock Street, Quincy, Massachusetts 02169.

2

6.      Defendant Frank Vitale is an individual residing at 216 Blue Point Road, Oakdale, New York 11769.

## JURISDICTION AND VENUE

7.      Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. §1332 in that the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

8.      The venue of this action is properly laid in this District pursuant to 28 U.S.C. §1391(a)(1).

## ALLEGATIONS COMMON TO ALL CLAIMS

### A&P And Stop & Shop Are Direct Competitors

9.      A&P is a leading supermarket retailer, operating under a variety of well-known trade names across the mid-Atlantic and Northeastern United States. A&P operates over 350 conventional supermarkets, combination food and drug stores, and discount food stores in Connecticut, Delaware, Massachusetts, Maryland, New Jersey, New York, Pennsylvania, Virginia, and the District of Columbia, with the great majority of stores being in the tri-state area. A&P's annual sales exceed $6 billion.

10.     A&P's operations are conducted under a variety of trade names, or "banners," including A&P, Pathmark, SuperFresh, Super Foodmart, The Food Emporium, Food Basics, and Waldbaum's. A&P has been in the grocery business since 1859 and currently employs over 35,000 employees.

11.     Stop & Shop is one of this region's largest supermarket chains, with over 375 outlets in Connecticut, Maine, Massachusetts, New Hampshire, New Jersey, New York, and Rhode Island. Stop & Shop is owned by Ahold USA.

12.     A&P and Stop & Shop are direct competitors in almost all of their markets, with stores often in close proximity to each other.

13.     On December 12, 2010, A&P filed for Chapter 11 bankruptcy protection in the Southern District of New York and is operating as a Debtor-In-Possession while it undertakes a massive restructuring of its business..

**Vitale Was A Senior A&P Executive With Intimate Knowledge of Trade Secrets**

14.     Until he abruptly resigned from A&P on February 14, 2011, Vitale had worked at A&P for his entire working life, starting with the company in December 1971 as a part-time clerk at Pathmark. He became a full time employee of A&P in October 1975. In March 1988, he became General Store Manager and then Product Manager in May 1991.

15.     In September 2007, Vitale was promoted to Regional Vice President of Store Operations. In March 2008, he became Vice President of Operations. As of February 14, 2011 when he abruptly resigned from A&P, he was earning $212,000 annually and was one of only two Regional Vice Presidents at A&P and was the second most senior operator at A&P.

16.     As such a high-ranking executive, Vitale had direct access to A&P's most sensitive trade secrets and business strategies.

17.     A&P is in the midst of a massive restructuring effort aimed at successfully exiting bankruptcy. As such, A&P has developed a comprehensive restructuring strategy comprised of many elements including, but not limited to closing a large number of stores pursuant to internally generated profitability metrics and reallocating capital to other stores.

18.     Vitale was a party to all elements of A&P's turnaround plan and, in particular, to A&P's marketing and pricing strategies for the next 8-12 months, trade secrets which, if divulged to Stop & Shop, could cripple A&P's restructuring plan.

4

**Vitale And A&P Enter Into Incentive Program Award Agreements In 2009 And 2010**

19.     On June 12, 2009, Vitale entered the 2009 Long Term Incentive Program Restricted Share Unit Award Agreement (the "2009 Agreement"). The right to enter that program was offered to only a select few senior executives at A&P and participation was not mandatory. In consideration for receiving the benefits of that program from A&P, Vitale agreed in Paragraph 5 of the 2009 Agreement, entitled "Non-Competition," as follows:

> In exchange for the opportunity to participate in the Program, you agree that during the term of your employment, and for a period of eighteen (18) months following termination of your employment for whatever reason, except if you are terminated by the Company without cause, you will not, directly or indirectly (including but not limited to self employment and consulting), perform any work or services for any Competing Enterprise that is similar to or competitive with the work that you performed for the Company during the last twelve months of your employment with the Company. Competing enterprise shall mean any entity (i) that operates retail grocery stores selling food or food and general merchandise, or if you work in the Company's pharmacy organization, any entity that operates retail pharmacies and (ii) that has a store within 15 miles of any one of the Company's stores. For the same eighteen-month period, you also agree not to contact or solicit employees of the Company for the purpose of inducing such employees to leave the employ of the Company. If any aspect of this paragraph shall be determined under applicable law to be overly broad in duration, geo-graphical coverage, substantive scope, or otherwise, it shall be deemed narrowed to the broadest term permitted by applicable law and shall be enforced as so narrowed. (emphasis supplied).

A copy of the 2009 Agreement is annexed hereto as Exhibit "A."

20.     The identical clause is also contained in paragraph 6 of the 2010 Long Term Incentive Program Grant of Non-Qualified Stock Options (the "2010 Agreement") that Vitale chose to enter on or about September 3, 2010. Again, that perquisite was offered to only a select few of the senior managers at A&P and participation was not mandatory. A copy of the 2010 Agreement is annexed hereto as Exhibit "B."

21.     The 2009 Agreement and 2010 Agreement each contain identical provisions, at ¶¶

5

6 and 7, respectively, concerning "Trade Secrets and Proprietary Information" and providing:

> You hereby acknowledge that you have and/or will have access to and become acquainted with various trade secrets and proprietary information of the Company and/or Releasees and other confidential information relating to the Company and/or Releasees.  You covenant that you will not, directly or indirectly, disclose or use such information except (i) as necessary and appropriate in connection with your employment by the Company and/or Releasees, (ii) as is required pursuant to a judicial or administrative subpoena, or (ii) if such information is already in the public domain (other than by reason of your breach of your obligations here-under).  Subject to the exceptions set forth above, you agree that you will adhere in all respects to the Company's policies against the use or disclosure of such information.  (emphasis supplied).

22.     The restrictive covenants of the 2009 Agreement and the 2010 Agreement prevent Vitale only from working for a competitor for the stated time, and Vitale's experience by no means confines him to working in the grocery industry.  It is perfectly permissible for Vitale to bring his operational skills to a retailer that does not compete with A&P, such as Toys R Us, Staples or any number of large retailers in the area with whom A&P does not compete.  Instead, Vitale chose to breach his agreements by going to work with A&P's primary competitor.

**Vitale Has Unique Knowledge Of A&P's Trade**
**Secrets, Proprietary And Other Confidential Information**

23.     Prior to his abrupt resignation on February 14, 2011, Vitale, who had worked for A&P for forty years, was the second most senior Operator at A&P.  Vitale has a wealth of infor-mation regarding the operational capabilities, strengths and weaknesses of A&P, all of which could easily be exploited by Stop & Shop, A&P's main competitor, should Vitale work there.

24.     The A&P trade secrets, proprietary information and confidential information of which Vitale is aware based upon his position in the company include, but are not limited to:

        a.      A&P's marketing strategies for the next 8 to 12 months, including Q1 marketing programs such as A&P's Spring Continuity program;

        b.      A&P's pricing strategies, including in connection with A&P's competition

6

with Stop & Shop, and merchandising strategies. Having knowledge of A&P's pricing strategies will enable Stop & Shop to undercut A&P's prices and frustrate the turnaround;

      c.     A&P's Sales and Labor forecasts for 2011;

      d.     The identities of those A&P stores that are on A&P's Store Closing List and are going to close, as well as stores that are on the Store Closing Watch List (stores that are being considered for closure). Obviously, that knowledge will provide Stop & Shop with a huge competitive advantage in determining its pricing and marketing strategies and in determining where and how to allocate its capital. It will also allow Stop & Shop to aggressively target A&P stores that Vitale knows are on the brink of failure in order to drive them out of business more quickly and destroy A&P's ability to turn them around;

      e.     The capabilities of key store operators such as Store Managers, Department Managers at the store level (e.g., deli, produce) and District Managers. With such knowledge of these key persons' abilities and job performance evaluations, Vitale will be able to provide Stop & Shop with information to enable it to selectively poach A&P's top performers, thereby further harming A&P's business;

      f.     The specific labor count and detailed payroll information for each and every store that he supervised;

      g.     The category detail for each store, e.g., the volume each particular store does in deli, produce, etc.; and

      h.     A&P's sales transfer program which has been designed and is being utilized to retain/redirect customers to nearby stores after closings via promotions, discounts, etc.

25.   A&P is in the midst of a massive operational restructuring requiring it to, among other things, design an optimal store footprint for its hundreds of current locations which will involve disposing of unprofitable stores while developing and implementing plans to make its remaining stores more appealing to customers.

26.   Vitale, as Regional Vice President, was intimately involved in the restructuring and has knowledge of A&P's plans regarding its store footprint, possible store closings, marketing and general strategy to emerge from Chapter 11. In addition, Vitale has knowledge of the performance of the stores he oversees, the personnel at such locations, A&P's marketing and pricing strategies for 2011 and, perhaps most importantly, A&P's plans with respect to its competitors, including, but not limited to, Stop & Shop.

27.   Making Vitale's true objectives clear, in addition to the trade secrets that Vitale possesses simply by virtue of his tenure and senior executive position, Vitale took with him physical copies of A&P's most sensitive trade secrets.

28.   In particular, A&P has learned that prior to announcing his departure, Vitale took with him the following highly sensitive A&P trade secrets and confidential information:

### Strategic Planning & Store Closures

- Document dated February 10, 2011 setting forth schedule to deal with closing stores
- Documents for each store showing Sales Growth, Competitor Impact and Sales Transfer for 2009 and 2010, budget for 2011 and forecast for 2012-14
- Draft – A&P Store Closure Analysis – Summary dated February 3, 2011
- Draft – A&P Store Closure Analysis – Store by Store dated February 3, 2011
- Draft letter dated February 9, 2011 from Sam Martin to Associates
- Preliminary Draft: Stores Under Consideration for Closure dated February 8, 2011
- Store Closing Timetable dated February 9, 2011
- Store Closing Winter 2011

8

- Store Rationalization Assumptions prepared by Lazard
- Store Rationalization Communication (Draft)
- E-mail dated January 12, 2011 from Elizabeth Oswald to Vitale & others re "Store Ranking Report as of P11 with attached report.
- E-mail dated February 7, 2011 from Ali Rizvi to Vitale & others re "Store Rationalization" with attached "A&P Stores for Rationalization Analysis – Less than (2.0%) LTM margin excluding Liquor."
- E-mail dated February 8, 2011 from Carlton Mandry to Vitale & others re "Proposed Closed Stores."

**Competitors**

- A&P Competitive Attack Program – February 2011
- ShopRite Opening in Patchogue, NY – January 2011
- ShopRite Opening in Uniondale, NY – Feb 2011
- Spreadsheet listing all A&P stores & their competitors, with information about each
- E-mail dated February 5, 2011 from John Moritz to Vitale & others re "Competitive Program Update for Mondays."

**Financial**

- Profit & Loss Statements dated February 7, 2011
- Profit & Loss Statements – Pathmark 2010 printed February 20, 2011
- Profit & Loss Statements – Pathmark South 2010 and Pathmark East 2010 printed February 21, 2011
- Spreadsheet showing EBITDA/EBITDAR for 2009, 2010 and Period 11YTD

**Marketing**

- Campaign ROI analysis – 8 hour sale
- 2010 Holiday Marketing Post Mortem
- Holiday Rewards Continuity Analysis

**Sales**

- The Food Emporium – Weekly Sales:  February 13, 2011
- Legacy South – Weekly Sales:  February 13, 2011
- Liquor – Weekly Sales:  February 13, 2011
- Pathmark South – Weekly Sales:  February 13, 2011
- Preliminary Weekly Sales:  January 22, 29, February 5, 12, 2011
- Sales by Primary Competitor – Preliminary Weekly Sales – February 12, 2011
- Spreadsheet (about 100 pages) showing weekly sales of all stores for

2008, 2009, 2010
- E-mail dated February 13, 2011 from Joe Voelkel to Vitale & others re "Pharmacy Figures – week ended 02 12 11."

**Training & Job Performance**

- District Manager Training Packet – Conference Call Outline
- Leadership Skills Assessment for Managers/Supervisors using Behaviorally-Anchored Rating Scales
- Operations Training Meeting

29.     Stop & Shop can utilize the trade secrets that Vitale possesses to derail A&P's restructuring plan, causing irreparable harm to A&P.

**Vitale Resigns From A&P On February 14, 2011 And
Announces That He Is Going To Work For Stop & Shop**

30.     Vitale abruptly announced on Monday, February 14, 2011 that he was resigning from A&P and would be commencing work at Stop & Shop the following week, February 21, 2011.

31.     The restrictive covenants contained in the 2009 Agreement and the 2010 Agreement make it absolutely clear that Vitale is prohibited from working for Stop & Shop until August 2012. There can be no dispute that Stop & Shop is a "Competing Enterprise" as that term is defined in the agreements, i.e., Stop & Shop "operates retail grocery stores selling food or food and general merchandise" and clearly has stores within 15 miles of A&P's stores. See Exhibits "A" and "B."

32.     After Vitale announced his resignation, he was informed by Derek Kinney, A&P Vice President of Human Resources, that he was contractually prohibited from going to work for Stop & Shop until the expiration of the restrictive covenants contained in the 2009 Agreement and 2010 Agreement he had entered into with A&P.

33.     On the following day, February 15, 2011, Christopher McGarry, A&P Senior

10

Vice President & General Counsel, telephoned Vitale, once again emphasized to Vitale his contractual obligations to A&P, and informed him in no uncertain terms that should he join Stop & Shop in violation of his contracts, legal action would be commenced against both him and Stop & Shop.

34.     Notwithstanding his contractual obligations to A&P, Vitale was and is intent on breaching those obligations and going to work for Stop & Shop immediately and informed A&P that he would be commencing his employment there on February 21, 2011.

35.     On February 17, 2011, counsel for A&P sent a letter via e-mail and overnight mail to Tom Hippler, Executive Vice President and General Counsel for Stop & Shop, with a copy to Vitale, voicing A&P's strenuous objection to Vitale's employment at Stop & Shop and "with the hope that S&S will inform Mr. Vitale that it cannot employ him unless and until the expiration of his contractual obligation to A&P or an acceptable and appropriate agreement is reached with A&P concerning same. S&S's failure to do so will result in A&P's taking all appropriate legal action without further notice against Mr. Vitale, S&S and any and all other responsible parties."

36.     As set forth in the letter, Vitale, as one of only two Regional Vice Presidents (which in terms of operations is below only the Chief Operating Officer), had operational responsibility for half of A&Ps fleet of stores, including its stores in Long Island.

37.     Vitale was hired by Stop & Shop to oversee its Long Island, New York stores, the same geographic area which was part of Vitale's responsibility at A&P prior to his abrupt resignation on February 14, 2011. Vitale possess vital trade secrets about all aspects of the A&P stores in that region.

38. Vitale cannot perform the job as overseeing the Long Island market without using

11

A&P's trade secrets.  It is <u>inevitable</u> that Vitale will disclose A&P's trade secrets.

39.     Vitale's employment by Stop & Shop in violation of his agreements with A&P will cause A&P irreparable harm and give Stop & Shop an unfair and unjust advantage in the marketplace.

40.     On February 17, 2011, outside counsel for Stop & Shop contacted A&P's outside counsel to see if an appropriate agreement could be reached.  Although numerous discussions took place and draft agreements were exchanged, the parties were unable to reach an agreement.

41.     Vitale, upon information and belief, already has communicated some of A&P's trade secrets, proprietary information and confidential information to Stop & Shop.

### FIRST CLAIM FOR RELIEF AGAINST VITALE
### (Breach Of Contract)

42.     A&P repeats and realleges the allegations contained in paragraphs 1 through 41 above as though such allegations were fully set forth herein.

43.     Vitale's agreements with A&P are valid and enforceable contracts.  The restrictive covenants and non-solicitation provisions contained in the 2009 Agreement and 2010 Agreement are reasonable and reasonably necessary to protect A&P's protectable interests.

44.     A&P has fully performed its obligations under the two agreements.

45.     Vitale has breached and threatens to continue breaching his restrictive covenants and non-solicitation agreements.

46.     As a result of Vitale's breaches of contract, A&P has been injured and faces continued irreparable injury.

47.     A&P has no adequate remedy at law.

## SECOND CLAIM FOR RELIEF AGAINST VITALE
### (Breach Of Fiduciary Duty/Breach Of Duty Of Loyalty)

48.     A&P repeats and realleges the allegations contained in paragraphs 1 through 47 above as though such allegations were fully set forth herein.

49.     During the term of his employment with A&P, Vitale at all times owed A&P a duty of undivided loyalty.

50.     Among the duties that Vitale owed to A&P is the duty not to divulge A&P's trade secrets.  That duty survives Vitale's termination of employment.

51.     In violation of his duties of loyalty to A&P, Vitale took A&P's trade secrets, proprietary information and confidential information before he announced his resignation and subsequently took it with him to Stop & Shop.

52.     Vitale has breached his duty of good faith and undivided loyalty to A&P.

53.     As a result of Vitale's breaches of his fiduciary and loyalty duties to A&P, A&P has been injured and faces continued irreparable injury.

54.     A&P has no adequate remedy at law.

## FIRST CLAIM FOR RELIEF AGAINST STOP & SHOP
### (Tortious Interference With Contract)

55.     A&P repeats and realleges the allegations contained in paragraphs 1 through 54 above as though such allegations were fully set forth herein.

55.     Vitale's agreements with A&P are valid and enforceable contracts.  The restrictive covenants and non-solicitation provisions contained in the 2009 Agreement and 2010 Agreement are reasonable and reasonably necessary to protect A&P's protectable interests.

56.     Stop & Shop was aware of the restrictive covenants and non-solicitation provis-

13

ions contained in the 2009 Agreement and 2010 Agreement at the time that Stop & Shop hired Vitale.

57.     Stop & Shop intentionally has interfered with Vitale's contracts with A&P and has induced him to breach such contracts by, inter alia, employing him long before the expiration of the restrictive covenants contained in Vitale's two agreements with A&P .

58.     As a result of Stop & Shop's tortious interference with A&P's contracts with Vitale, A&P has been injured and faces continued irreparable injury.

59.     As a proximate result of Stop & Shop's unlawful conduct, A&P has suffered financial loss and other damages to be determined at trial, but believed to be in excess of $1 million.

60.     Stop & Shop's actions were and are willful and malicious and are such as to warrant an award of punitive damages against Stop & Shop and in favor of A&P in the amount of $1 million.

### SECOND CLAIM FOR RELIEF AGAINST STOP & SHOP
### (Aiding And Abetting Breach Of Fiduciary Duty)

61.     A&P repeats and realleges the allegations contained in paragraphs 1 through 57 above as though such allegations were fully set forth herein.

62.     Stop & Shop knew that Vitale was a fiduciary to A&P and that he was breaching his fiduciary relationship by accepting employment with Stop & Shop and performing the other wrongful conduct alleged herein.

63.     As a result of Stop & Shop's aiding and abetting of Vitale in the breach of his fiduciary duties to A&P, A&P has been injured and faces continued irreparable injury.

64.     As a proximate result of Stop & Shop's unlawful conduct, A&P has suffered

14

financial loss and other damages to be determined at trial, but believed to be in excess of $1 million.

65.    Stop & Shop's actions were and are willful and malicious and are such as to warrant an award of punitive damages against Stop & Shop and in favor of A&P in the amount of $1 million.

## REQUESTED RELIEF

WHEREFORE, plaintiff A&P respectfully requests that this Court enter judgment in its favor and against defendants Vitale and Stop & Shop and award A&P an Order:

A.    On A&P's two claims for relief against Vitale, enjoining him for eighteen (18) months from going to work for any competitor of A&P, including, but not limited to, Stop & Shop and violating any other provisions of the 2009 Agreement and 2010 Agreement or breaching any of his fiduciary duties to A&P;

B.    On A&P's two claims for relief against Stop & Shop, enjoining Stop & Shop or any person, agent, officer or entity acting on its behalf, from (1) employing or having any contact with Vitale or (2) inducing and/or aiding and abetting any other A&P employees from violating their agreements with A&P or breaching any of their fiduciary duties to A&P;

C.    On A&P's two claims for relief against Stop & Shop, awarding A&P compensatory damages of at least $1 million and punitive damages of $1 million;

D.     Awarding A&P such other and further relief as this Court may deem just and

proper.

Dated:  New York, New York
        April 4, 2011

                              PRYOR CASHMAN LLP


                              By:
                                   James S. O'Brien, Jr., Esq.
                                   jobrien@pryorcashman.com
                                   Sarith Reddy, Esq.
                                   sreddy@pryorcashman.com
                              7 Times Square
                              New York, New York  10036-6569
                              (212) 421-4100

                              Attorneys for Plaintiff

## WAREHOUSING, DISTRIBUTION AND RELATED SERVICES AGREEMENT

THIS WAREHOUSING, DISTRIBUTION AND RELATED SERVICES AGREEMENT the "Agreement") is made as of March 7, 2008 between THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., a Maryland corporation with principal offices located at 2 Paragon Drive, Montvale, New Jersey 07645 ("A&P") and C&S WHOLESALE GROCERS, INC., a Vermont corporation with principal offices located at 7 Corporate Drive, Keene, New Hampshire 03431 ("C&S" and together with A&P, the "Parties").

### W I T N E S S E T H :

WHEREAS, C&S operates warehouse and distribution centers, performs procurement and wholesale supply services, and provides related operational services to its customers; and

WHEREAS, A&P has agreed to retain C&S to provide A&P certain warehousing and distribution services, and certain wholesale supply services, on the conditions set forth in this Agreement and the schedules hereto.

NOW, THEREFORE, in consideration of the mutual covenants and obligations hereinafter set forth, the Parties hereto, intending to be legally bound, hereby agree as follows:

1. *Preliminary Matters.* The Parties agree that as of the Effective Date, this Agreement shall supersede all prior agreements between C&S and A&P, and between C&S and Pathmark Stores, Inc. ("Pathmark"), as more fully described in Schedule 1.2 hereto. The Parties also agree that future Approved Budgets will comport with the form of the Interim Budget attached hereto as Exhibits 1.4(a)-(g) so as to facilitate the budget process described in Schedule 8.

2. *Warehousing Services.* During the Term of this Agreement, C&S shall provide to A&P comprehensive, managed warehouse, distribution and related services on the terms and conditions set forth in this Agreement and the schedules hereto, as more particularly described in Schedule 2. Together, the Warehousing Services, the Transportation Services, the Procurement Services, the Purchasing Services and the Additional Services shall be referred to as the "Services."

3. *Facilities and Fixed Assets.* Commencing upon the Effective Date, C&S shall perform the Warehousing Services from the Facilities listed in Schedule 3, and/or from such other warehouse facilities as the Parties may determine from time to time, subject to the terms and conditions set forth in Schedule 3 of this Agreement. C&S shall maintain the Facilities, and shall invest in such Fixed Assets in support of the operations at the Facilities, as more particularly described in Schedule 3.

4. *Transportation Services.* The Parties agree that A&P will be responsible for the overall direction of all outbound transportation to the A&P Stores, and that C&S will hire, on a sub-contracted basis, common carriers for the delivery of Merchandise to certain A&P Stores all in accordance with the terms and conditions set forth in Schedule 4. C&S shall manage inbound transportation for the account of A&P in accordance with the terms set forth in Schedule 4. In all events, A&P shall have the right to assume responsibility for all inbound and outbound transportation and C&S shall perform such transportation services as A&P may direct.

5. *Other Services.* C&S agrees to provide certain Other Services on behalf of A&P in accordance with the terms and conditions set forth in Schedule 5. In consideration for providing the Other Services, C&S shall receive the remuneration set forth in Schedule 5.

1.

6. **_Services Fees_**. As consideration for performing the Services under this Agreement, C&S shall receive from A&P payment of the Services Fees as set forth in Schedule 6 hereof.

7. **_Procurement and Purchasing Services; True Net Cost_**. Subject to the terms and conditions of this Agreement, A&P agrees to buy from C&S certain Merchandise for use or resale at the A&P Stores. The allocation of responsibilities for the procurement and purchase of such Merchandise between A&P and C&S shall be as set forth in Schedule 7 hereof. C&S agrees that neither it nor any of its Affiliates shall directly or indirectly retain any Trade Funding from the A&P Volume; rather, C&S shall rebate all such Trade Funding to A&P so that A&P will be responsible for paying to C&S no more than C&S's True Net Cost for all Merchandise sold by C&S to A&P. C&S and its Affiliates are expressly prohibited from earning any Trade Funding with respect to the A&P Volume except as may be specifically directed by A&P under this Agreement.

8. **_Preparation of Initial Budget and Annual Budgets; Shared Savings_**. The Parties shall agree upon and regularly review annual budgets for all Services prepared to an engineered standard on a facility-by facility basis in accordance with Schedule 8. The Initial Approved Budget and all subsequent Approved Budgets shall be prepared and reviewed in accordance with the terms and conditions set forth in Schedule 8.

9. **_Remuneration and Payment of Services Fees and Operating Costs_**. A&P will pay C&S all Services Fees and will pay or reimburse C&S for all Costs incurred by C&S in the provision of the Services under this Agreement, as set forth in Schedule 9 hereto.

10. **_Indemnification and Insurance; Force Majeure_**. Schedule 10 sets forth indemnification rights and insurance arrangements between the Parties.

11. **_Term and Termination_**. This Agreement will commence on March 30, 2008 (the "Effective Date"), and shall remain in effect through September 29, 2018, unless earlier terminated in accordance with Schedule 11.

12. **_Miscellaneous_**. The general conditions and definitions set forth in Schedule 12 are incorporated herein by reference and made a part hereof

**IN WITNESS WHEREOF,** the undersigned have executed this Agreement as of the date first written above.

**THE GREAT ATLANTIC AND PACIFIC TEA COMPANY, INC.**

By: _____
Name:   Eric Claus
Title:   President and Chief Executive Officer

**C&S WHOLESALE GROCERS, INC.**

By: _____
Name:   Richard B. Cohen
Title:   Chairman and Chief Executive Officer

2

## SCHEDULE 1

## PRELIMINARY MATTERS

***Preliminary Statement***   The Parties wish to materially change their contracting relationship as it exists under the Prior Agreements (as defined below). Specifically, the Parties wish to establish, as of the Effective Date, a strategic "open-book" relationship to merchandise, procure, warehouse and distribute supermarket products to the A&P Stores in the most cost-efficient manner possible. The Parties further desire to collaborate with respect to the exploration, evaluation and implementation of practices and procedures to reduce A&P's total supply chain costs and allow each Party to share equitably in the benefits of such practices and procedures.

1.1   ***Effective Date***.  The "Effective Date" shall mean March 30, 2008.

1.2   ***Prior Agreements***. The Parties agree that, subject to the terms hereof, and except as expressly provided herein, the Master Supply Agreement by and between A&P and C&S dated October 27, 2003 (the "Master Agreement"), the Supply Agreement by and between A&P and C&S dated June 27, 2005 (the "Ocean Agreement"), and the First Amended and Restated Supply Agreement by and between Pathmark and C&S dated January 29, 1998 (the "Pathmark Agreement"), together with all amendments thereto (collectively, the "Prior Agreements") shall remain in force and effect until the Effective Date. On the Effective Date, this Agreement shall replace and supersede the Prior Agreements in all respects, the Prior Agreements shall be terminated and no longer in effect as of the Effective Date, and neither of the Parties hereto shall thereafter have any rights, duties or obligations under the Prior Agreements; provided, however, with respect to any claim or cause of action that becomes known subsequent to the Effective Date (and should not have been known, through ordinary diligence, prior to the Effective Date) and arises from or is related to any set of facts or circumstances which arose or existed prior to the Effective Date, the terms and conditions of the respective Prior Agreement (including those related to dispute resolution) shall control. Notwithstanding anything to the contrary set forth herein, Section 4.13 of the Pathmark Agreement and A&P's obligation to pay a portion of the multiemployer pension plan withdrawal liability as set forth therein shall survive the Effective Date and shall remain in full force and effect. All claims that were known to a complaining Party, or through ordinary diligence should have been known by such Party, prior to the Effective Date shall be deemed waived and the complaining Party shall be forever barred from raising such claims as against the other, except as otherwise set forth in this Schedule 1.2 or with respect to such amounts as have been properly billed before the date hereof but not paid as of the date hereof. For the avoidance of doubt, no Affiliates of the Parties are or shall be deemed to be Parties to this Agreement. Notwithstanding the foregoing, each Party represents and warrants to the other Party that none of its Affiliates possesses any claims against such other Party. A&P hereby represents that as the sole shareholder of Pathmark, A&P has all proper right and authority to consent to the termination of the Pathmark Agreement and to waive any and all potential Pathmark claims and causes of action in accordance with the terms of this Schedule 1.2.

1.3   ***Supply Chain Evaluation***.  A&P and C&S wish to work together to create a network of distribution centers that, to the greatest extent possible, are dedicated exclusively to the service of A&P and the delivery of products to the A&P Stores. Throughout the Term, C&S shall use commercially reasonable efforts to consolidate into Dedicated Facilities the A&P Volume handled by C&S under this Agreement. The Parties further wish to identify opportunities to achieve warehousing and distribution efficiencies and to implement practices and policies that will minimize A&P's costs throughout the supply chain. In furtherance of these goals, the Parties agree to jointly retain during the "Ramp-Up Period" (defined in Schedule 1.4 below) and annually thereafter the consulting firm of Tompkins Associates or an equivalent firm ("Consultant") to conduct a comprehensive evaluation of the entire A&P supply chain and to make recommendations with respect to, among other areas, supply chain network configuration, facilities design, technology and systems design, loss prevention and health and safety, budgeting, operating best practices and policies, performance standards and shared cost-savings/incentive-sharing opportunities. The Parties by mutual agreement

3

shall retain Consultant and shall each pay fifty percent (50%) of the fees incurred by Consultant in providing services pursuant to Schedule 1.3. The Parties anticipate that they will spend no more than $1.0 Million annually, in the aggregate, in fees and expenses paid to the Consultant. The Parties shall incorporate the recommendations of Consultant in the creation of the Initial Approved Budget and subsequent Approved Budgets, the Service Specifications and Performance Measures, and other warehousing practices and policies that will be implemented on or after the Effective Date.

1.4  ***Ramp-Up Period and Interim Budget***.    The period commencing with the Effective Date and continuing through September 28, 2008 shall be referred to as the "Ramp-Up Period." During the Ramp-Up Period, the Parties shall operate in accordance with the budgeted costs and income items set forth in the following Exhibits: Exhibit 1.4(a) (Budget Summary), Exhibit 1.4(b) (Total Warehousing Costs), Exhibit 1.4(c) (Total Transportation Costs); Exhibit 1.4(d) (Total Direct Overhead Costs); Exhibit 1.4(e) (Capital Expenditures); Exhibit 1.4(f) (Total Services Fees); and Exhibit 1.4(g) (Total Center-Store Margin) (collectively, Exhibits 1.4(a)-(g) shall be referred to as the "Interim Budget").    Certain components of the Interim Budget shall also serve as the "Baseline Budget" which the Parties shall use for the purpose of computing whether and to what extent a Cost Savings Gainshare Incentive Fee is payable to C&S as described in Schedule 8.11 hereof.    The Initial Approved Budget and all future Approved Budgets will comport with the form of the Interim Budget, and will include the same Budget Summary and categories of line item expenses and revenues.

1.5  ***Initial Approved Budget***.  Commencing promptly after the Effective Date, the Parties shall conduct meetings for the preparation of the Initial Approved Budget and the Service Specifications in accordance with Schedule 8 hereof. The Parties shall collaborate with the Consultant with respect to the preparation of the Initial Approved Budget and the Service Specifications and the Parties shall make best efforts to complete them not later than thirty (30) days prior to the commencement of the First Contract Year.  In the event that any of the Initial Approved Budget and/or the Service Specifications have not been agreed upon by the Parties at least thirty (30) days prior to the first day of the First Contract Year, any such dispute shall be resolved in accordance with the dispute resolutions provisions set forth in Schedule 12 of this Agreement. The Initial Approved Budget shall be the Approved Budget for the First Contract Year. The Parties agree that the Initial Approved Budget and each subsequent Approved Budget shall cover periods corresponding to C&S's fiscal year, which is a 52-week period (or 53-week period every five to six years) that runs through the last Saturday in September. The Parties will make any prorations necessary to account for the Ramp-Up Period or any 53-week Contract Year. The schedule of Contract Years for the Term is set forth on Exhibit 1.5 attached hereto.

## SCHEDULE 2

## WAREHOUSING SERVICES

2.1    *Warehousing and Logistics Services*.  During the Term of this Agreement, C&S shall provide to A&P (and, with respect to any A&P Operated Facility, A&P shall perform on its own account) comprehensive managed warehousing and logistics services on the terms and conditions set forth in this Agreement (the "Warehousing Services"), including but not limited to: the daily operation and maintenance of the Facilities; handling and confirming receipt of inbound orders; loading and unloading; storage; selection; pallet building; case labelling (where applicable); providing off-site resources for logistics management or analytical services; processing claims for recovery of lost or damaged Merchandise, as applicable; the Recyclable Material Processing Services; providing trained, skilled personnel; and interfacing with A&P personnel, all in accordance with the performance standards set forth below and the operating procedures and Service Specifications (the "Services Standards") and targeted performance levels (the "Performance Measures") that shall be set forth in the Service Specifications and made a part of this Agreement. The Service Specifications shall also set forth (i) A&P's obligations that relate to the Services performed by C&S including, but not limited to, timely provision of orders, ad forecasts, resolving issues with short-coded product, product discontinuances, new items, etc., and (ii) the penalties that shall be assessed to C&S for its failure to perform the Services in compliance with the Service Specifications; provided that in no event shall C&S be required to pay any such penalty to the extent: y) C&S has already borne Costs resulting directly from the failure to perform for which the penalty is being assessed (i.e., in the case of controllable Costs in excess of the Approved Budget); and z) the amount of such Costs exceeds the amount of the penalty prescribed under the Service Specifications.  The Service Specifications may be revised from time to time in accordance with Schedule 8.

2.2    *Additional Services*.  From time to time, A&P may request the provision of additional services not within the scope of Services ("Additional Services").  In such event, A&P and C&S shall negotiate in good faith to mutually agree upon a description of such Additional Services, including revisions to the Service Specifications, if necessary, and an adjustment of the Approved Budget, as determined or adjusted in accordance with Schedule 8.  For the purposes of this Agreement, to the extent the Additional Services are mutually acceptable to C&S and A&P, such Additional Services shall form part of the Services hereunder and the Parties will mutually determine an appropriate adjustment to the Services Fee, if applicable.

2.3    *Exclusivity*.  Except as may be otherwise stated in this Agreement, A&P agrees that for the Term of this Agreement it shall not contract with any third party other than C&S for the rendering of the Warehousing Services, except with regard to promotional, seasonal, cross-dock, DSD and other high-velocity or specialty Merchandise.  Notwithstanding the foregoing, nothing in this Agreement shall be deemed to prohibit or restrict A&P from performing Warehousing Services on its own account or from contracting for any Warehousing Services with any Affiliate of A&P, provided that neither the Base Management Fee nor the Administrative Management Fee payable to C&S under this Agreement shall be reduced as a result of A&P exercising its rights under this Schedule 2.3. Without limiting the foregoing in any way, the Costs related to the Facilities and Fixed Assets shall continue to be chargeable to A&P during the Term of the Agreement even to the extent such are underutilized in the event of A&P's exercise of its rights under this Schedule 2.3.

2.4    *Performance Standards*.  In addition to the Services Standards and Performance Measures, C&S covenants and agrees to perform the Services and to maintain and operate the Facilities (including the cleanliness thereof) with the degree of care, skill and diligence consistent with an experienced, reputable warehouseman operating a warehouse and distribution service network in the Northeast United States, to the extent C&S's ability to perform the Warehouse Services in accordance with such standards is not prohibited by the Approved Budget, the Flex Budget or the withholding by A&P of any required approval.  C&S covenants and agrees that it shall use commercially reasonable

5

efforts to identify for A&P all necessary and desirable steps and measures to permit C&S to comply with its obligations under this Schedule so as to provide A&P the opportunity to include such steps and measures in the Approved Budget or the Flex Budget and to provide any required approvals.

2.5     **_Warehousing Services to be Provided from the Facilities._**     The Warehousing Services will be provided from the Facilities (as defined in Schedule 3.1) and from such other applicable facilities as may be permitted under the terms of this Agreement.

2.6     **_C&S Covenants_**.   In addition to any of its other obligations as set out in this Agreement, C&S covenants and agrees that during the Term it will, consistent with the performance standards set forth in Schedule 2.4 above:

    (a)  take all necessary and desirable steps and precautions to protect Merchandise from weather, water, theft, vandalism and all other reasonably foreseeable hazards and damages;

    (b)  comply with all federal, provincial and municipal governmental laws, rules, regulations, by-laws, zoning legislation, guidelines, ordinances, orders of any municipal or other government body, and any other restrictions, covenants and other limitations (including, without limit, those in respect of environmental and health and safety matters) applicable to the occupation and operation of the Facilities, the providing of the Services and the Other Services and to otherwise comply with the terms and conditions of this Agreement. C&S shall keep in full force and effect all licenses, registrations and other qualifications imposed by any applicable governmental authorities necessary to occupy and operate the Facilities, and to provide the Services and to otherwise fulfill the terms and conditions of this Agreement;

    (c)  except as otherwise instructed by A&P, not place any Merchandise in proximity to any other products or any material that is or may be noxious, flammable, hazardous or whose characteristics may adversely affect the quality, fitness or intended purpose, merchantability and other characteristics of the Merchandise or otherwise cause in any manner whatsoever Merchandise to be adulterated or deteriorate; provided that C&S shall use commercially reasonable efforts to notify A&P where any of the Service Specifications or provisions in the Approved Budget are inconsistent with the protections referred to in this sub-schedule (c); and

    (d)  maintain all of the Fixed Assets in good working order and promptly (or as soon as practicable in the case of refrigeration equipment) repair and/or replace any Fixed Assets that may prevent or hinder C&S's ability to provide the Services in accordance with the terms and conditions of this Agreement. C&S covenants and agrees that it shall use commercially reasonable efforts to identify all necessary and desirable maintenance and repair requirements outlined in this sub-schedule (d) for A&P and to provide A&P with an opportunity to include such requirements in the Approved Budget.

2.7     **_Independent Contractor_**.   It is expressly intended by the Parties hereto and each Party hereby specifically warrants, represents and agrees, that each Party (the "Performing Party" for the purposes of this Schedule) is an independent contractor having its own established place of business and all persons assisting the Performing Party in the performance of its obligations under this Agreement are and shall be deemed the employees of the Performing Party or under contract to the Performing Party for all purposes, and not of the other Party or any Affiliate of the other Party. It is further intended and agreed between the Parties that each Party shall have sole control of the manner and means of performing its obligations under this Agreement. The specific means of accomplishing the purposes of this Agreement shall be left to the discretion of the Performing Party, provided that the purpose of this Agreement is accomplished in a cost-effective manner and otherwise in a manner intended to benefit A&P and C&S. Each Party agrees that its officers, managers, or other management or supervisory personnel employed by them shall effect such management, direction and control in the sole and complete discretion of such Party.

6

2.8 **_Inventory Control._** The Parties hereto agree that they will agree to appropriate inventory control procedures (e.g., physical inventories and cycle counts, as applicable) as part of the Service Specifications. The Parties will further include in the Service Specifications procedures for regulating inventory levels (including investment buy formulas, taking into account the cost of money, and allocations of responsibility for inventory level overages or shortfalls) and handling short-coded or excess product.

2.9 **_Recyclable Material Processing._** C&S agrees that throughout the Term of this Agreement it shall manage the processing of certain non-hazardous recyclable materials located at the A&P Stores or held at the Facilities for use or resale at the A&P Stores including, but not limited to, cardboard, pallets and plastic materials (the "Recyclable Material") on A&P's behalf (the "Recyclable Material Processing Services") and shall be considered to be part of the Warehousing Services. Recyclable Material expressly excludes: (i) Merchandise and other items traditionally handled through reclamation; and (ii) environmentally hazardous materials or food waste. Specifically, A&P agrees to bale or package in an orderly fashion all Recyclable Material at the A&P Stores, and to label all such packages, so as to permit their collection, inventory, and the tracking of their movement, as set forth in the Service Specifications. C&S agrees to package Recyclable Materials at the Facilities in the same manner. C&S agrees to recover all Recyclable Materials from the A&P Stores, and to assemble the packages of all Recyclable Materials at the Facilities, and shall arrange for the transport of all such materials to an appropriate location for processing. All Recyclable Materials will be processed by C&S in accordance with the Service Specifications. C&S agrees to establish and maintain a means of tracking and reporting the movement of all Recyclable Materials from the A&P Stores and the Facilities, as well as the redemption or other processing of such Recyclable Materials on a unit-by-unit basis. The Parties acknowledge and agree that such a tracking process does not exist as of the Effective Date, but in no event will C&S establish and deploy a tracking system later than ninety (90) days after the Effective Date. Any revenue derived by C&S in the course of rendering the Recyclable Material Processing Services with respect to the sale, recycling, and/or other disposition of the Recyclable Materials shall be credited in full to the account of, and paid over to A&P (either directly from the recycler or through C&S as and when received by C&S), in accordance with Schedule 9 hereof on the first Weekly Statement following the receipt thereof by C&S. All labor, transportation and other costs incurred by C&S in performing the Recyclable Material Processing Services shall be deemed to constitute Costs, as that term is hereinafter defined. Unless otherwise agreed in the Service Specifications, the A&P Stores will not load dunnage or other refuse on C&S's or its contractors' trailers. C&S covenants and agrees that it shall use its commercially reasonable efforts to obtain no less than market rates on all revenue derived from the rendering of Recyclable Material Processing Services.

## SCHEDULE 3

## FACILITIES AND FIXED ASSETS

3.1 **_Facilities._**  Commencing on the Effective Date and continuing throughout the Term of this Agreement, C&S (and, in the case of the Edison GMDC Facility, A&P) shall perform all Warehousing Services and Transportation Services hereunder from the following warehouse and/or distribution centers that are owned or leased by C&S or one of its Affiliates, and any new or replacement warehouse and/or distribution centers, subject to Schedule 3.5 (the "Facilities"):

(a)  Facilities Dedicated Exclusively to Service of A&P Stores (each, a "Dedicated Facility"):

| Facility | Product Category(ies) |
|---|---|
| 1. Metro Woodbridge, NJ (GDC) | Dry Grocery |
| 2. Metro Woodbridge, NJ (PDC) | Fresh |
| 3. New Brunswick, NJ (KDC) | Dry Grocery |
| 4. North Brunswick, NJ (NBSC) | Dry Grocery/Bakery |
| 5. Dayton, NJ | Frozen |
| 6. Central Islip, NY* | Dry Grocery |
| 7. Bethlehem, PA** | Dry Grocery |
| 8. Dunmore, PA | HBC/GM |

\* Central Islip is subject to shutdown agreements between C&S and its union workforce dated as of February 4, 2008, that contemplate that all volume will be migrated out of the Central Islip Facility no later than March 29, 2008.  Pursuant to Schedule 3.5 hereof, the Parties have entered into a definitive agreement of even date herewith with respect to the closure of Central Islip, the transfer of such volume to other C&S Facilities, and the application of this Agreement to the closure of the Central Islip Facility.

\*\* Bethlehem is a two-building Dry Grocery complex with an adjoining entryway.  A&P is the sole customer serviced by the building known as "Bethlehem II" at 49 Hanoverville Rd., Bethlehem, PA.

(b)  Facilities Servicing A&P and at least one other C&S Customer (each, a "Shared Facility"):

| Facility | Product Category(ies) |
|---|---|
| 1. North Hatfield, MA | Fresh |
| 2. Westfield, MA | Frozen |
| 3. Windsor Locks, CT | Dry Grocery |
| 4. Aberdeen, MD | Frozen |
| 5. North East, MD | Fresh |

(c)  Facilities Operated by A&P (each, an "A&P Operated Facility"):

| Facility | Product Category(ies) |
|---|---|
| 1. Edison (GMDC) Edison, NJ | HBC/GM |

(d)  Shipping Origin.  A schedule setting forth each of the A&P Stores that are serviced by each of the Facilities listed above has been annexed to this Agreement as Exhibit 3.1.  Subject to a change in the roster of Facilities set forth in 3.1(a) and (b) above by the establishment of new, replacement or additional Facilities as set forth in Schedule 3.5, the shipping origin of A&P Stores may be changed in accordance with this Schedule 3.1(d).  A&P may instruct C&S to

8

change the shipping origin of one or more A&P Stores; provided, however, any change to the shipping origin of A&P Stores, whether singly or in the aggregate, that could reasonably be expected to (a) increase or decrease the volume of any Shared Facility by ten percent (10%) or more or (b) have an adverse effect with respect to C&S's collective bargaining agreements, warehouse capacity, benefits, or pension obligations (including pension withdrawal liability and contribution requirements), shall require the mutual written consent of C&S and A&P. In addition, the Parties may agree, at any time, to change the shipping origin of any one or more A&P Stores. Changes of shipping origin of A&P Stores that occur during the course of any Contract Year shall be reflected in a Flex Budget.

3.2   *Dedicated Facilities.*   The Parties acknowledge and agree that the Dedicated Facilities are exclusively utilized to support the A&P Stores serviced from such Facilities.  C&S covenants and agrees that it will not perform any services or other activities of any sort whatsoever at any of the Dedicated Facilities (a) on behalf of its other customers, (b) on its own account, or (c) for A&P Stores other than the A&P Stores which are normally serviced by such Dedicated Facilities, except to the extent expressly consented to in advance and in writing by A&P.  Furthermore, C&S agrees it will not, without A&P's prior written approval, warehouse at or transfer to or from any Dedicated Facility any Merchandise that is not intended for use or resale at the A&P Stores serviced by such Dedicated Facility, nor will C&S otherwise transfer Merchandise between any Facilities.   To the extent A&P gives written approval to C&S with regard to the activities for other customers otherwise prohibited in the preceding two (2) sentences, C&S will account for and record any incremental expense incurred in connection with such activities and such expenses will not be considered Costs under this Agreement and will therefore not be chargeable to A&P.  The Parties will periodically explore additional opportunities to transfer the A&P Volume to Dedicated Facilities. To the extent any Shared Facility ceases to hold any significant amount of case volume for C&S customers other than A&P Volume for a period of time not less than one Contract Quarter, A&P and C&S shall jointly determine if such Shared Facility shall be treated as a Dedicated Facility for the purposes of this Agreement.

3.3   *A&P Operated Facilities.*  A&P shall be permitted to occupy and operate any A&P Operated Facility, and to perform the Warehousing Services or any other activities at such A&P Operated Facility in any manner of its choosing, subject to A&P's obligations under this Agreement.  As of the date of this Agreement, A&P self-distributes HBC/GM product to some of the A&P Stores from the A&P Operated Facility listed in Schedule 3.1 above.  It is contemplated by the Parties that C&S will assume the operations at such Facility as soon as reasonably possible after the Effective Date and that such operation will be subject to the terms of this Agreement.  However, the transfer of this Facility, and the assumption of the employees, contracts and operations associated therewith shall be subject to the Parties' successful negotiation and execution of a separate definitive agreement related thereto.

3.4   *Real Estate Obligations.*   A statement of all Real Estate Obligations as of the Effective Date has been annexed to this Agreement as Exhibit 3.4. Subject to Schedule 3.5, below, C&S covenants and agrees that it shall not alter or add to any of the terms of the current Real Estate Obligations (or any of the future Real Estate Obligations established pursuant to Schedule 3.5 below) without first notifying A&P in writing. Furthermore, C&S agrees that to the extent it enters into any real estate financing transactions with respect to an existing Facility for the exclusive benefit of C&S (e.g., a sale-leaseback transaction) which would give rise to Costs in excess of what is set forth in the Approved Budget for the Contract Year in which such real estate financing transaction was entered into, C&S will hold A&P cost neutral with respect to such real estate financing transactions for such Contract Year and for all future Contract Years. The preceding sentence shall not apply to renewals, extensions or modifications of existing or future Real Estate Obligations in the ordinary course of business.

3.5   *Facility Relocation, Closure, Opening or Construction.*  From time to time, C&S may propose to undertake a relocation or closure of a Facility; material enhancement of a dedicated Facility requiring capital expenditure that is not already reflected in the Capital Expenditures component

9

of the Approved Budget; or opening or construction of a new Facility dedicated to A&P (each, a "Facility Decision"). Prior to undertaking a Facility Decision, C&S covenants and agrees that it will consult with A&P with regard to such Facility Decision. The Parties shall discuss in detail and in good faith (a) any capital expenditure requirements related to the Facility Decision and the impact of such expenditures on the Capex and Approved Budgets, including ROI assumptions; (b) the costs related to the Facility Decision, including any applicable shut-down expenses and liabilities, severance, pension withdrawal liability and pension contributions for prior underfunding, start-up costs, stranded facility costs, and cost of money for either party (their respective "Facility Decision Costs"); (c) the projected operational savings that will accrue once the Facility Decision Costs have been fully mitigated; and (d) the impact of the Facility Decision on C&S's compliance with the Service Specifications and other performance of the Services under the Agreement. Except as provided below, neither Party shall be required to bear any of the other Party's Facility Decision Costs and such Facility Decision Costs shall not be deemed Costs as defined in Schedule 8.3 except as otherwise set forth in a definitive agreement between the Parties. The Parties agree that there are a number of alternatives with respect to the allocation of the costs, capital investment and savings related to prospective Facility Decisions that the Parties may choose to pursue, among them:

(i) making provision for the revised Occupancy Costs in the Approved Budget and amortizing all the Facility Decision Costs, as borne respectively by the Parties, over the remaining life of the Agreement (or sooner if agreed by the Parties) in the Approved Budgets and any Flex Budgets and maintaining a full open-book relationship;

(ii) charging A&P in accordance with (iii) below and crediting the Parties from the operational savings on the transferred A&P Volume on a proportional basis (proportional to their respective Facility Decision Costs) until they have mitigated in full their respective Facility Decision Costs at which time all ongoing operating savings shall be shared by the Parties in accordance with the Shared Savings and the Gainshare provisions set forth in Schedule 8.11(d), and then reverting to an open-book relationship reflecting the ongoing costs of operation and the Shared Savings that will accrue therefrom;

(iii) converting to a fixed, percentage-based upcharge reflecting the costs of warehouse, transportation and direct overhead, for such transferred A&P Volume only, based on the historical costs of operations for the twelve (12) month period immediately preceding the Facility Decision, subject to adjustment for the cost of fuel; or

(iv) some other arrangement to be agreed to by the Parties.

The foregoing alternatives are for illustration only and do not represent a binding obligation on either Party, and nor will they be construed as foreclosing the Parties from considering other alternatives with respect to Facility Decisions.

C&S's proposal for any Facility Decision, and A&P's consent thereto, shall be set forth in a separate definitive agreement or amendment to this Agreement. Except as otherwise set forth in such definitive agreement, in no event shall a Facility Decision either (x) increase the aggregate Costs of the Services; or (y) reduce the Performance Standards, as (x) and (y) both relate to the A&P Stores serviced by the original Facility that is affected by the Facility Decision and the Facility to which the former Facility's volume is transferred. All actual costs including Facility Decision Costs incurred by either Party in connection with this Schedule 3.5 shall be subject to audit by the other Party pursuant to Schedule 12.5. Notwithstanding the above, in the event the Parties do not reach agreement as to the appropriate resolution to any proposed Facility Decision, C&S may nonetheless undertake such Facility Decision, provided: (1) A&P's proportional share of the projected operational savings shall exceed the aggregate Facility Decision Costs for A&P for the remaining Term; (2) the "payback" or full mitigation of the Facility Decision Costs for A&P is projected to occur during the Term of this Agreement; and (3) C&S will implement sub-

schedule (ii) in this Schedule 3.5 hereof. However, to the extent A&P's Facility Decision Costs exceed A&P's proportional share of the operational savings on the transferred volume for any Contract Year (the "Facility Decision Cost Excess"), then: (A) C&S shall be responsible for funding A&P's Facility Decision Cost Excess for the Contract Year; and (B) C&S shall be entitled to receive such share of the Gainshare (as defined hereafter in Schedule 8) for that Contract Year (in excess of 50% and up to 100%) as may be required to fully mitigate A&P's Facility Decision Cost Excess (which C&S has funded) for that Contract Year, plus any carryover from prior Contract Years. Notwithstanding the foregoing, C&S shall be responsible for funding A&P's Facility Decision Costs for any Contract Year only to the extent A&P acts in a commercially reasonable fashion with respect to the incurrence of such Facility Decision Costs, including but not limited to negotiating payment terms that are not unduly front-loaded and other terms that a reasonable person under similar circumstances would negotiate for itself, and C&S has a full and complete opportunity to audit such Facility Decision Costs in advance of its obligation to fund.

3.6     *Fixed Assets.* A&P recognizes, understands and agrees that C&S may be required to purchase, lease or license equipment or systems specifically dedicated to support the Services and necessary to meet C&S's obligations to A&P under this Agreement. Except with respect to any Emergency Expenditures, the Parties agree that C&S shall not purchase, lease, license or otherwise acquire any new Fixed Assets, or change the financing terms of any current Fixed Asset financing arrangements, which would give rise to Costs in any Fiscal Accounting Period in excess of what is set forth in the Approved Budget without first obtaining the written consent of A&P, which consent shall not be unreasonably withheld, delayed or conditioned. Any and all Fixed Assets which give rise to Costs chargeable to A&P hereunder shall be depreciated in accordance with C&S's depreciation schedule for such Fixed Assets as set forth on the Depreciation Schedule annexed hereto this Agreement as Exhibit 3.6.

11

## SCHEDULE 4

## TRANSPORTATION SERVICES

4.1     *General*.  For so long as A&P may direct during the Term of this Agreement, C&S shall be responsible for inbound transportation of Merchandise to such Facilities and A&P Stores as A&P may direct, and shall provide such services in accordance with the terms of this Schedule 4.  C&S will further be responsible for the routing and overall management of outbound transportation and delivery of Merchandise from such Facilities to such A&P Stores as A&P may direct, and C&S shall hire third-party contract carriers to deliver certain Merchandise to the A&P Stores, all in accordance with this Schedule 4 or otherwise as directed by A&P.  Notwithstanding the foregoing, the A&P Stores bannered "Pathmark" are currently serviced by Grocery Haulers, Inc. ("GHI") under a contract directly with A&P, and C&S has no management or oversight responsibility with respect to GHI or the outbound transportation of Merchandise to the A&P Stores bannered "Pathmark".  Until such time as A&P may amend its contract with GHI, GHI shall be responsible for the routing and delivery of all shipments of Merchandise to the A&P Stores bannered Pathmark.  Together, C&S's management of the inbound and outbound transportation and hiring of contract carriers as set forth herein shall be referred to as the "Transportation Services".  The Parties agree that, in its sole and exclusive discretion, A&P may elect, upon commercially reasonable notice to C&S, to assume exclusive responsibility for, or to contract with any third party to manage, the Transportation Services; provided that any Base Management Fee or Administrative Management Fee payable to C&S hereunder this Agreement shall not be reduced as a result of A&P exercising its right under this Schedule 4.1; and provided further that A&P shall be responsible for assuming from C&S such tractors, trailers and other similar assets owned or leased by C&S that C&S can demonstrate were utilized in its performance of the Transportation Services and which will not be used by C&S as a result of A&P exercising its rights hereunder.  C&S agrees to act in a commercially reasonable fashion to mitigate any expense or losses associated with such assets prior to A&P's assumption thereof.

4.2     *Inbound Transportation*.  Subject to A&P's rights in Schedule 4.1 above, C&S shall manage inbound delivery of Merchandise as it is shipped from A&P's vendors to the Facilities.  C&S shall use commercially reasonable efforts to solicit bids from, and to otherwise negotiate with, reputable third-party contract carriers for inbound transport rate proposals to obtain the lowest possible rate for the delivery of Merchandise from the A&P vendors to the Facilities.  A&P shall have the right to audit and/or monitor C&S's bidding processes with regard to inbound transportation.  Backhaul income and any transportation expense related thereto, are budgeted as separate line items reflected in the cost of transportation in the Interim Budget and the Approved Budgets, except for inbound freight income in connection with Fresh Products, which will be credited or paid over to A&P as part of the Gross Profit Rebate described in Schedule 7.14(b).  C&S will continue to pass on backhaul income to A&P, provided such backhaul lanes continue to exist, as an offset to the Total Transportation Costs in the Interim Budget and any Approved Budget.  Backhaul income in the Shared Facilities, calculated on a net basis, reflecting the backhauls that terminate at such Facilities, shall be passed through to A&P in an amount proportional to A&P's purchase volume from the applicable Shared Facility.  C&S shall provide to A&P, on a continuous and ongoing basis, a report setting forth all negotiated contract rates for the transport of Merchandise from the A&P vendors to the Facilities (the "Negotiated Inbound Rates").  Subject to the availability and capacity of such contract carriers, C&S shall invoice A&P the Negotiated Inbound Rates for any delivery of Merchandise from the A&P vendors to the Facilities.

4.3     *Outbound Transportation*.  The Parties agree that C&S, in cooperation with A&P and subject to A&P's strategic direction and right to assume exclusive responsibility for the Transportation Services, shall be responsible for the design, development and implementation of the outbound transportation activities, including, but not limited to, transportation network configuration and routing, and for the overall management of Transportation Services supporting the A&P Stores, except for the A&P Stores serviced by GHI as set forth in Schedule 4.1.  C&S agrees to arrange, through the hiring of reputable contract carriers on a sub-contracted basis, for the diligent,

professional and expeditious transport of such Merchandise to the A&P Stores, except for the A&P Stores serviced by GHI. C&S agrees to arrange, through its contract carriers, for the provision of transportation services, including such accessorial and special services that may relate to transportation services and may be requested by A&P, and to adhere to, and to cause its contract carriers to adhere to, the standards of service, delivery specifications, and other service requirements as set forth in the Service Specifications. C&S acknowledges and agrees that it will be responsible to A&P for the performance of the transportation services by such contract carriers. C&S's performance of the Transportation Services set forth herein shall be based upon the Service Specifications and other projections, information and directions provided by A&P to C&S. All costs associated with outbound transportation to the A&P Stores shall be estimated and agreed to by the Parties, shall be regarded as Costs herein, and shall be incorporated into and made a part of the Interim Budget and any Approved Budget. Title to Merchandise shall remain with C&S until (i) such time as the trailer containing Merchandise exits the loading dock of the applicable Facility, in the case of Merchandise that is picked up from the Facility by a contract carrier arranged for by A&P; or (ii) such time as the trailer containing Merchandise is received at the destination A&P Store, in the case of Merchandise that is picked up from the Facility by a contract carrier arranged for by C&S. Theft of Merchandise or Fixed Assets from an A&P Store location shall not be the responsibility of C&S, unless it is theft committed by a contract carrier or other party for whom C&S is responsible under this Schedule.

## SCHEDULE 5

## OTHER SERVICES

5.1     *General.* C&S agrees to perform certain services (the "Other Services") on A&P's behalf that are incidental or in addition to the Services, as specified in this Schedule 5. The Parties agree that the costs incurred by C&S in connection with the rendering of the Other Services, and all compensation earned by C&S in connection therewith, shall not constitute Costs but shall remain the sole responsibility of C&S and shall be excluded from the calculation of the Interim Budget and shall not be incorporated into or made a part of any subsequent Approved Budgets under Schedule 8.

5.2     *Coupon Processing Services.* C&S agrees that it will perform coupon processing services with respect to all of the A&P Stores (excluding those stores that as of the Effective Date are bannered as "Pathmark" and excluding stores that A&P may acquire, unless otherwise agreed in writing by the Parties). C&S agrees that it shall commence performing such services as soon as reasonably practicable following the Effective Date (which shall be no later than August 2008), and A&P agrees that it will provide written notice of termination to Coupon Controls, Inc. forthwith after executing this Agreement. The Coupon Processing Services will be performed in accordance with terms and conditions established by A&P and C&S and set forth in the Service Specifications, provided however that such terms shall not in any fashion limit C&S's ability to fulfill the Coupon Income Guarantee (as defined herein). A&P will pay to C&S a fee of $1.0 Million ($1,000,000) per Contract Year for such services, which will be payable in accordance with Schedule 9 hereof. C&S will remit to A&P all coupon processing net income received in the course of performance of the coupon processing services, and further, C&S guarantees that the coupon processing net income will be no less than $1.0 Million ($1,000,000) per Contract Year (the "Coupon Income Guarantee"). For purposes of clarification, the coupon processing net income remitted to A&P (a) is in addition to the face value of the coupon; (b) is in addition to the eight cent ($.08) handling fee; (c) specifically excludes the $1.0 Million coupon processing fee payable by A&P to C&S; and (d) is expressly net of out-of-pocket costs payable to C&S's coupon processor, which as of the Effective Date is $.01 per coupon. If the coupon processor raises its fees to C&S during the Term, C&S will meet with A&P to determine whether any such increase is chargeable to A&P, which the Parties will consider in good faith depending on the level of net income remitted to A&P prior to such change, with the understanding that if C&S is materially exceeding the Coupon Income Guarantee, C&S will be able to pass through the increased fee. Each week, C&S will remit the estimated amount of the face value of those coupons submitted to the coupon clearing house. At the end of each month, in connection with the monthly reconciliations set forth in Schedule 8.5.1, C&S will remit all coupon processing net income (including the $.08 handling fee) collected by C&S, and A&P will be assessed a customary interest charge for the coupon receivables C&S carries. If in any Contract Year the coupon processing net income remitted by C&S to A&P is less than $1.0 Million, then C&S will pay to A&P an amount equal to the difference between the Coupon Income Guarantee and the actual net income remitted by C&S during such Contract Year. A&P may require C&S to modify the vendor fees it charges related to coupon processing, provided that the Coupon Income Guarantee will be of no force or effect if this or any other action by A&P is the cause of such income being below $1.0 Million, and C&S shall in such case still be entitled to the fee stated in this Schedule 5.2. Notwithstanding the foregoing, the Parties further agree that: (a) if the coupon business materially changes during the Term and there is a material reduction in the prevalence of paper coupons, or (b) if A&P demonstrates that its Retailer Performance Funds are negatively impacted by more than the net income remitted by C&S and there is a direct causal nexus between the coupon processing activity and the loss of such funding, then the Parties shall discuss an appropriate modification to the coupon processing services and/or the fee payable by A&P to C&S hereunder.

5.3     *Accounts Receivables Deductions.* C&S agrees that throughout the Term of this Agreement it shall process and collect on A&P's behalf all accounts receivable deductions that are due A&P from the A&P vendors ("Accounts Receivables Deductions") and which A&P may direct C&S to

so collect. A&P will provide instructions pursuant to which C&S will process all deductions. Where practicable, A&P will provide C&S documentation in support of the Accounts Receivable Deductions. If C&S makes a deduction on A&P's behalf and the manufacturer disputes the amount of the deduction made by C&S, and the amount of the deduction is in accordance with the instructions provided to C&S by A&P, A&P agrees to indemnify, defend and hold C&S harmless from any claim by the manufacturer related to such deduction to the extent of the deduction (but not including any C&S fees).   C&S shall not be entitled to income from any deduction successfully disputed by a manufacturer. C&S will cooperate with A&P in the defense of any such claim to the extent it is a valid claim. If after taking a deduction and paying the amount of such deduction to A&P, C&S repays any such deduction, C&S will, upon presentation of supporting documentation, offset such amount against amounts otherwise due from C&S to A&P or add such amount to A&P's next Weekly Statement. Purchasing Service Level calculation shall not be adversely affected by an interruption in the supply of Merchandise from a manufacturer to C&S if the interruption is caused by the refusal of the manufacturer to ship product to C&S and such refusal is attributable to a disputed deduction that C&S has taken on A&P's behalf at A&P's direction.   C&S and A&P shall share equally all processing fees related to the Accounts Receivables Deductions. Commencing on the Effective Date, C&S will add to each deduction from a vendor its then current fee to process the deduction made by C&S on A&P's behalf, which as of the Effective Date is: (i) $150 for deductions equal to or less than $3,000 and (ii) 5% for deductions in excess of $3,000. A&P may amend the terms and conditions of the Accounts Receivables Deductions on 48 hours notice to C&S; provided however, A&P agrees to guarantee to C&S that C&S's share of the income from Accounts Receivables Deductions, net of any expenses related thereto, in any Contract Year shall be no less than $5.0 Million ($5,000,000) (the "A/R Deduction Guarantee"). To the extent C&S's share of the net income from Accounts Receivables Deductions in any Contract Year is less than the A/R Deduction Guarantee, prorated for the Ramp-Up Period, A&P will pay to C&S an amount equal to the difference between the A/R Deduction Guarantee and the net income actually realized by C&S for Accounts Receivables Deductions for such Contract Year.

5.4   *Reclamation.*   C&S agrees that throughout the Term of this Agreement it shall perform reclamation services (the "Reclamation Services") with respect to all damaged, discontinued or unsalable Merchandise located at the A&P Stores in accordance with the terms and conditions set forth in Exhibit 5.4 hereto. Notwithstanding the foregoing, C&S shall not perform Reclamation Services with respect to any HBC/GM product for A&P Stores bannered "Pathmark" on the Effective Date (regardless of whether such stores are re-bannered after the Effective Date) as these services are performed on A&P's behalf by an alternative service provider. A&P agrees to guarantee C&S's income for Reclamation Services as follows:   C&S's net income for Reclamation Services related to A&P Volume shall be no less than (a) $ 3,550,000 for the Ramp-Up Period; (b) $ 6,390,000 for the First Contract Year; (c) $6,035,000 for the second Contract Year; and (d) $1,926,000 for each Contract Year after the second Contract Year (collectively, the "Reclamation Income Guarantee"). To the extent C&S's net income from Reclamation Services for any period set forth in the preceding sentence is less than the applicable guaranteed amounts, A&P will pay to C&S an amount equal to the difference between the guaranteed net income set forth in (a)-(d) in the preceding sentence, as applicable, and the net income from Reclamation Services actually realized by C&S during such periods.

15

## SCHEDULE 6

### SERVICES FEES

6.1.   *General.* In addition to any other amounts payable hereunder, as consideration for performing the obligations under this Agreement, A&P shall pay to C&S the Services Fees, as set forth and defined below.  In addition to the Base Management Fee and the Administrative Management Fee, A&P shall also pay to C&S the Incremental Volume Fee, the Cost Savings Gainshare Incentive Fee and the Gross Margin Performance Share if certain conditions are satisfied, as described below.   For purposes of this Agreement, the Base Management Fee, the Administrative Management Fee, the Incremental Volume Fee, the Cost Savings Gainshare Incentive Fee and the Gross Margin Performance Share shall be referred to herein as the "Services Fees."  Services Fees shall also include (a) the fees and/or income guarantees by A&P with respect to the Other Services as set forth in Schedules 5.2, 5.3 and 5.4 (together, the "Other Services Fee") and (b) any fees later agreed to by the Parties, including for Additional Services.

6.2    *Fees.*

(a) Base Management Fee.  The "Base Management Fee" will be $20.0 Million ($20,000,000) per Contract Year (prorated for the Ramp-Up Period) commencing on the Effective Date, as adjusted pursuant to Schedule 6.4 hereof.  The Base Management Fee shall be payable to C&S in accordance with the terms and conditions set forth in Schedule 9 hereof.

(b) Administrative Management Fee.  In connection with C&S's provision of corporate and administrative services and personnel, C&S shall be entitled to an "Administrative Management Fee" in an amount equal to $23.0 Million ($23,000,000) per Contract Year (prorated for the Ramp-Up Period) commencing on the Effective Date, as adjusted pursuant to Schedule 6.4 hereof.  The Administrative Management Fee shall be payable to C&S in accordance with the terms and conditions set forth in Schedule 9 hereof.

6.3    *Incentive Compensation Fees.*  In addition to the Base Management Fee and the Administrative Management Fee and the Other Services Fee, C&S may be entitled to receive the following fees (the "Incentive Compensation Fees").

(a) Incremental Volume Fee.  To the extent A&P's total net sales (as defined by US Generally Accepted Accounting Principles ("GAAP"), consistently applied) exceeds $9.40 Billion ($9,400,000,000) (the "Incremental Volume Fee Trigger") in any Contract Year, C&S will be entitled to an "Incremental Volume Fee" in the amount equal to Two-Tenths of One Percent (0.20%) of all net sales volume in excess of the Incremental Volume Fee Trigger.   The Incremental Volume Fee, if any, shall be calculated in connection with the reconciliation performed by A&P and C&S following the completion of the year-end reconciliation at the end of each Contract Year, as set forth in Schedule 8.5.3 and the Incremental Volume Fee will be invoiced to A&P on the Weekly Statement immediately following completion of such year-end reconciliation.  The Incremental Volume Fee will not be in effect for the Ramp-Up Period, but will be in effect for the remainder of the Term.  The Incremental Volume Fee Trigger will be equitably adjusted by the Parties for any acquisition or divestiture by A&P.

(b) Cost Savings Gainshare Incentive Fee.  During the Ramp-Up Period and in any Contract Year, C&S may be entitled to receive a "Cost Savings Gainshare Incentive Fee" as calculated in accordance with Schedule 8.11 hereof.

(c) Gross Margin Performance Share.  During the Ramp-Up Period and in any Contract Year, C&S may be entitled to receive a "Gross Margin Performance Share" as calculated in accordance with Schedule 7.15(c) hereof.

6.4   *CPI Adjustments to Certain Services Fees.*

(a)  The Base Management Fee and the Administrative Management Fee shall be adjusted at the beginning of each Contract Year, including the First Contract Year, by a percentage equal to that percentage by which the non-seasonally adjusted Northeast Urban Average All Items Consumer Price Index for All Urban Consumers (1982 - 1984 = 100), as available on the first day of the new Contract Year from the Bureau of Labor Statistics of the United States Department of Labor, or any successor index ("CPI"), varies from the same on such day of the prior year. The Parties agree that they will use the CPI report for the month of August each year as the basis for comparing to the prior year, as such report becomes available generally within two weeks of the close of August. For purposes of illustration, for the CPI adjustment that will occur effective upon the second full Contract Year commencing September 26, 2009, assume that the CPI for August 2008 is 258.1 and the CPI for August 2009 is 260.4, then the CPI adjustment effective September 26, 2009 is 260.4 - 258.1 = 2.3 / 258.1 = 0.89%. The then current Base Management Fee would be multiplied by 0.89% to arrive at the increase to the Base Management Fee. If the then current Base Management Fee was $20.0 Million, then the adjustment would be $178,000 and the new Base Management Fee would be $20,178,000. Notwithstanding the above, the adjustment shall have an annual cap of (i) 2.5% for the Base Management Fee only and (ii) 1.5% for the Administrative Management Fee only, provided in each case that the excess over the capped amount shall be accumulated and applied to future adjustments to the extent the CPI adjustment in any year is less than the capped amount. For example, if in the first adjustment cycle the CPI is 3.0%, the second adjustment cycle the CPI is 3.2% and the third adjustment cycle the CPI is 0.5%, for purposes of calculating the adjustment in the third cycle to the Base Management Fee, the accumulated excess for the prior two cycles is 1.2%, thus the adjustment is 0.5% + 1.2% = 1.7%. In the case of the Administrative Management Fee, the accumulated excess would be 3.2%, so the adjustment in the third adjustment cycle would be 0.5% + 1.0% = 1.5%, leaving an accumulated excess of 2.2% (3.2% less the applied deficit of 1.0%).

(b)  The Incentive Volume Fee Trigger shall be adjusted at the beginning of each Contract Year, including the First Contract Year, for the "CPI for All Food" for most recent period for which such calculation is "Final" as reported by the United States Department of Agriculture Economic Research Service (or, if not available from the USDA, then as reported by such other similar authority).

As set forth in Schedule 8.11, the Baseline Budget is also subject to a CPI adjustment pursuant to this Schedule 6.4.

**SCHEDULE 7**

**PROCUREMENT AND PURCHASING SERVICES; TRUE NET COST**

**I. GENERAL**

7.1   *Merchandise.*  Subject to the terms and conditions set forth in this Agreement, A&P agrees to purchase from C&S, and C&S agrees to sell to A&P, certain quantities of grocery, produce, dry bakery, candy, fresh meat, fresh deli, fresh seafood, dairy, frozen (mainline), frozen bakery, frozen meat, frozen commodities, ice cream, ice, HBC/GM, private label products, spices and supplies, and certain other merchandise in the product categories carried by C&S or A&P, but excluding the products set forth in Schedule 7.4(a) (collectively, "Merchandise") for use or resale at the A&P Stores.

7.2   *Exclusivity.*  Except as may be otherwise expressly stated in this Agreement, A&P agrees that for the Term of this Agreement it shall not contract with any unaffiliated third party other than C&S to procure and/or purchase Merchandise.

7.3   *A&P Stores.*  The term "A&P Stores" means all supermarket stores owned and operated by A&P or any of its Affiliates as set forth on Exhibit 3.1, attached hereto. In addition, the term "A&P Stores" shall include any new or replacement stores of A&P or any of its Affiliates in the geographic region of any of the A&P Stores, except that A&P Stores shall not be deemed to include any acquisition of ten (10) or more stores at one time by A&P, nor shall it include those stores which are acquired by A&P and which, at the time of such acquisition, are already serviced by a third party logistics, procurement and/or purchasing services provider other than C&S and A&P was required to assume such third party contract as a condition of acquiring such stores. Likewise, should C&S acquire a business that supplies A&P, whatever contracts are then in existence shall continue and shall not be automatically subsumed into this Agreement.

7.4   *Exclusions.*

(a)  Merchandise does not include the following products:

(i)   products that are available for purchase by A&P through direct store delivery ("DSD") or from cross dock vendors and designated as DSD or cross dock by A&P from time to time;

(ii)  certain seasonal GM or specialty products, which may include natural, organic and private label products, which are procured and purchased by A&P (such as those products stored at the A&P Crown Facility) from specialty suppliers who at the time of this Agreement are, or in the future may become, authorized by A&P in A&P's sole discretion to procure such product on behalf of A&P, provided however that A&P will in good faith support C&S and purchase such products through C&S if, in the reasonable opinion of A&P, C&S is cost competitive and provides similar services to the other vendors of such products;

(iii) Floral;

(iv) Tobacco;

(v)  Pharmacy (prescription medications); or

(vi) Liquor.

18

(b) Nothing in this Agreement shall prohibit or otherwise limit A&P's ability to (i) purchase either now or in the future any item that is available to A&P via DSD or cross dock, or (ii) designate on a temporary or long term basis any Merchandise as DSD or cross dock.

7.5    ***Procurement Generally***.  For purposes of this Agreement, to "procure" shall mean to negotiate directly or indirectly with the applicable vendor with respect to all terms of the purchase of goods including, but not limited to (as applicable), price, specifications, quantity, freight and Trade Funding (the "Purchase Terms").  Both Parties shall, with respect to the Merchandise it procures hereunder: (a) procure such Merchandise, and otherwise operate, in accordance with all applicable law and with prudent and ethical business practices;  (b) maintain a right-sized procurement organization staffed with competent and appropriately skilled buyers, and supported by a commercially reasonable systems infrastructure, all taking into account the level and nature of procurement activity;  and (c) in all cases negotiate for its most competitive price available with respect to the Merchandise that it procures.  The Parties acknowledge and agree that, in its sole and exclusive discretion, A&P may elect upon commercially reasonable written notice to C&S to assume exclusive or partial responsibility for procuring any or all of the Merchandise intended for use or resale at the A&P Stores as more fully set forth in Schedule 7.7(e) hereof; provided that any Base Management Fee or Administrative Management Fee payable to C&S under this Agreement shall not be reduced as a result of A&P exercising its right under this Schedule 7.5.  Subject to any exceptions contained in this Agreement, C&S shall continue to purchase all such Merchandise as set forth in Schedule 7.6, below.  A&P shall have exclusive responsibility for procuring the goods that are excluded from Merchandise as set forth in Schedule 7.4(a), hereof.  C&S shall not engage in the procurement of any Merchandise in connection with the A&P Volume except as is expressly stated in this Agreement.

C&S agrees it shall give reasonable notice to A&P of its Alternative Source Procurement activities at the Dedicated Facilities and will cease or modify such activities at the direction of A&P; provided however that if any A&P-directed change in C&S's activities impacts C&S's realization of Center-Store Margin, the Center-Store Margin Guarantee will be adjusted pursuant to 7.15(d).

7.6    ***Purchasing Generally***.  For the purposes of this Agreement, to "purchase" shall mean to:  (a) perform the physical act of purchasing goods through the execution and tender of purchase orders to an applicable vendor;  (b) to pay for such goods; and (c) to own such goods for the period immediately preceding their resale to A&P.  In providing purchasing services on behalf of A&P hereunder, C&S shall be prohibited from negotiating, or otherwise arranging for, Trade Funding of any sort or any other purchase terms in connection with the A&P Volume purchased by C&S.  In certain cases, but only as expressly provided for in the Schedules that follow, purchasing may include the collection of Logistics Funds for the account of A&P, which will be rebated to A&P in accordance with Schedule 7.14 hereof.  A&P shall have exclusive responsibility for purchasing the goods that are excluded from Merchandise as set forth in Schedule 7.4(a), hereof.

II.    **PROCUREMENT  AND  PURCHASE  OF  CENTER-STORE  CATEGORIES  OF PRODUCTS**

7.7    ***Center-Store Procurement and Purchasing***.

(a) Subject to Schedules 7.5 and 7.6, C&S and A&P shall jointly procure all Center-Store Products intended for use or resale at the A&P Stores.  Specifically, the Parties acknowledge and agree that each of A&P and C&S may conduct either joint or separate negotiations with Center-Store Products vendors regarding terms of purchase for the identical Center-Store Products Volume.  However, the Parties agree that A&P's negotiations with such vendors will relate exclusively to Retailer Performance Funds while C&S's negotiations with such vendors will relate exclusively to Logistics Funds.  The Parties further agree that, for so long as they jointly procure all Center-Store Products in accordance with this Schedule 7.7, the Parties shall use their commercially reasonable best efforts to avoid negotiating against one another for monetary funding relating to the same Center-Store Products Volume.  To this end, the

19

Parties agree that the Merchandising Teams from each of A&P and C&S shall meet at least once every Fiscal Accounting Period for the first six (6) Fiscal Accounting Periods of the First Contract Year and then once every Contract Quarter thereafter (or more frequently as may be directed by A&P) to review, discuss, develop and implement coordinated negotiation strategies that will permit A&P to realize the lowest possible cost for its Center-Store Products (net of Trade Funding).

(b) C&S shall purchase and manage the regular turn Center-Store Products inventory intended for use or resale at the A&P Stores. C&S's management of A&P's regular turn Center-Store Products inventory shall be based upon historic Center-Store Products turn information maintained by C&S, volume forecast requirements provided by A&P, product specifications supplied by A&P, and other projections and other information and direction provided by A&P to C&S.

(c) C&S shall purchase promotional or other high-velocity Center-Store Products inventory intended for use or resale at the A&P Stores as directed by A&P. C&S's purchase of promotional or high-velocity Center-Store Products shall be based upon A&P's advance estimates of promotional volumes, product specifications, purchase quantities, delivery dates, store-specific volume allocations (as further set forth in the Service Specifications) and other Center-Store Products information supplied by A&P to C&S, and other projections and other information and direction provided by A&P to C&S.

(d) C&S agrees that it shall maintain and provide A&P on a daily basis detailed inventory date code viewing and close dated reports with respect to all Center-Store Products that have code dates, intended for use or resale at the A&P Stores, along with any other reports or information required under the Service Specifications. The Parties recognize that C&S as of the Effective Date does not have a systemic solution for this obligation and is working with vendors on "open" code dating and external labeling to facilitate more efficient tracking of code dates on Center-Store Products, but that C&S shall establish such a system within a commercially reasonable time following the Effective Date.

(e) To the extent A&P elects to take over the procurement of all Center-Store Products in accordance with Schedule 7.5 above, C&S shall cease to procure Center-Store Products and A&P shall control and otherwise have exclusive responsibility for the procurement of all Center-Store Products for use or resale at the A&P Stores, and C&S will purchase and manage such Center-Store Products inventory in accordance with the terms of Schedule 7.7(b) above, or with such other instructions as may be given by A&P to C&S. A&P must elect to take over the procurement of all Center-Store products and may not do so on a partial basis, unless otherwise agreed to by C&S in writing. A&P must give six months notice of its intent to take over procurement of Center-Store Products, upon which notice C&S will immediately commence planning and effecting a transition of all A&P Volume into Dedicated Facilities, including new facilities if necessary and commercially reasonable. The Approved Budget will be Flexed appropriately for the costs of the transition or any reduction in Costs and any changes in occupancy costs from such transition. If, however, A&P requests, and C&S consents, to such A&P Volume of Center-Store Products remaining in Shared Facilities, A&P agrees that it shall, in all respects, abide by and act in accordance with C&S's Logistics Funding programs applicable to such Center-Store Products in such Shared Facilities.

(f) In the event that A&P exercises its right under Schedule 7.5 to assume responsibility for all procurement of Center-Store Products hereunder, then A&P shall have the right, with respect to the Dedicated Facilities and subject to the terms of any of C&S's unexpired Logistics Funds programs as described in Schedule 7.8(b), to engage in forward buying, diverting and other Alternative Source Procurement, and to direct C&S to perform activities in support of any Logistics Funds programs A&P may implement at the Dedicated Facilities.

**7.8** *Trade Funding with Respect to Center-Store Products.*

(a) It is the Parties' mutual intent to maximize Trade Funding for the benefit of A&P with respect to the Center-Store Products intended for use or resale at the A&P Stores, the full extent of which shall be either received by A&P directly from its vendors in the form of Retailer Performance Funds negotiated directly by A&P with its vendors or Logistics Funds negotiated directly by C&S and passed through from C&S to A&P in the Gross Profit Rebate as described in Schedule 7.14. Accordingly, for so long as the Parties jointly procure the Center-Store Products, the Parties shall cooperate to ensure that a coordinated effort is made with respect to the procurement of Center-Store Products. A&P understands and acknowledges that C&S's Logistics Funds programs apply to all of its volume with the applicable vendors, not just the A&P Volume, and that A&P's desire to cause C&S to amend or terminate a Logistics Funds program will require thoughtful consideration about the impact of such program on the balance of C&S's business, and may also impact the Parties' agreement with respect to the Center-Store Margin Guarantee as described in Schedule 7.15 below. For so long as the Parties jointly procure the Center-Store Products, the Parties will work together to try to maximize A&P's Trade Funding for Center-Store Products while simultaneously preserving C&S's Logistics Funds programs as they relate to the volume of other C&S customers. As requested by A&P, and where possible, C&S will in good faith negotiate with vendors to segregate the A&P Volume from C&S's overall program with such vendors, allowing A&P to receive all of its funding directly from such vendors. C&S further agrees that it will not unilaterally remove a vendor from the Crossroads® program with respect to the A&P Volume. On the first Tuesday following the end of each Fiscal Accounting Period (but in no event sooner than 2 days following the end of the Fiscal Accounting Period), C&S will provide to A&P movement reports that will permit A&P to bill vendors for A&P's Retailer Performance Funds for all Center-Store Products. C&S will not collect any Retailer Performance Funds from A&P vendors with respect to Center-Store Products unless expressly consented to in writing by A&P.

(b) Notwithstanding the foregoing, if, pursuant to Schedules 7.5 and 7.7(e) hereof, A&P assumes exclusive responsibility for procuring the Center-Store Products intended for use or resale at the A&P Stores, C&S shall, upon the effectiveness of such assumption, cease all communication, whether direct or indirect, with respect to Center-Store Products Volume for A&P. In such case, C&S shall not negotiate, directly or indirectly, on its own account or that of its other customers, any Logistics Funds or any other credits, allowances, rebates, discounts or other monetary or non-monetary funding based upon, in connection with or in any way related to A&P's Center-Store Products Volume. Additionally, C&S shall cease to collect, earn or realize any Trade Funding with respect to A&P's Center-Store Products Volume and the Approved Budget and the Center-Store Margin Guarantee will be adjusted accordingly. Notwithstanding the provisions of this sub-schedule (b), C&S shall be permitted to communicate with vendors of Center-Store Products solely with respect to unexpired Logistics Funds programs related to Center-Store Products Volume that were negotiated by C&S prior to A&P's exercise of its rights under Schedule 7.5 hereof, and to continue to receive funding with respect thereto, with the understanding that all monetary and non-monetary funding for such unexpired Logistics Funds programs, to the extent related to A&P's Center-Store Products Volume, shall be paid over to A&P in the Gross Profit Rebate in accordance with Schedule 7.14. Notwithstanding anything to the contrary set forth herein, C&S may negotiate with vendors of Center-Store Products with respect to Trade Funding programs or any other funding or other credit or allowances based upon, in connection with or in any way related to the volume of Center-Store Products procured and/or purchased for C&S's own account or for that of its other customers and unrelated to A&P's Center-Store Products Volume. In no event will C&S negotiate for any new or renewal deals with respect to the Center-Store Products Volume once A&P has exercised its rights under Schedule 7.5 and 7.7(e) hereof. C&S agrees it shall not make any communication to any vendor or other third party, or engage in any other conduct, that directly or indirectly reduces any economic benefits realized by A&P under its Trade Funding programs in connection with the Center-

21

Store Products Volume or that otherwise has an adverse impact on A&P's negotiations regarding such Trade Funding programs. In no event shall any Trade Funding program negotiated by C&S on its own account or that of its customers in any way prevent, interfere with, or otherwise take from A&P's realization of the full economic benefit of the Trade Funding programs A&P may negotiate for its own account with respect to the Center-Store Products Volume. A&P shall provide or substantiate a direct nexus between the prohibited actions described in this Schedule 7.8(b) and any adverse economic impact suffered by A&P.

**III.    PROCUREMENT AND PURCHASE OF FRESH CATEGORIES OF PRODUCTS**

**7.9    _Fresh Products Procurement and Purchasing_.**

(a) <u>Terms Applicable to all Fresh Products</u>.

(i)    <u>General</u>.  Throughout the Term of this Agreement, A&P shall control and otherwise have exclusive responsibility for the procurement of all Fresh Products for use or resale at the A&P Stores, and, except where otherwise stated hereunder, and unless specifically instructed otherwise by A&P, C&S will purchase and manage such Fresh Products inventory in strict accordance with A&P's direction and specifications. A&P shall be relieved of the confidentiality obligations under Schedule 12.23 hereof, but only to the extent necessary to communicate to A&P's Fresh Products vendors that A&P has exclusive responsibility for Fresh Products procurement. Subject to Schedule 12.23, A&P shall under no circumstances disclose to any third party any other terms and conditions of this Agreement or the terms of any agreements governing C&S's Logistics Funds. Under no circumstances shall C&S substitute for any Fresh Products alternative goods that do not possess the identical product specifications as those designated by A&P without A&P's express written consent. A&P agrees to respond in a timely manner to C&S requests to substitute Fresh Products in order to meet A&P's service requirements in the event a vendor designated by A&P is unable to fulfill an order. The processes governing the substitution of Fresh Products shall be set forth in the Service Specifications.

(ii)    <u>Procurement</u>.  A&P shall determine all Fresh Products specifications, shall designate vendor(s) from whom specific Fresh Products shall be purchased, and shall exclusively negotiate with vendors all Purchase Terms for Fresh Products including, but not limited to, cost and quantity, delivery date and allowances, rebates, Trade Funding and any other monetary or non-monetary funding for all Fresh Products intended for use or resale at A&P Stores. Notwithstanding the foregoing, C&S will continue to assess logistics-related charges and penalties to vendors that do not meet inbound delivery standards and, unless otherwise directed by A&P, C&S shall continue to negotiate inbound freight contracts with respect to certain Fresh Products in order to obtain a lower delivered cost of goods. C&S shall purchase all Fresh Products as instructed by A&P, all in strict accordance with the product specifications, vendor designations and other terms of purchase established by A&P.

(iii)   <u>Purchases – Regular Turn Inventory</u>.  C&S shall purchase and manage the regular turn Fresh Products inventory intended for use or resale at the A&P Stores. C&S's management of A&P's regular turn Fresh Products inventory shall be based upon historic Fresh Products turn information maintained by C&S, volume forecast requirements provided by A&P, product specifications supplied by A&P, and vendor designations supplied by A&P, and other projections and other information and direction provided by A&P to C&S. C&S shall be responsible for determining the quantity and delivery date of regular turn inventory for Fresh Products. C&S's purchase of replenishment Fresh Products inventory shall be in strict accordance with all terms of purchase established by A&P in its procurement of Fresh Products.

(iv)    <u>Purchases – Promotional</u>. C&S shall purchase promotional or other high-velocity Fresh Products inventory intended for use or resale at the A&P Stores. C&S's purchase of promotional or high-velocity Fresh Products (which shall include turkey, shrimp, crab and other high-tonnage categories of frozen commodities) shall be based upon A&P's advance estimates of promotional volumes, product specifications, vendor designations, purchase quantities, delivery dates, store specific volume allocations (as further set forth in the Service Specifications), and other Fresh Products information supplied by A&P to C&S, and other projections and other information and direction provided by A&P to C&S.

(v)    <u>Short Supply</u>. If C&S fails to maintain the Fresh Products turn inventory, or to otherwise purchase any Fresh Products in accordance with instructions received from A&P hereunder, so as to result in "stock-outs" or short supplies of Fresh Products, C&S shall promptly notify A&P of such fact and A&P shall instruct C&S as to the manner and vendor from whom C&S shall purchase such amount of replenishment Fresh Products as may be required to cure the short supply. In the case of a short supply, at A&P's request C&S shall be required to prove that it made a good faith attempt to purchase all Fresh Products from the Fresh Products vendors designated by A&P.

(vi)    <u>Inventory; Purchase Orders; Inspections</u>. Subject to the confidentiality provisions set forth in this Agreement, C&S will provide A&P, at the end of each business day, a report providing detailed transaction information with respect to the purchase orders for Fresh Products processed during such business day. A&P will review such purchase order information provided by the reports for Fresh Products and will provide C&S with such changes to the purchase orders as A&P may request prior to 10:00 a.m. on the next day following the delivery of such reports. Such reports will enable A&P to verify that C&S is purchasing Fresh Products in conformity with product specifications and vendor designations supplied by A&P. C&S will be responsible for the inspection of all Fresh Products prior to their acceptance at the Facilities by C&S to ensure strict compliance with A&P's Fresh Products specifications. C&S will provide A&P prompt notice of any Fresh Products that, in C&S's judgment, warrant complete or partial refusal. A&P and C&S shall collaborate, in good faith, to interact with vendors with respect to such Fresh Products and the Parties will minimize any out-of-code Fresh Products, including distribution of such Fresh Products to the A&P Stores. If A&P requests that C&S accept any Fresh Products that C&S would otherwise reject, A&P and C&S will agree on a plan of distribution for such Fresh Products and C&S will not be responsible for out-of-code or quality issues related to such product.

(vii)    <u>Forward Buying</u>. C&S agrees that it shall not engage in any forward buying of Fresh Products at the Dedicated Facilities except as may be expressly consented to in writing by A&P and, in such case, only in strict accordance with such terms and conditions as may be given by A&P to C&S. Nothing herein shall prohibit C&S from forward buying any Merchandise in any of the Shared Facilities.

(viii)    <u>Information and Reports</u>. C&S agrees that it shall maintain and provide to A&P on a daily basis detailed inventory date code viewing with respect to short coded items and close dated reports with respect to all Fresh Products intended for use or resale at the A&P Stores, along with any other reports or information required under the Service Specifications. In addition, C&S will provide A&P on a daily basis a daily inventory report on all fresh seafood slots/SKUs at the Facilities, which shall be prepared and maintained by C&S in accordance with mutually agreed upon polling schedules and other specifications. The Parties agree to collaborate closely on minimizing out-of-code Fresh Product.

  (ix) <u>Exact Weight - Meat</u>.  C&S shall invoice A&P for the exact weight of all fresh and frozen meat products in Facilities with voice selection technology, which information shall be scanned from the case packaging of the meat products as they are selected by C&S for delivery to the A&P Stores.  In Facilities that do not have voice selection technology, C&S will continue to bill on an average weight basis.  The Parties will agree on a method of calculating average weight, which will be set forth in the Service Specifications.

  (x) <u>Product Handling Requirements</u>.  C&S shall receive, store, handle and distribute all Fresh Products in strict accordance with the Fresh Products handling requirements set forth in the Service Specifications.

**7.10** ***Floral Products Procurement and Purchasing.*** A&P shall determine all Floral Product specifications and shall exclusively negotiate with vendors all terms of purchase for Floral Products including, but not limited to, cost and quantity, delivery date and allowances, rebates, Trade Funding and any other monetary or non-monetary funding for all Floral Product intended for use or resale at A&P Stores.  A&P shall purchase all Floral Products.  A&P shall purchase and manage the regular turn Floral Products inventory intended for use or resale at the A&P Stores. C&S shall have neither procurement nor purchasing responsibility with respect to Floral Products under this Agreement. C&S agrees that, except as otherwise expressly stated herein, C&S shall not communicate in any fashion, whether directly or indirectly, with any of A&P's vendors with respect to Floral Products volume intended for use or resale at the A&P Stores.

**7.11** ***Trade Funding with Respect to Fresh Products.***

 (a) C&S agrees that, except as otherwise expressly stated herein, C&S shall not communicate in any fashion, whether directly or indirectly, with any of A&P's vendors with respect to A&P's Fresh Products Volume. Furthermore, in no event shall C&S negotiate, directly or indirectly, on its own account or that of its other customers, any Logistics Funds or any other allowances, rebates, discounts or other monetary or non-monetary funding based upon, in connection with or in any way related to A&P's Fresh Products Volume.  Under no circumstances will C&S collect or realize any Trade Funding in connection with A&P's Fresh Products Volume, except for logistics-related charges and penalties in connection with Fresh Products procured by A&P, which shall be passed through to A&P in the Gross Profit Rebate as described in Schedule 7.14.  A&P reserves the right to direct C&S to cease assessing logistics-related charges and penalties in relation to A&P's Fresh Products Volume; provided, the Approved Budget will be Flexed accordingly.  Notwithstanding anything to the contrary set forth herein, C&S may negotiate with vendors of Fresh Products with respect to Trade Funding programs or any other funding or other credits or allowances based upon, in connection with or in any way related to volume of Fresh Products procured and/or purchased for C&S's own account or that of its other customers and unrelated to A&P's Fresh Products Volume.

 (b) Except for communications to A&P vendors regarding logistics-related charges and penalties (provided A&P does not also direct C&S to cease such communications), C&S agrees it shall not make any communication to any vendor or other third party with respect to A&P's Fresh Products Volume, or engage in any other conduct, that directly or indirectly reduces any economic benefits realized by A&P under its Trade Funding programs in connection with the Fresh Products Volume or that otherwise has an adverse impact on A&P's negotiations regarding such Trade Funding programs.  In no event shall any Trade Funding program negotiated by C&S on its own account or that of its customers in any way prevent, interfere with, or otherwise take from A&P's realization of the full economic benefit of the Trade Funding programs A&P may negotiate for its own account with respect to A&P's Fresh Products Volume. A&P shall provide or substantiate a direct nexus between the prohibited actions described in this Schedule 7.11(b) and any adverse economic impact suffered by A&P.

(c) In the event that C&S purchases the identical Fresh Products as those procured by A&P hereunder and obtains additional discounts, incentives or credits ("Fresh Discounts") thereby on its own account or for that of its other customers, C&S shall make commercially reasonable efforts to promptly notify A&P of the availability of such Fresh Discounts, and, A&P may elect to purchase such Fresh Products from C&S and thereby share in such Fresh Discounts.

(d) The Parties agree that A&P may request that C&S continue to procure certain Fresh Products for use or resale at the A&P Stores for a period of time not to exceed ninety (90) days after the Effective Date. For so long as C&S procures any Fresh Products at the request of A&P, C&S shall procure such Fresh Products in cooperation with A&P, and C&S shall be expressly exempt from the limitations and restrictions set forth in Schedule 7.9 or this Schedule 7.11 with respect to C&S's negotiation of cost and quantity, delivery date and allowances, rebates, Trade Funding and any other monetary or non-monetary funding or terms for such Fresh Products during such transition period. During the transition period set forth in this paragraph, as specifically requested by A&P on an item or category basis, C&S will continue its current practice of charging A&P a quoted Base Price (including a standard markup), and all gross margin related thereto shall be rebated to A&P in accordance with Schedule 7.14(b).

## IV.   TERMS COMMON TO ALL PROCUREMENT AND PURCHASING

### 7.12   *Procurement Service Levels.*

(a) Target and Required Purchasing Service Level. C&S agrees that, commencing on the Effective Date and continuing during the Term of this Agreement, the targeted service level for all Merchandise purchased by C&S on A&P's behalf will be Ninety-Seven Percent (97%) (the "Targeted Purchasing Service Level"), and the Required Purchasing Service Level shall be Ninety-Five Percent (95.0%) for the first 18 months following the Effective Date and Ninety-Six Percent (96.0%) thereafter (the "Required Purchasing Service Level"). The punitive service level shall be Ninety-Four Percent (94.0%) for the first 18 months following the Effective Date and Ninety-Five Percent (95.0%) thereafter (the "Punitive Service Level"). The Purchasing Service Level will be measured each Contract Week (the "Measurement Period") during the Contract Year for all A&P Volume purchased from C&S: (i) by Facility; (ii) by Department within Facilities; and (iii) aggregated for all Facilities.

(b) Definitions.

The "Purchasing Service Level" in each instance is calculated as a quotient, the numerator of which shall be the number of cases (or shipping units, in the case of HBC/GM) invoiced, plus "Ad Overpulls," short supplies due to untimely or inaccurate volume forecasts provided by A&P (subject to the information requirements set forth in the Service Specifications), and "Manufacturer Out-of-Stocks," and the denominator shall be the number of cases (or shipping units, in the case of HBC/GM) ordered, less unauthorized cases and discontinued items. The Purchasing Service Level calculation shall be adjusted at the end of each week to reflect any shortages from the prior week that are in excess of 2/1000 (based on audited results).

"Ad Overpull" shall be defined as any promotional volume in excess of the forecast timely provided by A&P (with respect to whether A&P has provided information "timely" being determined in accordance with the Service Specifications and the subject vendor's lead-time requirements).

An item will qualify as a "Manufacturer Out-of-Stock" if: (i) such item was subject to a product recall; (ii) such Fresh Products item was rejected by C&S on quality-based grounds and such rejection was confirmed by A&P or a USDA inspector; (iii) C&S provides within seven (7) days after shipment to the A&P Stores written proof of out-of-stock status (e.g., a

25

letter from the manufacturer indicating the quantity of the item that was unavailable from the manufacturer for the period in question, or a received purchase order issued within proper lead time indicating the quantity of the item that was cut by the manufacturer); or (iv) the manufacturer has refused to ship product due to a dispute over an Accounts Receivables Deduction as set forth in Schedule 5.3 and C&S provides such evidence as described in sub-schedule (iii) in this paragraph.

"Department" shall mean each of the following seven groupings of product categories:

    1) Grocery, consisting of mainline grocery, dry bakery, candy, spices, and supplies
    2) HBC/GM
    3) Frozen Mainline
    4) Frozen Other, consisting of frozen meat, frozen commodities, frozen bakery, ice and ice cream
    5) Meat, consisting of packaged meat, fresh meat, deli, and fresh seafood
    6) Produce
    7) Dairy

(c) <u>Calculation and Reporting</u>.  C&S will provide A&P, throughout the Term of this Agreement, on a weekly and Fiscal Accounting Period basis, a "Purchasing Service Level Reconciliation Report" showing, with respect to all orders processed for the given period, the actual Purchasing Service Levels (i) by Facility; (ii) by Department within individual Facilities; and (iii) in the aggregate for all Facilities (each, respectively, the "Actual Purchasing Service Level"). By way of illustration, there shall be separate measurements of Purchasing Service Level for (i) the Dayton Facility in total; (ii) the Departments of Frozen Mainline and Frozen Other within the Dayton Facility; and (iii) all Facilities in the aggregate, which shall include Dayton's total Facility results.

(d) <u>Service Level Breaches</u>.

A "Minor Service Level Violation" with respect to a particular Department shall occur when C&S fails to meet the Required Purchasing Service Level for any Department measurement in any Contract Week.

A "Department Level Breach" is a failure to meet Required Purchasing Service Level for any particular Department for:  a) four (4) consecutive Contract Weeks during any twelve month rolling period; or b) any ten (10) Contract Weeks during any twelve month rolling period.

A "Facility Level Breach" is a failure to meet Required Purchasing Service Level for any Facility for:  a) four (4) consecutive Contract Weeks during any twelve month rolling period; or b) any ten (10) Contract Weeks during any twelve month rolling period.

A "Punitive Service Level Breach" is a failure to meet Punitive Service Level measured across all Facilities in the aggregate for: a) six (6) consecutive Contract Weeks during any twelve month rolling period; or b) any twelve (12) Contract Weeks during any twelve month rolling period.

(e) <u>Penalties</u>.

<u>*Minor Service Level Violation*</u>:  no penalty.

<u>*Department Level Breach or Facility Level Breach*</u>:  C&S shall pay a monetary penalty for each Contract Week that C&S is in breach of the service level requirement in an amount equal to the product of (i) difference between the Required Purchasing Service Level and the Actual Purchasing Service Level achieved during such Contract Week, multiplied by (ii) the number of cases ordered  (or units ordered, in the case of HBC) during such Contract Week, in each

26

instance minus unauthorized cases, Ad Overpulls, short supplies due to untimely or inaccurate volume forecasts provided by A&P (subject to the information requirements set forth in the Service Specifications), discontinued items, and Manufacturer Out-of-Stocks (such product the "Service Level Shortfall"), which product is then multiplied by an amount equal to eleven percent (11%) of the average wholesale case cost (or unit cost, in the case of HBC) for the Department or Facility, as the case may be, for the Contract Week for which the penalty is being assessed.

For example, if the Actual Purchasing Service Level for a Contract Week for the Frozen Mainline Department within the Dayton Facility is 95.0%, the Required Purchasing Service Level is 96.0%, the number of cases ordered for such Department (less adjustments for Manufacturer Out-of-Stocks, etc.) is 175,000, the average wholesale case cost is $20.00, then the penalty for such Contract Week is:

1% x 175,000 = 1750 (the Service Level Shortfall)

11% x 20.00 = 2.20 (the per case penalty)

1750 x 2.20 = $3500 (penalty payment)

*Punitive Service Level Breach*:  $175,000 for every 1.0% (pro-rated) by which the Punitive Service Level measured across all Facilities is not met, for each week comprising the Punitive Service Level Breach and for each additional week thereafter that C&S fails to meet the Punitive Service Level (measured across all Facilities) during any twelve month rolling period.

*Termination Level Breach*: A&P shall have the right to terminate this Agreement in the event that the Purchasing Service Level measured across all Facilities in the aggregate is below the Punitive Service Level for ten (10) consecutive Contract Weeks or any eighteen (18) Contract Weeks during any twelve month rolling period.  However, A&P shall have the right to terminate this Agreement in the event that the Purchasing Service Level measured across all Facilities in the aggregate is below Ninety-Three Percent (93.0%) for three (3) consecutive Contract Weeks or any eight (8) Contract Weeks during any twelve month rolling period.

Measurement Periods must be distinct and not overlapping.  Penalties likewise may be assessed only a single time for cases or units that comprise a Service Level Shortfall, meaning that if C&S been assessed a penalty for such volume, it cannot be assessed another penalty for that same volume shortfall.

(f)  **Exceptions**.  This Schedule 7.12 shall be void with respect to any Merchandise for which A&P assumes responsibility for turn or promotional buying.  If A&P assumes a portion of the turn or promotional buying responsibility, this Schedule 7.12 shall apply only to that A&P Volume with respect to which C&S has retained buying responsibility.  With regard to Merchandise for which A&P assumes turn or promotional buying responsibility, C&S shall notwithstanding be responsible for shipping (or making available for pickup where outbound transportation is arranged for by A&P) Ninety-Nine Percent (99.0%) of all Merchandise ordered by A&P, unless C&S can provide adequate proof that there was not sufficient inventory of such Merchandise at the Facility to meet the order placed by A&P and such was not attributable to C&S's failure to properly execute purchase order.

7.13  *Leftover Ad*. For the purposes of this Agreement, "Leftover Ad Volume" shall mean the volume of any Merchandise originally comprising a promotional order that remains unshipped as of the date upon which the applicable promotion concluded minus the average regular turn inventory on-hand of such Merchandise for the prior Contract Quarter. C&S and A&P will work together to minimize Leftover Ad Volume, including, remerchandising items where possible, canceling trucks and having vendors pick up Leftover Ad Volume, or providing other instructions to C&S with

regard to the disposition of such items prior to any Merchandise going out of code. If the Parties are not successful in disposing of such Leftover Ad Volume, A&P shall reimburse C&S for its True Net Cost for such items, less any salvage value received. The specific procedures to be followed by the Parties shall be as set forth in the Service Specifications.

**7.14** ***Base Price and Gross Profit Rebate.***

(a) Base Price. It is the mutual intent of the Parties that the price of the Merchandise charged to A&P shall be C&S's True Net Cost, as defined herein and as more fully set forth below. "True Net Cost" shall mean the Base Price (as defined below), less any and all discounts including cash discounts for early payment, credits for overpayment, net price changes, investment buy income (e.g., diverting income and income from price advance and truckload forward buys), bracket pricing differential, off-invoice allowances, rebates and Logistics Funds or other Trade Funding.

(i) "Base Price" is hereby defined as:

(x) for Merchandise with a published list price, the manufacturer's published list price (as delivered) in effect as of the time C&S processes A&P's order, in the bracket in which C&S normally purchases such item for the applicable Facility, less any off-invoice allowances, and

(y) for Merchandise without a published list price, the gross realized, delivered acquisition cost as directed and confirmed in advance by A&P, before allowances, rebates and Logistics Funds.

(ii) C&S shall invoice A&P for the Base Price at the time of sale of the applicable Merchandise to A&P. Base Price assigned to Merchandise shall be on a first in, first out basis (FIFO) based on C&S purchases. A&P acknowledges that C&S, for purposes of its own internal accounting, uses LIFO inventory accounting and capitalizes expenses in accordance with principles of UNICAP. In the event that a vendor implements a net price decrease for any Merchandise sold by C&S to A&P hereunder, the Base Price assigned to such Merchandise shall immediately reflect the net price decrease, to the extent the vendor provides a floor stock rebate or credit for such Merchandise. A&P further acknowledges that certain components of Logistics Funds (such as fees and fines related to inbound quality) may be reflected and credited in the Costs (as hereinafter defined) and not in the cost of goods, but will be identified in a separate line item in the Approved Budgets so that they may be properly accounted for.

(iii) Any and all price changes, roll-forward and variance income relating to Merchandise shall be immediately applied to A&P purchases as of the effective date such amounts were realized by C&S and shall be rebated by C&S to A&P in accordance with Schedule 7.14(b), below, but in no event shall C&S be required to sell Merchandise to A&P below C&S's actual cost for such Merchandise and the Base Price chargeable to A&P shall reflect these adjustments.

(iv) The Parties agree that, during the Ramp-Up Period and the first two Contract Years only, C&S will continue certain pre-existing billing practices in order to preserve the integrity of the Base Center-Store Margin (as defined in Schedule 7.15(a)). As of the Effective Date, such practices are: (1) the Base Price for Center-Store Products procured by C&S will reflect deal extension and price advance protections as set forth in the Prior Agreements; (2) C&S will continue to follow the practice of cash equalization as set forth in the Master Agreement, reflecting such equalization in the Base Price and rebating the same in the Gross Profit Rebate, as hereinafter defined; (3) C&S will continue the practice of including logistical programs in the Base Price as set forth in the Ocean Agreement. Nothing herein shall be construed to alter C&S's obligation to charge A&P

28

the True Net Cost of Merchandise. Such pre-existing billing practices will apply only to those A&P Stores to which they are applicable immediately prior to the Effective Date. For the purpose of clarification, to the extent an A&P Store changes banner during the period between the date hereof and the commencement of the third Contract Year, the terms applicable to such A&P Store shall be those terms set forth in the Prior Agreement in effect with respect to such A&P Store on the Effective Date. As of the commencement of the third Contract Year, all such pre-existing billing practices will be terminated and C&S will charge A&P the Base Price for such Center-Store Products, as set forth in Schedule 7.14(a)(i)(x).

(v) With respect to sub-schedule (iv) in this Schedule 7.14(a), the Parties agree that they will re-examine such practices in light of the Center-Store Margin results as measured in the year-end reconciliation and mutually determine whether such practices may be terminated before the end of the second Contract Year, making any necessary changes to the Base Center Store Margin.

(b) <u>Gross Profit Rebate</u>. All components of the True Net Cost not reflected in the Base Price will be rebated to A&P in the form of a rebate of gross profit (the "Gross Profit Rebate"), which will be made in accordance with GAAP, consistently applied, as and when earned by C&S. C&S will reconcile the Gross Profit Rebate in the monthly, quarterly and year-end reconciliations set forth in Schedule 8.5. Subject to the terms of Schedule 7.14(e), to the greatest extent possible, all rebates to A&P under this Schedule shall be tracked to the original case(s) of Merchandise for which such rebate(s) were originally attributed. The Parties understand and agree that the elements that comprise gross profit represent a compilation of a large number of often complex transactions and, where applicable, may include allocations and approximations. In no event will C&S, directly or indirectly, retain, be credited for or otherwise earn for its own account or that of its other customers any Trade Funding with respect to the A&P Volume. Any breach of this Schedule 7.15(b), except for an unintentional or de minimis breach of this Schedule 7.15(b), shall constitute a material breach under this Agreement.

(c) <u>Audit Rights</u>. A&P may audit C&S's records in order to confirm that the Base Price and True Net Cost are calculated and administered in accordance with the terms and conditions of this Agreement. Such audits shall be conducted in accordance with the terms of Schedule 12.5 hereof. In connection with such audits, A&P may also seek to audit the records of A&P's vendors, in which case C&S shall execute any authorizations necessary to permit such audit activity and will otherwise instruct A&P's vendors to fully cooperate with such audits. To the extent A&P seeks to review any contracts or other records pursuant to such an audit and which are subject to a confidentiality agreement between C&S and any of C&S's vendors, A&P will execute an appropriate "clean room" protocol or other confidentiality agreement that will permit access to such confidential information but only to members of A&P's internal audit team or to any third-party external auditor A&P has engaged for that purpose and that are approved by C&S.

(d) <u>Restricted Information</u>. A&P understands and agrees that information related to C&S's Logistics Funds and other non-public information related to C&S's incentive programs with its vendors ("Restricted Information") is highly sensitive and shall be subject to a heightened level of confidentiality and restricted access. Accordingly, in order for C&S to agree to provide such Restricted Information, A&P agrees that it will allow access to such Restricted Information only to those A&P employees or third party agents who have a need to know such Restricted Information in connection with A&P's confirmation of Base Price and True Net Cost (the "Permitted Use"), who have been approved of by C&S, and who will each individually be required to execute affirmations of the confidentiality obligations stated herein ("Permitted Individuals"). A&P agrees that other than to the Permitted Individuals, A&P shall not disclose such information to any other person or party. All such Restricted

29

Information may not be copied or reproduced by A&P in any form, and may only be used pursuant to the Permitted Use.

(e) <u>Interim Pricing Methodology</u>. C&S shall complete testing of and shall be prepared to commercially deploy its Lot Management System within ninety (90) days of the Effective Date (the "Interim Period"). However, A&P shall have the right to conduct a pre-deployment LMS audit and the LMS shall not be deployed until approved by A&P (which approval shall not be unreasonably withheld). During the Interim Period, C&S may not be able to account for the True Net Cost of goods procured and purchased on behalf of A&P down to the individual case unit. Therefore, with respect to all Center-Store Products purchased by C&S on behalf of A&P during the Interim Period, C&S will charge A&P a purchase price equal to the Base Price of such Center-Store Products, less the budgeted margin for such Merchandise, as set forth in the Total Center-Store Margin Budget as set forth on Exhibit 1.4(g). The Base Price for Fresh Products during the Interim Period shall be the rolling daily average cost of such Fresh Products. C&S and A&P shall reconcile the True Net Cost of all Merchandise for the Interim Period per C&S product line (e.g., dry grocery, frozen, produce, dairy, etc.) on a monthly and quarterly basis. A&P shall be provided such number of sample invoices for Fresh Products to permit A&P to audit, on a statistically valid basis, the rolling daily average cost of such Fresh Products purchased during the Interim Period.

(f) With respect to ice cream only, for the Term of this Agreement (unless the Parties agree otherwise), the Base Price of ice cream shall reflect the mark-up to be determined in accordance with the Master Agreement, and such mark-up will be rebated to A&P in connection with the Gross Profit Rebate.

(g) C&S will at all times act in good faith and will not manipulate, defer, assign, redirect, transfer or disproportionately allocate any Trade Funding or negotiated Base Price for the benefit of its other customers or its own account so as to deprive A&P of the Base Price or Gross Profit Rebate A&P would otherwise be entitled to under this Agreement in the ordinary course of business.

**7.15** <u>**C&S Margin Guarantee.**</u>

(a) <u>Center-Store Margin</u>. The Total Center-Store Margin budget attached hereto as Exhibit 1.4(g) sets forth, in absolute dollars, based on projected volume, and as a percentage of A&P's total purchase of Center-Store Products from C&S, the margin projected to be earned with respect to the procurement and purchase of Center-Store Products set forth on Exhibit 1.4(g) by C&S for C&S's fiscal year ending September 27, 2008 (cumulatively across all Center-Store Product categories set forth on Exhibit 1.4(g), the margin expressed as a percentage shall be the "Base Center-Store Margin"). The actual margin received across all Center-Store Products set forth on Exhibit 1.4(g) for the Ramp-Up Period or any Contract Year and expressed as a percentage of A&P's total Center-Store Products purchases from C&S in the categories set forth on Exhibit 1.4(g) shall be the "Actual Center-Store Margin."

(b) <u>Center-Store Margin Guarantee</u>. Subject to the adjustments set forth in sub-schedule 7.15(d) below, C&S agrees to guarantee to A&P that the Actual Center-Store Margin shall be no less than (a) One Hundred Percent (100%) of the Base Center-Store Margin budgeted to be earned during the Ramp-Up Period; (b) Ninety Percent (90%) of the Base Center-Store Margin for the First Contract Year; and (c) Eighty-Five Percent (85%) of the Base Center-Store Margin for the second Contract Year, (together, the "Center-Store Margin Guarantee"). In connection with the year-end reconciliations, A&P and C&S shall determine whether any amounts are due and owing to A&P pursuant to this Schedule 7.15(b). Any amounts due to A&P in connection with the Center-Store Margin Guarantee shall be paid to A&P in accordance with this Schedule 7.15(b) and Schedule 9 hereof and shall be credited to A&P on the next Weekly Statement immediately following the conclusion of the year-end reconciliation. For purposes of clarification only, assume (i) the Base Center-Store Margin

30

is 3.05%, (ii) the Actual Center-Store Margin realized during the First Contract Year was 2.70%, and (iii) total Center-Store Purchases during the First Contract Year were $4.0 Billion. Given the previous assumptions, C&S shall pay to A&P the product of (a) the difference between 90% of the Base Center-Store Margin (2.745%) and the Actual Center-Store Margin realized during the First Contract Year (2.70%) which is .045%, and (b) $4.0 Billion (the actual Center-Store Products purchases from C&S during such First Contract Year), equaling $1.8 Million.

(c) <u>Gross Margin Performance Share</u>. In the event that the Center-Store Margin (expressed as a rate) realized during the Ramp-Up Period or during any Contract Year exceeds the budgeted Center-Store Margin (expressed as a rate) as set forth in the Interim Budget for the Ramp-Up Period or Approved Budget for the applicable Contract Year, then the difference between the realized Center-Store Margin rate and the budgeted Center-Store Margin rate shall be multiplied by A&P's total Center-Store wholesale purchase volume for the Ramp-Up Period or the Contract Year, as the case may be. The resulting dollar amount shall be allocated between A&P and C&S as set forth herein: A&P – 80% of the difference; and ii) C&S – 20% of the difference (the "Gross Margin Performance Share"). In connection with the year end reconciliations, A&P and C&S shall determine whether any amounts are due and owing to C&S pursuant to this Schedule 7.15(c). For example, if the budgeted Center-Store Margin for a Contract Year is 3.25% and the realized Center-Store Margin for such Contract Year is 3.30%, and the Center-Store purchase volume during such Contract Year is $3.0 Billion, the total surplus Center-Store Margin is $1.5 Million and the Gross Margin Performance Share payable to C&S is $300,000. The Gross Margin Performance Share shall be paid to C&S in accordance with this Schedule 7.15 and Schedule 9 hereof, and will be billed on A&P's next Weekly Statement immediately following the conclusion of the year-end reconciliation. This sub-schedule "c" shall be deemed null and void to the extent A&P elects to assume control over all aspects of procurement of Center-Store Products pursuant to Schedule 7.5 hereof.

(d) <u>Adjustments to Center-Store Margin Guarantee</u>. In the event that A&P (a) assumes any procurement of Center-Store Products previously performed by C&S; (b) materially changes its product mix from the mix that existed as of the establishment of the Base Center-Store Margin, including private label penetration; (c) materially changes its ordering, procurement or purchasing practices with regard to Center-Store Products; or (d) otherwise takes any action (or causes C&S to take any action on A&P's behalf) that affects the ability of C&S to realize Center-Store Margin, then the Parties shall negotiate in good faith an equitable adjustment to the Center-Store Margin Guarantee to account for such change in practices or operations. The Center-Store Margin Guarantee shall be adjusted only to the extent such events or occurrences in this paragraph have a material adverse effect on C&S's ability to achieve the required threshold of such guarantee.

7.16 ***Additional Margin Opportunities***. The Parties will work together to develop an outbound diverting program for A&P with respect to non-Crossroads® vendors and to share the income from such program in an amount to be agreed. To the extent A&P asks C&S to supply tobacco, natural or specialty products, or other products not within the scope of Merchandise supplied by C&S, the Parties will discuss an allocation of the savings and margin that may result from purchasing such products through C&S.

7.17 ***Standard Credit Policy***. The Parties agree to the terms and conditions of the Standard Credit Policy attached hereto as Exhibit 7.17. A&P and C&S will work together in good faith to revise the Standard Credit Policy currently in effect to the Parties' mutual satisfaction. The purpose of such revision is to agree upon terms that comport with the open-book nature of the relationship between the Parties and to create costs savings and efficiencies wherever possible, while at the same time ensuring high quality selection and service level to the A&P Stores. When such revised terms have been mutually agreed to in writing by the Parties, such revised Standard Credit Policy will be included in the Service Specifications.

**SCHEDULE 8**

**PREPARATION OF INITIAL BUDGET AND ANNUAL BUDGETS; SHARED SAVINGS**

8.1    ***Budget and Remuneration Procedures.***   The procedures for the establishment of the Initial Approved Budget and subsequent Approved Budgets, and Flex Budgets and budget variances which the Parties agree shall apply for the Term is set forth below. A&P agrees to pay to C&S the Costs and remuneration due under this Agreement in the time and manner set forth in Schedule 9.

8.2    ***Initial Approved Budget.*** Not less than thirty (30) days prior to the end of the Ramp-Up Period and the commencement of the First Contract Year, C&S and A&P will agree upon a budget that has been developed in accordance with the form of the Interim Budget attached hereto as Exhibits 1.4(a)-(g). The "Approved Budget" shall be comprised of the budgets for the Total Warehousing Costs, Total Transportation Costs, Total Direct Overhead Costs, Capital Expenditures, Total Services Fees and Total Center-Store Margin. The Approved Budget for the First Contract Year shall be referred to herein as the "Initial Approved Budget". The Initial Approved Budget and all subsequent Approved Budgets will be prepared in accordance with the Interim Budget format. For the purposes of this Agreement, all calculations related to the Approved Budget and any other matters in connection with the terms of this Agreement shall be calculated consistent with GAAP.

8.3    ***Budgeted Costs.*** The Initial Approved Budget, and all subsequent Approved Budgets, shall set forth in absolute dollars all Costs agreed upon by the Parties to be incurred in connection with the performance of the Services, the operation of the Facilities by C&S, and purchases and other investments in Fixed Assets (in the applicable Contract Year) and shall be broken out on a Facility-by-Facility basis (except for the Center-Store Margin and Direct Overhead). The Approved Budgets shall be prepared according to an engineered standard, provided however that the Parties acknowledge and agree that C&S, as of the Effective Date, has partially embarked on a project to convert its facilities from a cost-per-piece compensation system to engineered standards. Accordingly, to the extent that costs, bargaining obligations, and other factors bear on the rollout of engineered standards across the Facilities, C&S shall provide to A&P a business case setting forth all such costs and obligations as well as the return on investment (ROI) associated with such costs and obligations, and the Parties shall agree on an appropriate capital expenditure budget addressing such costs and obligations.

(a) Costs will include costs and expenses reasonably incurred in connection with the performance of the Services and the operation of the Facilities during the Term as further set forth on the Approved Budget. Without limiting the foregoing, the term "Costs" shall include the following categories of costs and expenses:

(i) "occupancy costs" for all Facilities, which shall be comprised of:

a. With respect to leased Facilities - all rent, additional rent, leasehold improvements, rental subsidies and other costs, liabilities and obligations relating to any leases or subleases of the Facilities;

b. With respect to owned Facilities – an imputed rental amount for the applicable Facility; and

c. such other customary periodic real estate carrying costs including, but not limited to, common area maintenance, real estate, personal property and business taxes, utilities, insurance and customary maintenance and repair expenses;

(ii) imputed rental amount for all Fixed Assets owned by C&S;

(iii) all equipment maintenance, repair and rentals and all charges under any leases of equipment assumed by C&S or entered into by C&S in accordance with the terms of

this Agreement (including without limitation leases which constitute capital leases under GAAP) and relating to the provision of the Services;

(iv) all reasonable and necessary transportation and freight costs, including fuel, tolls and payments made to contract carriers for freight services, directly relating to the provision of the Transportation Services;

(v) all direct and indirect labor costs (including without limitation salaries, wages, benefits, worker's compensation expenses incurred or accrued by C&S on a GAAP basis) relating to the provision of the Services, provided however that the Parties agree beginning with the First Contract Year A&P shall be responsible to pay the amount of workers' compensation expense set forth in the Approved Budget, plus or minus a maximum of 15% (meaning that if the expense is greater than 15% over the budgeted amount, C&S will be responsible for such excess over 15%, and if the amount is greater than 15% below the budgeted amount, C&S shall retain the benefit below 15%);

(vi) costs of third party contractors;

(vii) all reasonable pay in lieu of notice, reasonable termination and severance payments and like amounts (other than those resulting from termination of this Agreement in accordance with Schedule 11 of this Agreement or from any Facility Decision, unless otherwise agreed to by the Parties pursuant to Schedule 3.5), and all related costs and expenses in accordance with C&S's procedures and policies, relating to the termination of employment of any one or more employees employed in connection with the provision of the Services;

(viii) direct overhead charges representing the reasonable and necessary administrative and systems costs incurred by C&S to the extent they are necessary to directly support the rendering of Services performed by C&S hereunder but shall not include those in support of C&S's rendering of the Other Services (the "Direct Overhead Costs"). These costs primarily relate to the use of financial, human resources, procurement, purchasing and other management personnel and information systems;

(ix) premiums payable with respect to the policies of insurance referred to in Schedule 10.2 of this Agreement;

(x) deductibles, retentions, expenses and out-of-pocket settlements paid by C&S from time to time with respect to any of the policies of insurance referred to in Schedule 10.2 of this Agreement;

(xi) product shrink, out of code, damaged or unsalable Merchandise;

(xii) all reasonable and necessary costs with respect to any information processing and related communications devices, equipment, systems, information, data, or software (collectively "Systems") used in connection with the Services; and

(xiii) all other costs of whatever nature properly incurred by C&S in connection with the provision of the Services and approved in advance by A&P, other than in the case of an Emergency Expenditure or other exigent circumstances, which, in C&S's commercially reasonable judgment, such costs were required to be incurred prior to such approval by A&P.

33

(b) "Costs" shall not include:

    (i)    imputed rent or depreciation related to any additional capital expenditures not included in the Capital Expenditures portion of the Approved Budget, unless C&S and A&P otherwise agree in writing, except in the case of an Emergency Expenditure;

    (ii)    Subject to Schedule 1.2, any costs, claims, liabilities, charges or obligations of any sort whatsoever that have been incurred by C&S, or have accrued or arisen, prior to the Effective Date, regardless of when asserted or when effective, whether in connection with the Prior Agreements, or in connection with Services rendered by C&S on behalf of A&P, Pathmark, any of C&S's other customers, or in connection with C&S's other activities prior to the Effective Date, including but not limited to judgments, claims, suits, actions or other obligations, subject to the treatment of workers' compensation expense as set forth in Schedule 8.3(a)(v) above; provided, however that claims such as personal injury claims in which the triggering incident occurred prior to the Effective Date but expenses associated therewith are experienced during the Term, such expenses as incurred and recorded on a GAAP basis during the Term shall properly be included as Costs under this Agreement, but in no event shall A&P be responsible for any such expenses incurred and recorded on a GAAP basis outside the Term of this Agreement;

    (iii)    except for the pension plan contribution obligations as set forth in the applicable collective bargaining agreements, any costs, claims, liabilities, charges or obligations related to any multi-employer fund withdrawal liability or any underfunded pension plan payment obligations and any surcharges or assessments from multi-employer funds, subject to agreements that may be entered into pursuant to Schedule 3.5 and subject to A&P's specific obligation under Section 4.13 of the Pathmark Agreement;

    (iv)    costs resulting from any violation of Law, any labor or employment claims (other than workers' compensation claims), any costs related to C&S's or its subcontractors' negligence or third party personal injury claims outside of the Costs set forth in Schedule 8.3(a)(v) or Schedule 8.3(a)(ix)-(x), third-party contractual claims or other third-party judgments, claims, losses, suits, actions, or other obligations of any sort whatsoever, except to the extent such cost is subject to A&P's indemnification obligation to C&S under Schedule 10 hereof;

    (v)    any costs resulting from any breach by C&S of its obligations under this Agreement, or from C&S's acts or omissions constituting gross negligence or willful misconduct; or

    (vi)    costs in connection with the performance of Other Services by C&S.

(c) Costs for Shared Facilities.

    (i)    Costs in connection with any Shared Facility during a Fiscal Accounting Period shall be allocated to A&P according to a ratio (expressed as a percentage) equal to (x) A&P's actual shipped case volume for such Shared Facility for the trailing twelve-month period ending on the last day of such Fiscal Accounting Period divided by (y) the total case volume, expressed as a percentage (the "Actual Allocation Amount"). For purposes of this Schedule 8.3(c), the "Baseline Allocation Amount" shall mean A&P's Actual Allocation Amount as of the last day of the first Fiscal Accounting Period of the Term. In the event of a change of shipping origin of one or more A&P Stores that results in a material volume shift, including but not limited to changes that occur as a result of a Facility Decision, the Actual Allocation Amount will be reset in accordance with A&P's volume in the new Facilities and will be modified every Fiscal Accounting Period using only the trailing volumes that reflect such changes in shipping origin.

34

(ii)   To the extent a reduction in the case volume of other C&S customers at a Shared Facility results in an increase of A&P's Actual Allocation Amount by five percentage points (five hundred basis points) or more compared to the Baseline Allocation Amount for such Facility, A&P's Actual Allocation Amount for such Fiscal Accounting Period shall be deemed to be no more than the Baseline Allocation Amount plus five percentage points (5%). For the avoidance of doubt, any increase in the Actual Allocation Amount due to an increase in A&P Volume at such Facility shall not be counted for purposes of the aforementioned calculation.

(d)   The Parties agree that to the extent the Actual Costs in an Aggregate Cost Grouping (as set forth on Exhibit 1.4(a)) exceed the Approved Budget for such Aggregate Cost Grouping in any Contract Year (or the Ramp-Up Period) after taking into account the budget Flex as described below (the "Excess Costs"), A&P will not pay or reimburse C&S for such Excess Costs, unless: (i) the Excess Costs were necessary or advisable in the discretion of C&S to perform the Services or to otherwise comply with its obligations under this Agreement and C&S obtained A&P's prior written authorization to incur the Excess Costs, to the extent obtaining such advance authorization was feasible under the circumstances; (ii) the Excess Costs were of the nature of an uncontrollable cost, which shall include all costs that are not within the reasonable control of C&S, including but not limited to inflation in the cost rate of fuel, electricity or like commodities (e.g., natural gas); medical costs; out of code product resulting from investment buys made in accordance with the agreed investment buy procedures, provided such product is located in the Dedicated Facilities or is product unique to A&P in the Shared Facilities; costs related to materially adverse weather conditions; costs related to actions or omissions on the part of A&P; or costs related to Force Majeure; or (iii) the Excess Cost is related to an Emergency Expenditure. In the case of (iii), above, C&S shall provide notice to A&P promptly after incurring such Emergency Expenditure and A&P shall have the right to direct C&S to cease incurring such non-budgeted Costs; provided, however, that C&S shall have no liability for any loss or adverse consequences resulting from such cessation. Notwithstanding the foregoing, A&P shall have no responsibility for any uncontrollable cost to the extent such uncontrollable cost is incurred or exacerbated by the negligence, gross negligence or intentional misconduct of C&S.

(e)   With respect to Direct Overhead Costs only, it is the intent of the Parties that Direct Overhead Costs will be budgeted by the Parties each Contract Year in the Approved Budget, subject to Flex for material changes that occur during such Contract Year, and A&P will be responsible to pay only such budgeted amount (as Flexed) and such amounts will not be subject to true-up to actuals or reconciliation (as set forth in Schedule 8.5 hereof).

**8.4    *Flex Budgets, Fuel, Emergency Expenditures.***

*8.4.1*    Flexing an Approved Budget. Prior to the commencement of each Fiscal Accounting Period and in connection with the year end reconciliation, or as otherwise agreed to by the Parties hereto, the Approved Budget will be adjusted (a "Flex Budget") for the following factors:

i)    changes in regulatory requirements, compliance with GAAP, and compliance with Laws (provided such adjustment is not required to correct C&S's non-compliance for any prior Fiscal Accounting Period),

ii)   market fluctuations in C&S's actual cost of fuel (except to the extent of A&P's participation in C&S's fuel hedging program), or other uncontrollable costs,

iii)  Emergency Expenditures (defined below),

iv)   changes in Facilities' case volumes, Daily Peaking and other volume fluctuations,

35

> v) changes to the Product Mix or Service Specifications, and
>
> vi) any other such similar factors as may be appropriate or mutually agreed to by the Parties hereto.

The Capital Expenditures portion of the Approved Budget is not subject to budget Flexing, but shall be subject to amendment at the mutual agreement of the Parties.

**8.4.2** *Fuel Cost Adjustment*. It is the intent of the parties that A&P pay the actual delivered cost of fuel, exclusive of any financial hedging unless the Parties otherwise agree in writing. Prior to the Ramp-Up Period and each Contract Year, as part of the budget process, the parties shall agree upon a "Base Cost of Fuel" for the Approved Budget for the forthcoming Ramp-Up Period or Contract Year (as applicable). Each Contract Quarter, the Base Cost of Fuel used to calculate fuel costs as a component of the Total Transportation Costs for such Contract Quarter will be adjusted for any changes to reflect the actual delivered cost of fuel incurred by C&S in connection with the Services hereunder. The Service Specifications shall set forth in detail the formula for calculating Base Cost of Fuel for each Facility.

**8.4.3** *Emergency Expenditures*. An "Emergency Expenditure" shall be any cost, expense or liability incurred by C&S in an emergency in connection with the performance of the Services which C&S deems, in its reasonable business judgment, necessary in order to a) protect or preserve the Merchandise, any Facility or any Fixed Assets used in connection with the performance of the Services, (b) comply with any Laws, or (c) avoid harm to persons or property, whether C&S, A&P or a third party. To the extent feasible, C&S will attempt to obtain A&P's prior written consent before undertaking any such Emergency Expenditure, and C&S shall use commercially reasonable best efforts to mitigate the costs of such Emergency Expenditures. Where it was not feasible for C&S to obtain A&P's prior written consent before incurring the Emergency Expenditure, C&S shall provide notice to A&P promptly after incurring such Emergency Expenditure. In such case, A&P shall have the right to direct C&S to cease incurring such non-budgeted Costs; provided, however, that C&S shall have no liability for any loss or adverse consequences resulting from cessation of such Cost. The Parties will make a good faith effort to include Emergency Expenditures in a Flex Budget. In any event, Emergency Expenditures will be billed to A&P in accordance with the monthly reconciliation as set forth in Schedule 8.5.1.

**8.5** *Reporting of Variances*.

**8.5.1** *Monthly Reconciliations*. Within twenty (20) days of the end of each Fiscal Accounting Period, C&S shall provide to A&P a detailed report (the "Monthly P&L") containing a comparison of variances between (i) Costs actually incurred by C&S in performing the Services (the "Actual Costs"); (ii) the Approved Budget Costs; and (iii) Flex Budget Costs for the immediately preceding period, on a line item basis. A&P will either (a) receive a credit on its next Weekly Statement equal to the amount of C&S's Actual Costs set forth on the Monthly P&L for such month were less than the Approved Budget Costs (or Flex Budget Costs, as applicable) paid by A&P for such month or (b) pay C&S, in connection with the next Weekly Statement, any amount by which C&S's Actual Costs set forth on the Monthly P&L for such month were greater than the Costs set forth on the Approved Budget (or Flex Budget as applicable) which were paid by A&P for such month less any Emergency Expenditures not reflected in a Flex Budget.

**8.5.2** *Quarterly Reconciliations*. Within forty-five (45) days of the end of each Contract Quarter, C&S will reconcile the Monthly P&Ls for such Contract Quarter and either (i) provide to A&P a credit on A&P's next Weekly Statement equal to the amount C&S's Actual Costs set forth on the Monthly P&Ls for such Contract Quarter were less than the

amount of Costs set forth on the Approved Budget (or Flex Budget as applicable) for such Contract Quarter paid by A&P or (ii) A&P will pay C&S any amount C&S's Actual Costs set forth on the Monthly P&Ls for such Contract Quarter were in excess of the Costs set forth on the Approved Budget (or Flex Budget as applicable) for such Contract Quarter and paid by A&P for such Contract Quarter, in either case (i) or (ii) taking into account any amounts credited to or paid by A&P in connection with the monthly reconciliations. Quarterly reconciliations will be completed in conjunction with the closing of the accounts for the C&S fiscal quarter in which such Contract Quarter concludes.

**8.5.3    *Year-End Reconciliations*.** Within ninety (90) days of the end of each Contract Year, C&S will reconcile the final Contract Quarter for such Contract Year and either (i) provide to A&P a credit on A&P's next Weekly Statement equal to the amount C&S's Actual Costs for such Contract Year were less than the amount of Costs set forth on the Approved Budget (or Flex Budget, as applicable) for such Contract Year paid by A&P, plus any Excess Costs previously paid by A&P or (ii) A&P will pay C&S any amount C&S's Actual Costs for such Contract Year were in excess of the Costs set forth on the Approved Budget (or Flex Budget as applicable) for such Contract Year and paid by A&P for such Contract Year, minus any Excess Costs previously paid by A&P, in either case (i) or (ii) taking into account any amounts credited to or paid by A&P in connection with the monthly and quarterly reconciliations. The year-end reconciliations will be completed in conjunction with the closing of the accounts for the C&S fiscal year, which is coterminous with the Contract Year. The Parties shall also include a reconciliation pursuant to Schedule 8.3(d) as a part of the year-end reconciliation to determine whether and to what extent there were Excess Costs during such Contract Year.

**8.5.4    *Review of Reconciliations*.** Within seven (7) days after the receipt of each of the monthly and quarterly reconciliation reports or within fourteen (14) days after the receipt of the yearly reconciliation report, representatives of the parties shall meet to review the report. The Flex Budget shall be subject to adjustment based on such review. A&P shall have access to C&S internal accounting records to verify Costs incurred by C&S and presented to A&P are accurate. C&S will bring to each meeting sufficient authentic documentation of costs incurred (e.g., general ledger to verify depreciation taken on equipment, invoices to verify any material/equipment purchased, etc.) to support and permit analysis of all reconciliations.

**8.6    *Forecasting*.** On a quarterly basis (or more often as needed), C&S shall provide to A&P an updated estimate of Actual Costs and Services Fees compared against the Approved Budget, which shall include material changes in budget assumptions with respect to case volume, Daily Peaking and other volume fluctuations, as well as Product Mix, Service Specifications, timeliness of order advice, level of stocking and other factors as may be appropriate.

**8.7    *Reconciliation of Variances*.** Any dispute between the parties relating to this Schedule 8 which cannot be resolved after the parties have used all reasonable efforts to do so shall be resolved in accordance with Schedule 12 hereof.

**8.8    *Preparation of Subsequent Approved Budgets*.** A&P and C&S will meet annually, beginning at least 90 days prior to the end of the Contract Year, to negotiate subsequent Approved Budgets, which shall be completed within thirty (30) days prior to the commencement of the upcoming Contract Year. The parties understand and agree that timely completion of the Approved Budget is a critical component of the open-book relationship and that if there is a delay in the budgeting process the parties will dedicate whatever executive-level resources are necessary to ensure completion. In the event the parties cannot agree on a subsequent Approved Budget then either Party may invoke the dispute resolution procedure set forth in Schedule 12 to determine or establish an Approved Budget. Until such subsequent Approved Budget is determined, the

Approved Budget for the immediately preceding Contract Year shall remain in full force and effect.

**8.9** ***Failure to Settle Service Specifications.*** If, at any time during the Term of this Agreement, C&S and A&P are unable to agree on revised Service Specifications, the matter shall be resolved in accordance with the dispute resolution procedures set forth in Schedule 12 and current Service Specifications shall continue to apply to the provision of Services until such time as new Service Specifications are established.

**8.10** ***Quarterly Changes to Information.*** Prior to each Contract Quarter, A&P shall advise C&S of any anticipated changes to the forecasted case volumes, and other volume fluctuations, Product Mix, Service Specifications and other information used as the basis for preparation of the Approved Budget.

**8.11** ***Shared Savings: Cost Savings Gainshare Incentive Fee.***

(a) <u>Baseline Budget</u>. The "Baseline Budget" is defined as the sum of the Interim Budgets for the: a) Total Warehousing Costs (excluding HBC/GM and occupancy); b) Total Occupancy Costs (excluding HBC/GM); c) Total Transportation Costs (excluding HBC/GM); d) Total HBC/GM Operating Costs (warehousing, transportation and occupancy); and e) Total Direct Overhead Costs. The Baseline Budget (as adjusted under sub-schedule (c) below) will be utilized in this Agreement for the calculation of the Cost Savings Gainshare Incentive Fee ("Gainshare"), if any, payable to C&S for actual cost savings realized by A&P against such Baseline Budget in the Ramp-Up Period or any Contract Year, as calculated in accordance with this Schedule 8.11.

The Baseline Budget is annexed to this Agreement as Exhibit 8.11(a). The Baseline Budget for the below categories are expressed either on a rate basis expressed as cost per case or as a percentage of sales (the "Cost Rate") or on the basis of absolute dollars ("Fixed Absolute Dollars"), as follows:

a. Total Warehousing Costs (excluding HBC/GM and occupancy) – cost per case
b. Total Occupancy Costs (excluding HBC/GM) – Fixed Absolute Dollars
c. Total Transportation Costs (excluding HBC/GM) – cost per case
d. Total HBC/GM Operating Costs – cost expressed as percentage of sales
e. Total Direct Overhead Costs - Fixed Absolute Dollars

The Cost Rate or Fixed Absolute Dollars measure shall be utilized in calculating the Shared Savings and the resulting Gainshare payable to C&S, if any, in the Ramp-Up period or any Contract Year in accordance with sub-schedule (d) below.

(b) <u>Non-C&S Managed Outbound Transportation</u>. The outbound transportation expense to the Pathmark-bannered stores is not included in the Interim Budget, as that is an A&P-managed function currently performed by GHI and paid for directly by A&P. The parties agree, however, that the expense associated with the volume transported by GHI or any successor thereto (regardless of banner, given that A&P and GHI may subsequently agree to substitute A&P Volume for Pathmark volume), is a legitimate source of potential Shared Savings that will be factored into the calculation of the Gainshare. The parties agree further that all savings associated with the non-C&S-managed outbound transportation (the "Non-C&S Managed Outbound Transportation") shall be calculated as part of the Gainshare, including the savings that may later result from relocations, openings or closures of Facilities, except that the Gainshare shall not include fee or cost reductions that A&P negotiates directly with GHI, or that A&P negotiates on its own, and that do not include C&S's participation or cooperation. As more fully set forth in sub-schedule "d" below, the savings associated with the Non-C&S Managed Outbound Transportation shall be calculated as a separate component of the Shared Savings and added to the Gainshare calculation. Further, the base cost (non-

fuel) for the Non-C&S-Managed Outbound Transportation shall be adjusted for CPI (as defined in Schedule 6.4 above). Fuel will be adjusted as set forth in sub-schedule "c", below. Attached as Exhibit 8.11(b) are the base costs of the Non-C&S Managed Outbound Transportation which shall operate as the baseline for the calculation of this component of the Shared Savings. The Costs outlined on Exhibit 8.11(b) are subject to further due diligence and confirmation by C&S and will be adjusted if necessary pursuant to sub-schedule "c" below. C&S shall further have the right to audit the actual costs related to the Non-C&S Managed Outbound Transportation for the purpose of the Gainshare.

(c)  Adjustments to Baseline Budget. The Baseline Budget will be adjusted annually as follows ("Adjusted Baseline Budget"):

    (i)    All costs (other than fuel) comprising the Baseline Budget will be adjusted annually in the following manner:

        Total Warehousing Costs – adjusted for CPI (as defined in Schedule 6.4, above)
        Total Occupancy Costs – adjusted for CPI (as defined in Schedule 6.4 above)
        Total Transportation Costs – adjusted for CPI (as defined in Schedule 6.4, above)
        Total Direct Overhead Costs – adjusted for CPI (as defined in Schedule 6.4, above)

        Fuel will be adjusted in the Baseline Budget annually consistent with Schedule 8.4.2 above to accurately reflect the actual current cost of fuel.

        Total HBC/GM Operating Costs will be adjusted only for fuel.

    (ii)    If there is any material change in A&P's service requirements that increases the cost of providing services to A&P (including, by way of example only and not limited to, C&S's assumption of the Edison GMDC operation), the parties will meet and in good faith negotiate a revision to the savings calculation and, if necessary, a revision to the Baseline Budget to better reflect the performance of C&S against such Baseline Budget.

    (iii)    For any fifty-three (53) week Contract Year, the Baseline Budget will be adjusted for the additional Costs arising from an additional week of operation.

    (iv)    If there is case or unit volume deviation of more than 5% from the volume reflected in the Baseline Budget, up or down, the Parties agree that they will examine the fixed and variable cost components within the Baseline Budget and make any necessary adjustments to the Baseline Budget to allow an appropriate comparison of the costs incurred in the applicable Contract Year to the costs set forth in the Baseline Budget.

    (v)    If there is any other matter or development that prevents a legitimate and meaningful comparison of the Baseline Budget to the Actual Costs, then the parties shall meet and in good faith adjust the Baseline Budget to permit such a meaningful comparison.

        The Cost Rates or Fixed Absolute Dollars for the Baseline Budget shall be re-calculated following any adjustment to the Baseline Budget in accordance with this sub-schedule (c).

(d)  Calculation of Shared Savings and Cost Savings Gainshare Incentive Fee. In the event that the Actual Costs paid by A&P for the Ramp-Up Period or any Contract Year are lower than the Adjusted Baseline Budget, as calculated in accordance with sub-schedules 8.11(d)(i)-(vi) below, thereby resulting in cost savings as against such Adjusted Baseline Budget, then the favorable difference between the Actual Costs paid by A&P and the Adjusted Baseline Budget (the "Shared Savings") shall be allocated between A&P and C&S on an equal (50% - 50%) basis.

(i)    Total Warehousing Cost savings (non HBC/GM) shall be calculated by multiplying: A) the difference between the Cost Rate for Total Warehousing Costs under the Adjusted Baseline Budget and the Cost Rate for the actual Total Warehousing Cost paid by A&P for the Contract Year for which the Gainshare is being determined; and B) the number of cases for the Contract Year for which the Gainshare is being determined.

(ii)    Total Occupancy Cost savings shall be calculated by taking the difference, in Fixed Absolute Dollars, between the Total Occupancy Cost under the Adjusted Baseline Budget and the actual Total Occupancy Costs paid by A&P for the Contract Year for which the Gainshare is being determined

(iii)    Total Transportation Cost savings (non HBC/GM) shall be calculated by multiplying: A) the difference between the Cost Rate for the Total Transportation Cost under the Adjusted Baseline Budget and the Cost Rate for the actual Total Transportation Cost paid by A&P for the Contract Year for which the Gainshare is being determined; and B) the number of cases for the Contract Year for which the Gainshare is being determined.

(iv)    Total HBC/GM Operating Cost savings shall be calculated by multiplying: A) the difference between the Cost Rate for the Total HBC/GM Operating Cost under the Adjusted Baseline Budget and the Cost Rate for the actual Total HBC/GM Operating Cost paid by A&P for the Contract Year for which the Gainshare is being determined; and B) the total HBC/GM sales for the Contract Year for which the Gainshare is being determined.

(v)    Direct Overhead Cost savings shall be calculated by taking the difference, in Fixed Absolute Dollars, between the Total Direct Overhead Cost under the Adjusted Baseline Budget and the actual Total Direct Overhead Cost paid by A&P for the Contract Year for which the Gainshare is being determined.

(vi)    The Non-C&S-Managed Outbound Transportation savings shall be calculated by multiplying A) the difference, on a cost-per-case basis, the costs that existed as of the Effective Date, as adjusted per sub-schedule 8.11(b) above, with the cost per case for the Contract Year for which the Gainshare is being determined; and B) the number of cases applicable to the Non-C&S-Managed Outbound Transportation for the Contract Year for which the Gainshare is being determined. Savings that do not qualify for the Gainshare as set forth in sub-schedule 8.11(b) hereof shall not be included in the calculation of savings under this sub-schedule 8.11(d)(vi).

The Shared Savings for the Ramp-Up Period or any Contract Year shall be determined by adding (i) through (vi) above. An illustrative example of the calculation of the Shared Savings has been annexed hereto as Exhibit 8.11(d).

(e)  Payment of Cost Savings Gainshare Incentive Fee.

(i)    C&S and A&P shall reconcile the Gainshare in connection with the year-end reconciliation (as set forth in Schedule 8.5.3 hereof). To the extent any portion of the Cost Savings Gainshare Incentive Fee is disputed, A&P shall nonetheless pay to C&S the undisputed portion of such Fee on the next Weekly Statement and the parties shall resolve any disputed portion in accordance with the terms and conditions as set forth in Schedule 12 hereof;

(ii)    Payment of the Cost Savings Gainshare Incentive Fee shall be made to C&S in accordance with the terms and conditions set forth in this Schedule 8.11 and Schedule 9 hereof.

## SCHEDULE 9

## REMUNERATION AND PAYMENT OF SERVICES FEES AND OPERATING COSTS

**9.1** *Payment of Costs and Services Fees.*

(a) <u>Weekly Statements</u>.  Commencing on the Effective Date and on each Sunday thereafter during the Term of this Agreement, C&S will electronically transmit to A&P a statement (the "Weekly Estimate") setting forth (a) the estimated amounts payable to C&S for the True Net Cost of A&P's purchases of Merchandise and (b) the Costs and Services Fees for the forthcoming Contract Week, as set forth in the Approved Budget (or Flex Budget, as the case may be) (the "Estimated Weekly Payment Amount").  In addition, each Sunday during the Term, C&S will electronically transmit to A&P files (such files shall be referred to collectively as the "Weekly Statement") setting forth all amounts actually due to C&S (including the True Net Cost of A&P's purchases of Merchandise, Services Fees, and Costs) for the immediately preceding Contract Week (the "Weekly Actual Amount").  The Weekly Statement will include a shipment file with all Merchandise charged to the A&P Stores at the Base Price; a gross profit file indicating the Gross Profit Rebate; and an Expense/Charge File with all Costs and the Services Fees allocated to such week as set forth on the Approved Budget or Flex Budget, as applicable.  With respect to the Cost Savings Gainshare Incentive Fee, for the First Contract Year only, such amounts will be paid to C&S in connection with the year-end reconciliation related to any Contract Year.   Thereafter, the Cost Savings Gainshare Incentive Fee will be budgeted in the Approved Budget (or the Flex Budget, if applicable) for each succeeding Contract Year, based on the amounts realized in the immediately preceding Contract Year and trued up in connection with the year-end reconciliations.   Each week, the Weekly Statement will reflect, and A&P will pay in accordance with Schedule 9.1(b) below, seventy-five percent (75%) of the budgeted amount of the Cost Savings Gainshare Incentive Fee budgeted for the preceding Contract Week.

(b) <u>Payment</u>.  Each Monday, Tuesday and Thursday, before receipt of the Weekly Statement, A&P will effect an ACH payment for settlement on such day in the amount of 8% of the Estimated Weekly Payment Amount.  On each Wednesday and Friday of the same week, A&P will effect an ACH payment for settlement on such day in the amount of 38% of the Estimated Weekly Payment Amount.  At the end of each Contract Week, C&S and A&P will compare the Weekly Actual Amount to the Estimated Weekly Payment Amount for such Contract Week and adjust the payment to be made on the next succeeding Wednesday to reflect any overpayment or underpayment for such Contract Week's Weekly Actual Amount.  C&S may appropriately and timely adjust A&P's Estimated Weekly Payment Amount to the extent A&P's estimated purchases of Merchandise are consistently less than the actual amounts of A&P's purchases of Merchandise as set forth in the Weekly Actual Amount.  Should the due date of A&P's payment fall on a date on which banks in New York are required to be closed, the due date shall be accelerated to the previous day that banks in New York may legally open.   If at any time A&P's S&P corporate credit rating is B+ or above, then C&S will adjust A&P's payment terms for a Friday payment of such Contract Week's Estimated Weekly Payment Amount with a true-up payment the following Wednesday.

(c) <u>Miscellaneous Billing and Payment Matters</u>.  Time is of the essence.  If any payment under Schedule 9.1 is in default, and A&P has failed to cure the default within seventy-two hours after receiving written notice from C&S, then C&S shall have the right (which rights shall be nonexclusive, cumulative of and additional to all other remedies) to defer further deliveries until all payments in default have been made, or if such payment is in default for more than five (5) business days following notice from C&S, to terminate this Agreement in accordance with Schedule 11 hereof.   If either of the Parties disputes any portion of the Weekly Statement, absent manifest error, such Party shall nonetheless pay the full amount of the statement by the payment due date, without any deductions or offsets; provided, such Party may avail itself of the dispute resolution provision set forth below and in Schedule 12 hereof

41

with respect to such disputed amount. The Party disputing the payment shall give the other Party notice of any billing adjustments it believes should be made, and the Parties shall attempt to reach agreement on any adjustments within seven days. If either Party believes a billing adjustment should be made, it shall give notice to the other Party and the Parties shall attempt to reach agreement on any adjustments within seven days from the date notice is received. In the event an agreement cannot be reached on disputed adjustments within said seven days, the Parties will settle the dispute in accordance with the dispute resolution procedures for accounting disputes set forth in Schedule 12 hereof.

9.2    *Taxes.*  All amounts payable by A&P under this Agreement shall be paid together with any applicable taxes and duties including any sales taxes and any other miscellaneous taxes related to the provision of Services hereunder (such as the New Jersey Litter Tax or the Delaware Gross Receipts Tax) which are assessed against C&S or its Affiliates, other than income taxes related to the collection of the Services Fees.

9.3    *Payments for Assumption of Performance.*  If any provision of this Agreement requires C&S to make any payment to any third person or perform specific actions and C&S fails to make such payment or perform such actions within 5 days of notice thereof from A&P to C&S, and provided that C&S is not in dispute with such third person with respect to such obligation, A&P may elect (but in no event shall A&P be obligated) to make all or part of such required payment or perform all or part of such actions, in which event C&S shall immediately reimburse A&P for such payment or performance, provided that A&P shall have the right, as an alternative to such reimbursement, to set-off the amount of any such required payment made by A&P against any amount owed by A&P to C&S. In the event that A&P exercises such right of set-off, it shall provide C&S with a copy of supporting documentation including evidence of payment.

42

**SCHEDULE 10**

**INDEMNIFICATION AND INSURANCE; FORCE MAJEURE**

10.1   *Indemnification.*

    (a)   C&S.  C&S shall defend, indemnify and hold harmless A&P and its Affiliates, and their respective employees, servants, agents, independent contractors, successors and assigns from any and all losses, damages, claims, liabilities, causes of action, costs and expenses, including but not limited to reasonable legal fees and costs of settlement (collectively, "Losses") arising out of or related to any third party claim in connection with or resulting from (i) C&S's acts, omissions or negligence in its performance of the Services or its other obligations under this Agreement; (ii) C&S's failure to comply with any applicable Laws related to its performance of the Services or its other obligations under this Agreement; or (iii) the acts, omissions or negligence of any third party hired by C&S or its Affiliates in connection with this Agreement; provided, however, this indemnification and hold harmless with respect to sub-schedules (i)-(iii) shall not apply to the extent of any claims arising out of or resulting from the negligence or willful misconduct of A&P, its Affiliates or their respective employees, representatives or agents.  Whenever A&P receives notice of a claim or demand that would be covered by this provision, A&P shall in turn provide C&S with prompt written notice of such claim or demand.  Notwithstanding anything to the contrary set forth herein, nothing in this Schedule 10.1(a) shall be interpreted to excuse C&S from its obligation to reimburse C&S for Costs as set forth in Schedule 8.

    (b)  A&P.  A&P shall defend, indemnify and hold harmless C&S and its Affiliates, and their respective employees, servants, agents, successors and assigns from any and all Losses arising out of or related to any third party claim in connection with or resulting from (i) A&P's acts, omissions or negligence related to this Agreement; (ii) A&P's failure to comply with any applicable Laws related to Merchandise procured, handled, packaged, used, possessed, transported or stored by A&P; or (iii) acts, omissions or negligence of any Affiliate of A&P or any third party hired by A&P or its Affiliates in connection with this Agreement including, but not limited to, GHI; provided, however, this indemnification and hold harmless with respect to sub-schedules (i)-(iii) shall not apply to the extent of any claims arising out of or resulting from the negligence or willful misconduct of C&S, its Affiliates or their respective employees, representatives or agents.  Whenever C&S receives notice of a claim or demand that would be covered by this provision, C&S shall in turn provide A&P with prompt written notice of such claim or demand.

    (c)  Product Liability - Infringement.  The Parties hereto agree that each shall use commercially reasonable efforts to seek indemnity from the manufacturer of any Merchandise with respect to any and all Losses arising out of or relating to any third party claim in connection with or resulting from (i) actual or alleged product liability or the handling, possession, storage, use or any other dealing by any person of any Merchandise or (ii) any actual or alleged infringement of any trademark, patent, copyright or other intellectual property right.  To the extent C&S has exhausted its efforts to seek indemnity from the manufacturer as set forth in this Schedule 10(c), but was unable to secure such indemnity, A&P shall indemnify C&S with respect to Losses to the extent (a) such Losses are related to private label or A&P unique items and (b) such Losses do not arise from or are not related to the negligence or willful misconduct of C&S.  To the extent A&P has exhausted its efforts to seek indemnity from the manufacturer as set forth in this Schedule 10(c), but was unable to secure such indemnity, C&S shall indemnify A&P with respect to any Losses arising out of or relating to any third party product liability claim related to C&S's handling, possession, storage or use of Merchandise, to the extent such claim does not relate to any actual or alleged negligence or willful misconduct of A&P.  Notwithstanding anything to the contrary set forth herein, this paragraph shall not be deemed to prohibit or restrict either Party in any way from seeking indemnification from the other Party under this Schedule 10.

43

10.2    *Insurance by C&S.*

    (a)   Insurance Policies.  During the Term of this Agreement, C&S shall carry and maintain the following policies of insurance issued by recognized, reputable insurers reasonably acceptable to A&P, in forms satisfactory to A&P acting reasonably, and naming A&P as an additional insured on all policies except the Workers Compensation and Disability Benefits policies of insurance:

        (i)    All Risks of physical damage property insurance for the Facilities and Fixed Assets including Boiler & Machinery coverage, all on a full replacement cost basis.

        (ii)   All Risks of physical damage property insurance (including coverage against acts of terrorism and coverage for goods in transit) on all inventories of Merchandise on a full replacement cost basis.

        (iii)  Commercial General Liability coverage with a limit of not less than $50.0 Million per occurrence for bodily injury, personal injury and property damage.  Such policy shall include blanket contractual liability coverage and products/completed operations liability coverage.  Products/completed operations liability coverage shall remain in effect for not less than two (2) years after expiration or earlier termination of this Agreement.

        (iv)   Workers Compensation and Disability Benefits coverage as required by statute and Employers Liability coverage in a minimum amount of $2.0 Million per accident/disease.

        (v)    Automobile Liability Insurance coverage with a limit of not less than $20.0 Million per occurrence for bodily injury, personal injury and property damage.

    (b)   Primary Coverage.  The policies set forth in this Schedule 10.2 shall be primary with respect to the acts or omissions of C&S.

    (c)   Subrogation.  C&S agrees to waive all rights of subrogation against A&P.

    (d)   Proof of Insurance.  Not later than ten (10) days prior to the Effective Date, C&S shall provide to A&P certificates evidencing the insurance coverages required of C&S under this Schedule 10.2, and such certificates shall state that all policies of insurance evidenced therein may not be terminated, cancelled or modified except upon no less than thirty (30) days prior written notice to A&P.  In addition, C&S shall deliver renewal certificates to A&P promptly upon receipt by C&S, and C&S will provide evidence that such coverage did not lapse.

10.3    *Insurance by A&P.*

    (a)   Insurance Policies.  During the Term of this Agreement A&P shall carry and maintain the following, naming C&S as an additional insured with respect to "i" below, policies of insurance issued by recognized, reputable insurers reasonably acceptable to C&S, in forms satisfactory to C&S acting reasonably:

        (i)    Commercial General Liability coverage with a limit of not less than $50.0 Million per occurrence for bodily injury, personal injury and property damage.  Such policy shall include blanket contractual liability coverage and products/completed operations liability coverage.  Products/completed operations liability coverage shall remain in effect for not less than two (2) years after expiration or earlier termination of this Agreement.

    (ii)    Workers Compensation and Disability Benefits coverage as required by statute and Employers Liability coverage in a minimum amount of $2.0 Million per accident/disease.

(b)  <u>Primary Coverage</u>.  The policies set forth in this Schedule 10.3 shall be primary with respect to the acts or omissions of A&P.

(c)  <u>Subrogation</u>.  A&P agrees to waive all rights of subrogation against C&S.

(d)  <u>Proof of Insurance</u>.  Not later than ten (10) days prior to the Effective Date, A&P shall provide to C&S certificates evidencing the insurance coverages required of A&P under this Schedule 10.3 and such certificates shall state that all policies of insurance evidenced therein may not be terminated or cancelled except upon no less than thirty (30) days prior written notice to C&S.  In addition, A&P shall deliver renewal certificates to C&S promptly upon receipt by A&P, and A&P will provide evidence that such coverage did not lapse.

**10.4**    *Self-Insurance.*  Notwithstanding anything to the contrary contained herein, if any Party required to carry insurance hereunder has a net worth in excess of $100.0 Million ($100,000,000) Dollars, then such insurance may be carried whole or in part under a program of self-insurance.

**10.5**    *Force Majeure.*

(a)  If either Party is rendered unable at any time, wholly or in part, to perform or comply with any of its obligations under this Agreement, other than obligations regarding the payment of money, by reason of act of God, force of nature, fire, or other casualty, eminent domain, war-like activity, utility failure, insurrection, or civil commotion, shortage of raw materials or supplies, any law, regulation or order by any governmental body or authority of competent jurisdiction, or any other cause beyond its reasonable control, or beyond the control of any person directly or indirectly engaged by it (any such event being referred to as a "Force Majeure"), the obligations of such Party shall be suspended for the duration of the Force Majeure, but only to the extent such event of Force Majeure impairs the Party's ability to perform its obligations under this Agreement.

(b)  As soon as the Party whose performance is affected by the Force Majeure (the "Affected Party") becomes aware that an event of Force Majeure has occurred or is likely to occur, such Affected Party will notify the other Party.  Upon receipt of such notice by the other Party, representatives of the Parties shall meet to establish plans and procedures to overcome or mitigate the effects of the Force Majeure and the Affected Party shall use all reasonable efforts to minimize any adverse effects on the other Party.  A&P shall pay all reasonable costs and expenses incurred by C&S in overcoming or mitigating the effects of the Force Majeure and shall continue to pay to C&S all Costs and Services Fees otherwise payable under this Agreement.

(c)  The foregoing notwithstanding, if the Force Majeure causes C&S to be unable to render substantial performance of its obligations under this Agreement, which inability causes substantial damage to A&P and A&P can either render such performance itself or obtain such performance from a third party, then A&P may perform or engage third parties to perform the Services until C&S is able to resume the performance of the Services.

**10.6**    *Disaster and Recovery Plans*. Each of the Parties shall maintain a disaster and recovery plan that is specific to the performance of their respective obligations under this Agreement and to the information systems maintained by the respective Parties in connection with this Agreement.  Each Party shall have the right to audit, test and review the other Party's disaster and recovery plan, and may conduct on-site interviews with relevant officers and employees.

45

## SCHEDULE 11

## TERM AND TERMINATION

11.1    *Term.*  This Agreement will commence on March 30, 2008 (the "Effective Date"), and shall remain in effect through September 29, 2018, unless earlier terminated in accordance with this Schedule 11. The Parties shall meet and in good faith discuss an extension of the Term if C&S makes material capital expenditures exclusively to service A&P during the Term.  However, under no circumstances shall A&P be deemed to be under any obligation whatsoever to agree to any extension of this Agreement for any reason. Unless the Parties otherwise agree in writing, the Parties shall cooperate in good faith to ensure that upon the expiration of this Agreement, the Services, Other Services and inventory of Merchandise held on A&P's behalf at the Facilities is transitioned and transferred to A&P or A&P's designee in accordance with Schedule 11.7.

11.2    *C&S Events of Default.*    Subject to any applicable cure period set forth in this Schedule 11.2 or elsewhere in this Agreement, each of the following is a "C&S Event of Default" and in case of occurrence of one or more of the following, C&S will be in default hereunder:

(a)    C&S fails to make any material, undisputed payment required under this Agreement, and such non-payment remains uncured for a period of ten (10) days after written notice thereof from A&P.

(b)    C&S fails to perform any of its material obligations as and when required under this Agreement and such nonperformance continues uncured for thirty (30) days after written notice thereof from A&P.  Notwithstanding the foregoing, if the non-performance under this Schedule 11.2 represents an immediate and emergent threat to the health, safety or welfare of the public, then such nonperformance shall be deemed to constitute a "C&S Event of Default" if it continues uncured for ten (10) days.

(c)    Any of C&S's material representations or warranties in this Agreement is breached or not true in any respect, and such representation or warranty remains breached or untrue for thirty (30) days after written notice thereof from A&P and such continuing breach materially adversely affects C&S's ability to perform its obligations hereunder.  Notwithstanding the foregoing, if the breach of such representation or warranty under this Schedule 11.2 presents an immediate and emergent threat to the health, safety or welfare of the public, then such breach of representation or warranty shall be deemed to constitute a "C&S Event of Default" if it continues uncured for ten (10) days.

(d)    C&S (i) becomes insolvent; (ii) commits an act of bankruptcy; (iii) becomes subject to any voluntary or involuntary bankruptcy proceedings; (iv) makes an assignment for the benefit of creditors; (v) appoints or submits to the appointment of a receiver or a receiver manager for all or any of its assets; (vi) admits in writing its inability to pay its debts as they become due; or (vii) enters into any type of voluntary or involuntary liquidation.

(e)    C&S is in default with respect to any financial covenant of C&S's most senior tranche of indebtedness and such default remains uncured or un-waived beyond the applicable cure period or any extension thereof. (With respect to this sub-schedule "e", C&S agrees to provide to A&P within 120 days of the completion of its fiscal year a copy of the annual certification of covenant compliance that C&S's auditors provide to C&S lenders for the just-completed fiscal year).

(f)    C&S is in material breach of Schedule 7.8(b), 7.11(a) or 7.11(b).

(g)    A majority of the assets or voting stock of C&S is acquired by a competitor of A&P.

46

(h) C&S has breached any obligation under any provision of this Agreement other than this Schedule 11.2 which gives rise to A&P's ability to terminate this Agreement as specifically set forth in such provision, subject to any applicable cure period set forth therein.

**11.3** *__Remedies Upon C&S Event of Default__.*     Upon the occurrence of any C&S Event of Default and subject to any applicable cure periods:

(a) A&P shall have all remedies available to it under this Agreement, at law and/or in equity in each case subject to the terms of this Agreement.

(b) A&P shall have, at its discretion, the right to terminate this Agreement upon written notice to C&S, such termination to occur at the termination date specified in such notice.

**11.4** *__A&P Events of Default__.*   Subject to any applicable cure period set forth in this Schedule 11.4 or elsewhere in this Agreement, each of the following is an "A&P Event of Default" and in the occurrence of one or more of the following, A&P will be in default hereunder:

(a) A&P fails to make any material, undisputed payment required under this Agreement, and such non-payment remains uncured for a period of ten (10) days after written notice thereof from C&S.

(b) A&P fails to perform any of its other material obligations as and when required under this Agreement and such non-performance continues uncured for 30 days after written notice thereof from C&S. Notwithstanding the foregoing, if the non-performance under this Schedule 11.4 represents an immediate and emergent threat to the health, safety or welfare of the public, then such nonperformance shall be deemed to constitute an "A&P Event of Default" if it continues uncured for ten (10) days.

(c) Any of A&P's material representations or warranties in this Agreement is breached or not true in any respect, and such representation or warranty remains breached or untrue for thirty (30) days after written notice thereof from C&S and such continuing breach materially adversely affects A&P's ability to perform its obligations hereunder. Notwithstanding the foregoing, if the nonperformance under this Schedule 11.4 represents an immediate and emergent threat to the health, safety or welfare of the public, then such nonperformance shall be deemed to constitute an "A&P Event of Default" if it continues uncured for ten (10) days.

(d) A&P (i) becomes insolvent; (ii) commits an act of bankruptcy; (iii) becomes subject to any voluntary or involuntary bankruptcy proceedings; (iv) makes an assignment for the benefit of creditors; (v) appoints or submits to the appointment of a receiver or a receiver manager for all or any of its assets; (vi) admits in writing its inability to pay its debts as they become due; or (vii) enters into any type of voluntary or involuntary liquidation.

(e) A&P has breached any obligation under any provision of this Agreement other than this Schedule 11.4 which gives rise to C&S's ability to terminate this Agreement as specifically set forth in such provision, subject to any applicable cure period set forth therein.

**11.5** *__Remedies Upon A&P Event of Default__.*  Upon the occurrence of any A&P Event of Default, and subject to any applicable cure periods:

(a) C&S shall have all remedies available to it under this Agreement, at law and/or in equity in each case subject to the terms of this Agreement.

(b) C&S shall have, at its discretion, the right to terminate this Agreement upon written notice to A&P, such termination to occur at the termination date specified in such notice.

**11.6** *__Force Majeure__.*   Either party shall have the right to terminate this Agreement without penalty if due to a Force Majeure event which has occurred and is continuing, C&S is unable to perform any

47

material obligation, as and when required, under this Agreement for more than twenty-six (26) consecutive weeks.

11.7    **_Procedures on Termination._**

(a) Notwithstanding termination of this Agreement by reason of a C&S Event of Default or an A&P Event of Default or as otherwise stipulated herein, C&S shall remain obligated to fully perform, to the extent permitted by Law and for a period of up to (but no more than) one hundred and eighty (180) days, the Services and the Other Services pursuant to this Agreement (including without limitation, making whatever arrangements are necessary to continue such Services without interruption or diminution in the Service Specifications), and C&S shall continue to be compensated for such Services and Other Services in accordance with this Agreement, until such time (the "Effective Date of Termination") as may be reasonably required to transition or transfer to A&P or its designee responsibility for performing all Services and Other Services, and all inventory of Merchandise ordered on behalf of A&P and held at the Facilities. The Parties shall cooperate to ensure that the Services and Other Services, and the inventory described above, are transferred or transitioned to A&P or A&P's designee in an orderly and professional manner.   A&P's payment obligations for Services under this Agreement shall not be subject to any increase as a direct or indirect result of any termination of this Agreement. This Schedule 11.7(a) shall be void in the event that the termination by C&S of this Agreement was due to nonpayment by A&P and such nonpayment is not immediately cured.

(b) If this Agreement terminates by reason of a C&S Event of Default, C&S agrees to:

(i) pay or rebate to A&P all sums due to A&P under the Agreement through the effective date of termination and for such further period during which Services or Other Services are rendered in accordance with sub-schedule (a) above; and

(ii) pay and/or reimburse A&P for all proven direct damages made against or suffered or incurred by A&P arising from or in any way related to the termination of this Agreement.

(c) If this Agreement terminates by reason of an A&P Event of Default, A&P agrees to:

(i) pay C&S all sums due to C&S under the Agreement through the effective date of termination and for such further period during which Services or Other Services are rendered in accordance with sub-schedule (a) above;

(ii) additionally pay and/or reimburse C&S for all proven direct damages made against or suffered or incurred by C&S arising from or in any way related to the termination of this Agreement and the Services hereunder including, but not limited to, early termination fees and equipment pay-out amounts related to any early termination of a lease or licensing agreement related to the Facilities or any Fixed Assets.

(d) IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL, PUNITIVE OR EXEMPLARY DAMAGES, INCLUDING LOST SALES OR LOST PROFITS; PROVIDED THAT THIS LIMITATION OF LIABILITY SHALL NOT APPLY IN INSTANCES OF WILLFUL BREACH OR MISCONDUCT OR TERMINATION PURSUANT TO SCHEDULE 7.12(e).

11.8    **_Facilities and Fixed Assets._**  Notwithstanding anything contained in this Agreement to the contrary, but without limiting A&P's obligations in Schedule 11.7(c), in no event shall A&P have any responsibility or obligation to take title to any of the Facilities or Fixed Assets, or to assume any Real Estate Obligations relating to the Facilities, or to assume any leases, licenses or other agreements relating to the Fixed Assets or otherwise, upon the expiration or earlier termination of this Agreement (regardless, in the case of an early termination, of the reason for such early termination).

## SCHEDULE 12

## MISCELLANEOUS

12.1 _Negotiation._ If a dispute arises under this Agreement which cannot be resolved by the personnel directly involved, either Party may invoke the dispute resolution procedure set forth below by giving written notice to the other Party of the dispute and designating its chief legal officer as its representative in negotiations relating to the dispute. The chief legal officers of both Parties, acting in good faith and using reasonable efforts, shall work toward a reasonable and equitable resolution of the dispute. In the event the chief legal officers are unable to reach resolution, the Parties will designate their respective Chief Executive Officers to negotiate resolution of the dispute.

12.2 _Appointment of Mediator – Non-Accounting Disputes._ If the respective designated officers of C&S and A&P are unable to resolve the dispute within ten (10) business days from the receipt of written notice of the dispute, the Parties shall agree on the appointment of a mediator to assist in resolving the matter. A mediator shall be appointed by the American Arbitration Association upon the request of either Party if the Parties cannot agree in the selection of such person within five (5) business days of a request to agree. The person so appointed shall, within one month of appointment, render his decision on the matter. Such decision shall not be binding on the Parties. The Parties shall cooperate with any person appointed pursuant to this Schedule 12.2 and shall provide him with such information and other assistance as he shall require and his costs shall be paid by such Party as he shall determine.

12.3 _Resolution of Accounting Disputes._ Any accounting disputes, including disputes relating to specific amounts and numerical assumptions to be used in the preparation or modification of budgets, shall be resolved in the following manner: If Parties exhaust all good faith efforts to reach agreement within 10 days, the matter shall be referred to each Parties' independent accountants and such independent accountants shall agree upon the appointment of a third independent accountant to resolve the matter. The independent accountant so appointed shall, within 20 days of appointment, render a decision on the matter and such decision shall be final and binding on the Parties.

12.4 _Resolution of All Other Disputes._ Failing resolution by the Parties through negotiation or mediation, any controversy, claim, or dispute between the Parties, directly or indirectly, concerning this Agreement or the breach hereof, or the subject matter hereof, including questions concerning the scope and applicability of this arbitration clause, shall be finally settled by arbitration before a single arbitrator in New York City pursuant to the applicable rules of the American Arbitration Association, with the sole exception for a breach of confidentiality requiring injunctive relief. The single arbitrator shall be selected within 20 days after the commencement of the arbitration proceeding. The Parties agree that the arbitrator's award shall be duly made in writing within thirty (30) days after the hearings in the arbitration proceedings are closed, and that such award shall be binding and conclusive on all of the Parties to this Agreement. The arbitrator shall have the right and authority to assess the cost of the arbitration proceedings and to determine how its decision as to each issue or matter in dispute may be implemented or enforced. Judgment upon the award may be sought and entered in any competent federal or state court located in the United States of America. An application may be made to such court for confirmation of the award and for any other equitable or legal remedies that may be necessary to effectuate such award or otherwise preserve any rights for which no adequate remedy at law exists. Notwithstanding anything to the contrary contained in this Schedule 12, neither Party shall be prohibited from opting out of the arbitration process set forth hereunder and litigating in court any claim arising under Schedule 11 of this Agreement; provided, however, each of the Parties hereby expressly waives a right to a jury trial with respect to any such claim or cause of action.

49

**12.5**   *Audit and Access Rights.*

(a) <u>Books and Records</u>. C&S shall maintain complete and detailed records, data, information and statements in auditable form and quality in respect of all activities related to the provision of Services on behalf of A&P and to all of C&S's other obligations under this Agreement, as information fully integrated into the overall financial statements maintained by C&S in the ordinary course of business. C&S shall maintain all such records consistent with GAAP. Without limiting the generality of the foregoing, C&S shall maintain and provide to A&P such other separate records, information and reports in such forms and for such periods of time as are set forth in the Service Specifications. C&S shall prepare and maintain for a period of not less than five (5) years following the end of each of its fiscal years, adequate books and records with respect to: (i) C&S's performance of Services, Other Services and all of its other obligations under this Agreement; (ii) all amounts charged or credited by C&S to A&P hereunder; (iii) all Costs arising under this Agreement; (iv) C&S's compliance with Laws governing its performance hereunder; (v) the Base Price charged by C&S to A&P and the Gross Profit Rebate rebated by C&S to A&P hereunder, and (vi) such other records, data or information as may be set forth under the Service Specifications or as may be otherwise required under this Agreement or by A&P from time to time (collectively, the "Books and Records"). The Books and Records shall also be deemed to include any other books, records, data or other materials that relate to the activities described in subsections (i) through (vi) above and which may be maintained by C&S or its employees, representatives or third-party vendors. The Books and Records shall be maintained consistent with GAAP, consistently applied, and shall be in a form suitable for audit, review and copying and shall be made available as reports produced from C&S's overall financial statements maintained by C&S for its entire operations in the ordinary course of business. All Books and Records shall be maintained in accordance with C&S's document retention policy. A&P will be provided access to, and the right to audit, any information A&P determines it needs in order to verify any of the items listed in (i)-(vi) above, provided however, A&P will not be provided access to data or information relating to other customers of C&S or information unrelated to the performance of the Services, except as may be necessary to verify cost allocations at the Shared Facility.

(b) <u>Financial Statements</u>. Each Party shall promptly deliver to the other audited financial statements for the year-end period, which have been certified to by a registered public accounting firm, after such financial statements have been issued by such public accounting firm.

(c) <u>Access to Books and Records</u>.   C&S shall permit A&P and its officers, directors, representatives, counsel, advisors and other agents (collectively, "Agents"), upon reasonable notice and during normal business hours, to inspect, have access to the Facilities and to inspect, have access and audit all of the Books and Records for the purpose of auditing: a) the performance of the Services and the Other Services;  b) the conformity to this Agreement of C&S's charges and calculations of charges for all Costs and True Net Cost charged to A&P and for all Gross Profit Rebate rebated to A&P;  c) preparation and maintenance of records related to such Services;  and d) any other matter relating to C&S's performance or obligations under this Agreement.  The right of access under this Schedule 12.5(c) shall include the right to discuss such documentation with C&S's employees, representatives and outside vendors having knowledge of their contents, and C&S shall instruct all such employees, representatives or third-party vendors to fully cooperate with any request for information made by A&P to such employee, representative or third-party vendor.

(d) <u>Frequency and Scope</u>. During the Term of this Agreement, and for a period of one (1) year thereafter, A&P or A&P's duly authorized auditor or agent shall have the right at any time to audit and review the Books and Records.  The scope of the audit shall encompass no more than the prior 24-month period, except in the event that the auditor determines reasonably that there is a specifically identified irregularity that requires further inspection, in which case the audit shall be permitted to look back an additional three (3) years but solely with respect to

the identified irregularity.  All Books and Records are subject to audit and review by A&P in accordance with this Agreement including the confidentiality provisions set forth in Schedule 12.23 below.  Notwithstanding anything to the contrary set forth herein, failure by A&P to challenge the amount of any True Net Cost, Gross Profit Rebate, Cost, or the Services Fee within the audit periods described herein shall be deemed to be A&P's agreement and consent to such billed amounts, and A&P shall thereafter waive any claim or right to adjust such amounts.

(e)  Deficiencies.  If an audit or review reveals that any amounts to be paid or charged to A&P have been overstated or understated, then C&S shall issue a charge or credit, as applicable, to correct such overstatement or understatement.  If an audit or review reveals that amounts paid or charged to A&P were overstated or understated by ten percent (10%) or more during the period audited, the Party required to pay such amount to the other Party shall reimburse the other Party for all costs and expenses incurred in connection with the audit or review. The foregoing remedies shall be in addition to any other remedies available to A&P and C&S at law or in equity.

(f)  Confidentiality.  Any and all information provided to A&P pursuant to this Schedule 12.5 including, but not limited to any audited financial statements and other financial information, will be subject to the Confidential Information provisions set forth in Schedule 12.23 below.

12.6   *Headings*.  The division of this Agreement into Schedules and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement. Unless inconsistent with the context, references in this Agreement to Schedules are to Schedules of this Agreement.

12.7   *Extended Meanings*.   In this Agreement words importing the singular number only include the plural and vice versa, words importing the masculine gender include the feminine and neuter genders and vice versa and words importing persons include individuals, partnerships, associations, trusts, unincorporated organizations and corporations.

12.8   *Accounting Principles*.  Wherever in this Agreement reference is made to a calculation to be made in accordance with GAAP (generally accepted accounting principles consistently applied), such reference shall be to generally accepted accounting principles of the United States of America from time to time recommended by the Financial Accounting Standards Board (FASB), or any successor, applicable as at the date on which such calculation is made or required to be made.

12.9   *Currency*.  All references to dollar amounts in this Agreement are to lawful money of The United States of America.

12.10   *Proper Law of Contract; Consent to Jurisdiction*. This Agreement shall be governed by the laws of the State of New York and the laws of The United States of America as applicable in such State.

12.11   *Legal Relationship*. The legal relationship of C&S and A&P to each other shall be that of independent contractors, and neither Party shall be the agent or legal representative of the other for any purpose.  Neither Party shall have the right or authority to bind or obligate the other to any third party for any purpose whatsoever.

12.12   *Notices*.  Any demand, notice or other communication to be given in connection with this Agreement shall be in writing and shall be given by personal delivery, by overnight courier, by registered mail or by facsimile or electronic means of communication addressed to the recipient at the address set forth below or to such other address, individual or electronic communication number as may be designated by notice given by either Party to the other.  Any demand, notice or other communication shall be conclusively deemed to have been given (i) on the day of actual delivery if given by personal delivery; (ii) on the next business day if given by overnight courier;

(iii) on the third business day following deposit in the mail if given by registered mail; and (iv) on the day of transmittal if given by facsimile or electronic communication during the normal business hours of the recipient and on the next following business day if not given during such hours on any day.

If to C&S:

C&S Wholesale Grocers, Inc.
7 Corporate Drive
Keene, NH 03431
Attn: Richard B. Cohen, Chairman and Chief Executive Officer
Phone: (603) 354-4601
Fax: (603) 354-4692

with a copy to:

General Counsel
Phone: (603) 354-5885
Fax: (603) 354-4694

If to A&P:

The Great Atlantic & Pacific Tea Company, Inc.
2 Paragon Drive
Montvale, NJ 07645
Attention: Eric Claus, President and Chief Executive Officer
Phone:  (201) 571-8770
Fax:  (201) 571-8715

with a copy to:

Vice President – Legal Services
Phone: (201) 571-8161
Fax:  (201) 571-8106

12.13   ***Further Assurances.***  Each of C&S and A&P shall from time to time execute and deliver all such further documents and instruments and do all acts and things as the other Party may reasonably require to effectively carry out or better evidence or perfect the full intent and meaning of this Agreement.

12.14   ***Benefit of the Agreement.*** This Agreement shall inure to the benefit of and be binding upon C&S, A&P and their respective assigns and successors, including any transferee of substantially all of the assets of either Party.

12.15   ***Third Party Agreements.***  Neither C&S nor A&P shall enter into any agreement with any Person that would have the effect of impairing any of the other Party's rights hereunder this Agreement or limiting either Party's ability to amend this Agreement in accordance with the terms hereof, without the prior written consent of the other Party hereto.

12.16   ***Continued Provisions.***  Notwithstanding any expiration or termination of this Agreement, (i) the indemnification obligation of both Parties as set forth in Schedule 10; (ii) the obligations of the both Parties upon termination of this Agreement as set forth in Schedule 11; (iii) the confidentiality and non-solicitation provisions set forth below; and (iv) any other provision which expressly or by its nature is intended to survive termination of this Agreement, shall continue in full force and effect.

12.17   *General Representations and Warranties by A&P.* A&P represents and warrants to C&S as follows:

    (a)  A&P is a corporation duly incorporated and validly existing under the laws of its jurisdiction of incorporation and has all necessary corporate power, authority and capacity to enter into this Agreement and to carry out its obligations under this Agreement.  The execution and delivery of this Agreement and the performance of A&P's obligations under this Agreement have been duly authorized by all necessary corporate action on the part of A&P.

    (b)  A&P is not a party to, bound or affected by, or subject to, any indenture, mortgage, lease, agreement, collective bargaining agreement, obligation, instrument, charter or by-law provision, statute, regulation, order, judgment, decree, license, permit or law which would be violated, contravened or breached as a result of the execution and delivery of this Agreement, or the performance by A&P of any of its obligations under this Agreement.

12.18   *General Representations and Warranties by C&S.* C&S represents and warrants to A&P as follows:

    (a)  C&S is a corporation duly incorporated and validly existing under the laws of its jurisdiction of incorporation and has all necessary corporate power, authority and capacity to enter into this Agreement and to carry out its obligations under this Agreement.  The execution and delivery of this Agreement and the performance of C&S's obligations under this Agreement have been duly authorized by all necessary corporate action on the part of C&S.

    (b)  C&S is not a party to, bound or affected by, or subject to, any indenture, mortgage, lease, agreement, collective agreement, obligation, instrument, charter or by-law provision, statute, regulation, order, judgment, decree, license, permit or law which would be violated, contravened or breached as a result of the execution and delivery of this Agreement, or the performance by C&S of any of its obligations under this Agreement.

    (c)  C&S is not in breach of any Laws that could reasonably be expected to have a material, adverse effect on C&S's ability to perform the Services or perform its other obligations under this Agreement, including without limitation and to the extent applicable all Laws pertaining to human rights, labor or employment standards, labor relations and employment, protection of personal information, occupational health and safety, workers' compensation and workplace safety insurance and environmental Laws.

12.19   *Entire Agreement.*  This Agreement together with all schedules and exhibits hereto constitutes the entire agreement between the Parties with respect to its subject matter and cancels and supersedes any prior understandings and agreements between the Parties with respect to such subject matter.  There are no representations, warranties, terms, conditions, undertakings or collateral agreements, express, implied or statutory, between the Parties other than as expressly set forth in this Agreement.

12.20   *Amendments and Waiver.*  No modification of or amendment to this Agreement shall be valid or binding unless in writing and duly executed by both of the Parties and no waiver of any breach of any term or provision of this Agreement shall be effective or binding unless made in writing and signed by the Party purporting to give the same and, unless otherwise provided, shall be limited to the specific breach waived.

12.21   *Assignment.*  Except as provided below, this Agreement may not be assigned, either directly or by operation of law, by either Party without the written consent of the other Party, such consent not to be unreasonably withheld; provided, however, that in the event of any assignment the assignor shall continue to be bound by all obligations under this Agreement as if such assignment had not occurred and shall perform such obligations to the extent that the assignee fails to do so.  This Agreement may be assigned by either Party without the consent of the other Party to an affiliate of

53

the assignor, provided that the affiliate enters into a written agreement with the other Party to be bound by the provisions of this Agreement in all respects and to the same extent as the assignor is bound and provided that the assignor shall continue to be bound by all obligations under this Agreement as if such assignment had not occurred and shall perform such obligations to the extent that the affiliate fails to do so. Notwithstanding anything to the contrary, this Agreement shall be binding on any transferee of substantially all of the assets of either Party.

12.22 *Non-Solicitation.* During the Term of this Agreement and for a period of twelve (12) months following the expiration or termination of this Agreement for any reason whatsoever, A&P shall not, and shall not permit any of its Affiliates to, directly or indirectly, hire, solicit, induce or encourage any person who is a managerial employee or agent employed or engaged by C&S or any of its Affiliates within one year prior to such solicitation, to leave or otherwise cease being employed or engaged by C&S or any of its Affiliates (other than a person whose pay in lieu of notice, termination, and severance payments has been reimbursed pursuant to this Agreement).

12.23 *Confidentiality.* Each Party shall not, during the Term of this Agreement or at any time thereafter, transmit Confidential Information of the other Party to any third person either in whole or in part. Each Party shall take all reasonable precautions to safeguard the Confidential Information of the other Party from unauthorized disclosure and, at a minimum, shall afford the Confidential Information of the other Party such precautions and safeguards as it affords to its own confidential information of a similar nature. A&P also agrees to the heightened confidentiality restrictions as set forth in Schedule 7.14(d). "Confidential Information" for purposes of this Agreement shall mean all non-public, confidential or proprietary information of either Party and its clients and customers, including but not limited to information regarding costing, merchandising, procurement, inventory systems, technology, formulations, transportation, warehouse, administrative and other technical and economic data and information, received by the other Party in the course of the negotiation of, or performance of its obligations under, this Agreement. The above restrictions shall not apply to the extent that Confidential Information comes into the public domain through no fault of the other Party, is received by the other Party from a third party having a bona fide right to disclose such information, or disclosure is required by law.

(a) *Public Notices.* Neither Party shall make any press release or public announcement regarding this Agreement or otherwise publicly disclose any of the terms of this Agreement without the prior written consent of the other Party, except where required to do so by Law or by the applicable regulations or policies of any Federal, State or other regulatory agency of competent jurisdiction or any stock exchange in circumstances but only after prior consultation with the other Party, and the disclosing Party shall use commercially reasonable best efforts to ensure that all Confidential Information and other information that is required to be disclosed in accordance with Laws will be accorded confidential treatment.

(b) *Requirement to Disclose.* Wherever in this Agreement disclosure is permitted if "required by Law",

(i) the term "Law" shall be deemed to include (A) any applicable statute, regulation or policy of The United States of America or other government, any State or local government or any agency or authority of any of them having jurisdiction over a Party or its business or any stock exchange or self-regulatory organization in the securities industry and (B) any order, demand or subpoena of any such government, agency, authority, exchange or organization or any court of competent jurisdiction; and

(ii) such disclosure shall be permitted only if, as promptly as practicable after determining that disclosure is required or after receipt of any such order, demand or subpoena, the Party intending to make such disclosure shall notify the other Party of such requirement and the scope of the proposed disclosure and shall simultaneously deliver to the other Party a copy of such order, demand or subpoena or, if there is none, a written opinion of its counsel describing the legal basis upon which such disclosure is

required. The Party intending to make such disclosure shall cooperate with all reasonable requests of the other Party for assistance in preventing or limiting such disclosure.

**12.24** <u>_Definitions_.</u>

"_A&P_" is a Maryland corporation with its principal offices located at 2 Paragon Drive in Montvale, New Jersey 07645.

"_A&P Event of Default_" has the meaning set forth in Schedule 11.4.

"_A&P Operated Facility(ies)_" has the meaning set forth in Schedule 3.5(c).

"_A&P Stores_" has the meaning set forth in Schedule 7.3.

"_A&P Volume_" means any volume of Merchandise intended for use or resale at the A&P Stores or otherwise procured or purchased on A&P's behalf, at A&P's direction or with any other reference to A&P's account, business, operations or name.

"_A/R Deduction Guarantee_" has the meaning set forth in Schedule 5.3.

"_Accounts Receivables Deductions_" has the meaning set forth in Schedule 5.3.

"_Actual Allocation Amount_" has the meaning set forth in Schedule 8.3(c)(i).

"_Actual Center- Store Margin_" has the meaning set forth in Schedule 7.15(a).

"_Actual Costs_" has the meaning set forth in Schedule 8.5.1.

"_Actual Purchasing Service Level_" has the meaning set forth in Schedule 7.12(c).

"_Ad Overpull_" has the meaning set forth in Schedule 7.12(b).

"_Additional Services_" has the meaning set forth in Schedule 2.2.

"_Adjusted Baseline Budget_" has the meaning set forth in Schedule 8.11(c).

"_Administrative Management Fee_" has the meaning set forth in Schedule 6.2(b).

"_Affected Party_" has the meaning set forth in Schedule 10.5(b).

"_Affiliate_" means a corporation or business entity that, directly or indirectly, is controlled by, controls or is under common control, with respect to A&P or C&S, as applicable.

"_Agents_" has the meaning set forth in Schedule 12.5(c).

"_Aggregate Cost Grouping_" is a grouping of Cost items as depicted on Exhibit 1.4(a).

"_Agreement_" means this Warehousing and Distribution Services Agreement, including the Schedules and Exhibits to this Agreement, as it or they may be amended or supplemented from time to time, and the expressions "hereof", "herein", "hereto", "hereunder" and similar expressions refer to this Agreement and not to any particular portion or section of this Agreement.

"_All Risk_" means losses are covered with respect to all perils unless a peril is specifically excluded under the policy.

*"Alternative Source Procurement"* means any procurement of Merchandise through inbound diverting.

*"Approved Budget"* has the meaning set forth in Schedule 8.2.

*"Base Center-Store Margin"* has the meaning set forth in Schedule 7.15(a).

*"Base Cost of Fuel"* has the meaning set forth in Schedule 8.4.2.

*"Base Price"* has the meaning set forth in Schedule 7.14(a)(i).

*"Baseline Allocation Amount"* has the meaning set forth in Schedule 8.3(c)(i).

*"Baseline Budget"* has the meaning set forth in Schedule 8.11(a).

*"Base Management Fee"* has the meaning set forth in Schedule 6.2(a).

*·"Books and Records"* has the meaning set forth in Schedule 12.5(a).

*"C&S"* is a Vermont corporation with its principal offices located at 7 Corporate Drive in Keene, New Hampshire 03431.

*"C&S Event of Default"* has the meaning set forth in Schedule 11.2.

*"Capital Expenditure"* means an expense related to the acquisition (including any rent or lease payments), replacement, repair, maintenance or improvement of any Fixed Asset, Facility or real estate used in connection with the performance of the Services.

*"Capital Expenditures Budget"* means that portion of any Approved Budget that reflects the Capital Expenditures and which comports with the form of Exhibit 1.4(e).

*"Center-Store Margin"* means the gross profit realized in connection with the sale of Center-Store Products to A&P, expressed either in absolute dollars or on a rate basis.

*"Center-Store Margin Guarantee"* has the meaning set forth in Schedule 7.15(b).

*"Center-Store Products"* means grocery, spices, candy, dairy, frozen (mainline), frozen meat, packaged meat, frozen and processed meat, ice cream, ice, and HBC/GM, and supplies.

*"Center-Store Products Volume"* means any A&P Volume comprised of Center-Store Products.

*"Confidential Information"* has the meaning set forth in Schedule 12.23.

*"Consultant"* has the meaning set forth in Schedule 1.3.

*"Contract Quarter"* means C&S's four (4) fiscal quarters, which together comprise C&S's fiscal year.

*"Contract Week"* means any period of seven (7) consecutive calendar days commencing on a Sunday and concluding on a Saturday during any Contract Year.

*"Contract Year"* means C&S's fiscal year which is a 52-week period (or 53-week period every five to six years) that runs through the last Saturday in September. Each Contract Year is comprised of four (4) Contract Quarters. A schedule of Contract Years for the Term is set forth

on Exhibit 1.5. The "Ramp-Up Period" shall be treated as a "stub period" and all amounts calculated on a Contract Year basis shall be prorated accordingly for the Ramp-Up Period.

*"Cost Rate"* has the meaning set forth in Schedule 8.11(a).

*"Costs"* has the meaning set forth in Schedule 8.3(a).

*"Cost Savings Gainshare Incentive Fee"* has the meaning set forth in Schedule 6.3(b).

*"Coupon Income Guarantee"* has the meaning set forth in Schedule 5.2.

*"CPI"* has the meaning set forth in Schedule 6.4.

*"Currency"* has the meaning set forth in Schedule 12.9.

*"Daily Peaking"* means that the volume of product units within any product category in the Product Mix which C&S actually receives or ships in a day varies by more than twenty (20%) percent from the average number of product units received or shipped, as the case may be, in a Fiscal Accounting Period (based on the total number of product units received or shipped in the period divided by the number of business days within that period).

*"Dedicated Facility(ies)"* has the meaning set forth in Schedule 3.1(a).

*"Department"* has the meaning set forth in Schedule 7.12(b).

*"Department Level Breach"* has the meaning set forth in Schedule 7.12(d).

*"Direct Overhead Costs"* has the meaning set forth in Schedule 8.3(a)(viii).

*"DSD"* means direct store delivery.

*"Effective Date"* has the meaning set forth in Schedule 11.1.

*"Effective Date of Termination"* has the meaning set forth in Schedule 11.7.

*"Emergency Expenditure"* has the meaning set forth in Schedule 8.4.3.

*"Estimated Weekly Payment Amount"* has the meaning set forth in Schedule 9.1(a).

*"Excess Costs"* has the meaning set forth on Schedule 8.3(d).

*"Facilities"* has the meaning set forth in Schedule 3.1.

*"Facility Decision"* has the meaning set forth in Schedule 3.5.

*"Facility Decision Costs"* has the meaning set forth in Schedule 3.5.

*"Facility Decision Cost Excess"* has the meaning set forth in Schedule 3.5.

*"Facility Level Breach"* has the meaning set forth in Schedule 7.12(d).

*"First Contract Year"* means the contract year commencing September 28, 2008 and ending September 26, 2009.

*"Fiscal Accounting Period"* means periods of four consecutive Contract Weeks beginning on the Effective Date. In a 53-week Contract Year, one Fiscal Accounting Period will be comprised

five (5) consecutive Contract Weeks.  Thirteen (13) Fiscal Accounting Periods comprise each Contract Year.

*"Fixed Absolute Dollars"* has the meaning set forth in Schedule 8.11(a).

*"Fixed Assets"* means the fixed assets or items of plant, machinery, equipment and leasehold improvements, together with any additional items of plant, machinery, equipment and leasehold improvements acquired by C&S in accordance with the terms of this Agreement and relating to the provision of Services.

*"Flex Budget"* has the meaning set forth in Schedule 8.4.1.

*"Flex" or "Flexing"* shall mean the process of adjusting an Approved Budget in accordance with the terms and conditions set forth in Schedule 8.4 hereto.

*"Floral Products"* means non-food plants and flowers.

*"Force Majeure"* has the meaning set forth in Schedule 10.5(a).

*"Fresh Discounts"* has the meaning set forth in Schedule 7.11(c).

*"Fresh Products"* shall include, but not be limited to, produce, fresh meat, fresh deli, dry bakery, frozen bakery, non-warehouse-delivered candy, fresh seafood, and frozen commodities (e.g., turkey, shrimp and crab), and shall exclude Floral Products and any Center-Store Products.

*"Fresh Products Volume"* means any A&P Volume comprised of Fresh Products.

*"GAAP"* has the meaning set forth in Schedule 6.3(a).

*"Gainshare"* has the meaning set forth in Schedule 8.11(a).

*"GHI"* means Grocery Haulers Inc., a Delaware corporation.

*"Gross Margin Performance Share"* has the meaning set forth in Schedule 7.15(c).

*"Gross Profit Rebate"* has the meaning set forth in Schedule 7.14(b).

*"Incentive Compensation Fees"* has the meaning set forth in Schedule 6.3.

*"Incremental Volume Fee"* has the meaning set forth in Schedule 6.3(a).

*"Incremental Volume Fee Trigger"* has the meaning set forth in Schedule 6.3(a).

*"Initial Approved Budget"* has the meaning set forth of Schedule 8.2

*"Interim Budget"* has the meaning set forth in Schedule 1.4.

*"Interim Period"* has the meaning set forth in Schedule 7.14(e).

*"Laws"* has the meaning set forth in Schedule 12.22(b)(i).

*"Lease"* means the leases for the Facilities set forth on Exhibit 3.4.

*"Leftover Ad Volume"* has the meaning set forth in Schedule 7.13.

*"Logistics Funds"* means published or unpublished off-invoice allowances, rebates and all monetary or non-monetary funding payable, credited or otherwise earned in connection with the purchasing, receiving, warehousing, distribution or transport of Merchandise including, but not limited to, accessorial charges, warehouse slotting allowances, logistics incentives, other logistics program payments and penalties, price reconciliations (such as purchase order or accounts payable variance), transfer income and volume-based accrual incentives such as Crossroads® or other preferred vendor programs. Manufacturer's swell allowances shall not be considered Logistics Funds or Trade Funding for purposes of this Agreement.

*"Losses"* has the meaning set forth in Schedule 10.1(a).

*"Manufacturer Out-of-Stock"* has the meaning set forth in Schedule 7.12(b).

*"Master Agreement"* is the Supply Agreement by and between A&P and C&S dated October 27, 2003.

*"Measurement Period"* has the meaning set forth in Schedule 7.12(a).

*"Merchandise"* has the meaning set forth in Schedule 7.1.

*"Merchandising Team"* means the four (4) most senior merchandising executives from either C&S or A&P, as the case may be.

*"Minor Service Level Violation"* has the meaning set forth in Schedule 7.12(d).

*"Monthly P&L"* has the meaning set forth in Schedule 8.5.1.

*"Negotiated Inbound Rates"* has the meaning set forth in Schedule 4.2.

*"New Jersey Facilities"* has the meaning set forth in Schedule 4.1.

*"Non-C&S Managed Outbound Transportation"* has the meaning set forth in Schedule 8.11(b).

*"Occupancy Costs"* has the meaning set forth on Schedule 8.3(a)(i).

*"Ocean Agreement"* means the Supply Agreement by and between A&P and C&S dated June 27, 2005.

*"Other Services"* has the meaning set forth in Schedule 5.1.

*"Other Services Fee"* has the meaning set forth in Schedule 6.1.

*"Pathmark"* means Pathmark Supermarkets, Inc., a Delaware corporation and a wholly-owned subsidiary of A&P.

*"Pathmark Agreement"* is the First Amended and Restated Supply Agreement by and between Pathmark and C&S dated January 29, 1998.

*"Parties"* means C&S together with A&P.

*"Performance Measures"* has the meaning set forth in Schedule 2.1.

*"Performing Party"* has the meaning set forth in Schedule 2.7.

*"Permitted Individuals"* has the meaning set forth in Schedule 7.14(d).

*"Permitted Use"* has the meaning set forth in Schedule 7.14(d).

*"Person"* is to be interpreted broadly and includes an individual or group of individuals, an entity or group of entities, a corporation, a partnership, a trust, an unincorporated organization, the government of a country or any political subdivision thereof, or any agency or department of any such government, and the executors, administrators or other legal representatives of an individual in such capacity.

*"Prior Agreements"* means Master Agreement, Ocean Agreement, Pathmark Agreement and all amendments thereto.

*"Procurement Services"* shall be those services described in Schedule 7 related to the procurement of Merchandise.

*"Product Mix"* means the mix of categories of Merchandise handled by C&S calculated on a unit basis with the categories being as more particularly described in the variance analysis included in the Service Specifications, as they may be amended from time to time in new Service Specifications.

*"Punitive Service Level"* has the meaning set forth in Schedule 7.12(a).

*"Punitive Service Level Breach"* has the meaning set forth in Schedule 7.12(d).

*"Purchase Services"* shall mean those services described in Schedule 7 related to the purchase of Merchandise.

*"Purchase Terms"* has the meaning set forth in Schedule 7.5.

*"Purchasing Service Level"* has the meaning set forth in Schedule 7.12(b).

*"Purchasing Service Level Reconciliation Report"* has the meaning set forth in Schedule 7.12(c).

*"Ramp-Up Period"* has the meaning set forth in Schedule 1.4.

*"Real Estate Obligations"* means any lease or sublease to occupy any Facility in connection with the performance of Services hereunder as set forth on Exhibit 3.4.

*"Reclamation Income Guarantee"* has the meaning set forth in Schedule 5.4.

*"Reclamation Services"* has the meaning set forth in Schedule 5.4.

*"Recyclable Material"* has the meaning set forth in Schedule 2.9.

*"Recyclable Material Processing Services"* has the meaning set forth in Schedule 2.9.

*"Required Purchasing Service Level"* has the meaning set forth in Schedule 7.12(a).

*"Restricted Information"* has the meaning set forth in Schedule 7.14(d).

*"Retailer Performance Funds"* means all Trade Funding except Logistics Funds.

*"Service Level Shortfall"* has the meaning set forth on Schedule 7.12(e).

*"Service Specifications"* shall mean the standard operating procedures to be followed by the Parties in connection with the performance of the Services, the Other Services, and in

60

connection with their respective obligations under this Agreement, as may be amended from time to time.

*"Services"* means Warehousing Services, the Transportation Services, the Procurement Services, Purchasing Services and Additional Services.

*"Services Fees"* has the meaning set forth in Schedule 6.1.

*"Services Standards"* has the meaning set forth in Schedule 2.1.

*"Shared Facility(ies)"* has the meaning set forth in Schedule 3.1(b).

*"Shared Savings"* has the meaning set forth in Schedule 8.11(d).

*"Systems"* has the meaning set forth in Schedule 8.3(a)(xii).

*"Targeted Purchasing Service Level"* has the meaning set forth in Schedule 7.12(a).

*"Term"* has the meaning set forth in Schedule 11.1.

*"Total Transportation Costs"* shall mean those Costs set forth on Exhibit 1.4(c).

*"Total Warehousing Costs"* shall mean those Costs set forth on Exhibit 1.4(b).

*"Trade Funding"* means any and all credits, allowances, discounts, free goods, fees or other monetary or non-monetary funding of any sort whatsoever that is paid by vendors or manufacturers of Merchandise to C&S or A&P based upon the purchase, ownership, warehousing, distribution or re-sale of A&P Volume including, but not limited to, Retailer Performance Funds and Logistics Funds.

*"Transportation Services"* has the meaning set forth in Schedule 4.1.

*"True Net Cost"* has the meaning set forth in Schedule 7.14(a).

*"Warehousing Services"* has the meaning set forth in Schedule 2.1.

*"Weekly Actual Amount"* has the meaning set forth in Schedule 9.1(a).

*"Weekly Estimate"* has the meaning set forth in Schedule 9.1(a).

*"Weekly Statement"* has the meaning set forth in Schedule 9.1(a).

*"Weekly Actual Amount"* has the meaning set forth in Schedule 9.1(a).





September 3, 2010

Dear:  Frank Vitale

**Reference:  2010 Long Term Incentive Program ("Program")**
**Grant of Non-Qualified Stock Options ("Grant Letter")**

This will confirm the terms and conditions of an Award being made to you pursuant to The Great Atlantic & Pacific Tea Company, Inc. (the "Company") **2008 Long Term Incentive and Share Award Plan** (the "Plan"), a copy of which is attached hereto and made a part hereof. This Award is contingent upon the shareholders approving an increase in the number of Shares reserved for issuance under the Plan. This Award is also contingent upon and subject to your signing and returning this Grant Letter, indicating your acceptance of its terms and conditions, by October 1, 2010.

1.     On August 26, 2010, the Company granted to you an Option, as a non-qualified stock option, to purchase from the Company up to a total of 32,121 shares of the Company's $1.00 par value Common Stock (the "Common Stock") at a price of $3.14 for each share purchased pursuant to this Option, such exercise price being equal to the closing price of the Company's Common Stock on the New York Stock Exchange on the date of grant, as reported in The Wall Street Journal.

The Option and the number of shares and price per share are subject to adjustments as provided in the Plan. In any adjustments of the number of shares of Common Stock, fractional shares shall be omitted from the shares covered by this Option. Any adjustment of the price per share shall be computed at the next higher cent.

2.     (a)     This Option shall have a term of ten years from the date of grant, and shall vest and may be exercised with respect to one-third of the options granted hereby as of the first anniversary of the date of grant of this Option and each additional one-third of the options covered hereby on the second and third anniversaries, respectively, of the date of grant of this Option, and in each case during the remaining term of this Option; provided, however, that in the event you attain age 64 while employed by the Company or a parent or subsidiary of the Company, the entire remaining number of shares with respect to which this Option then remains unexercisable shall become exercisable during the remaining term of this Option effective as of the later of (i) your attainment of age 64 or (ii) the date which is six (6) months after the date of grant. In no event shall this Option be exercisable after ten years from the date of this Agreement.

(b)     Except as provided in Section 3(b), 3(c), 3(d), 3(e), 3(f) or 3(g) hereof, this Option may be exercised (i) only if you are, at all times during the period beginning with the date hereof and ending on the day three months before the date of exercise, an employee of either the Company, or a parent or subsidiary of the Company, or of another corporation referred to in Section 422(a)(2) of the Internal Revenue Code of 1986, as amended from time

to time (the "Code") and (ii) only with respect to shares exercisable during such period of employment. The terms "parent" and "subsidiary" as used herein shall have the meanings assigned to them by Section 425 of the Code.

(c)     This Option may be exercised, with respect to shares as to which the right to exercise has matured as herein provided in whole at any time or in part from time to time, but not with respect to less than 25 shares in each exercise or such lesser number with respect to which this Option remains unexercised.

3.     (a)     This Option is subject to all the terms, conditions, limitations and restrictions contained in the Plan and may not be exercised, assigned or transferred, in whole or in part, except as therein provided. Specifically, but not by way of limitation, this Option is not transferable by you otherwise than by will or the laws of descent and distribution and is exercisable during your lifetime only by you.

(b)     In the event you should die while employed by the Company, or a parent or subsidiary of the Company, such person who shall have acquired, by will or by the laws of descent and distribution, the right to exercise this Option may exercise this Option with respect to all shares covered hereby at any time prior to the expiration of the term of this Option, or prior to the first anniversary of your death, whichever date is earlier.

(c)     In the event you should die after termination of your employment with the Company or a parent or subsidiary of the Company, but at a time when you are still eligible to exercise all or any portion of this Option, such person as shall have acquired, by will or by the laws of descent and distribution, the right to exercise this Option may exercise this Option at any time prior to the expiration of the term of this Option, or prior to the first anniversary of your death, whichever date is earlier, but only with respect to shares that became exercisable during your period of employment.

(d)     In the event that you become disabled (within the meaning of Section 22(e) (3) of the Code) while employed by the Company, or a parent or subsidiary of the Company, you may exercise this Option at any time prior to the expiration of the term of this Option, or prior to the first anniversary of your becoming disabled, whichever date is earlier, but only with respect to shares that became exercisable during your period of employment.

(e)     In the event that you retire from the Company, or a parent or subsidiary of the Company, pursuant to a tax-qualified pension or retirement plan of the Company, or a parent or subsidiary of the Company, this Option will become fully vested and you may exercise this Option at any time prior to the expiration of the term of this Option.

(f)     In the event that your employment is terminated without "cause" (as defined below) by the Company or a parent or subsidiary of the Company, or with the written consent of the Company or a parent or subsidiary of the Company, you may exercise this Option at any time prior to the expiration of the term of this Option, or prior to the first anniversary of your termination of employment, whichever date is earlier, but

only with respect to shares that became exercisable during your period of employment. For this purpose, "cause" shall mean any of the following: (i) any act of gross negligence by you which results in material injury to the Company or a parent or subsidiary of the Company, (ii) any willful engagement by you in conduct which involves dishonesty, fraud or moral turpitude, (iii) your conviction of a felony or any crime involving moral turpitude, or (iv) any willful engagement by you in illegal or improper conduct which results in material injury to the Company or a parent or subsidiary of the Company or material personal enrichment to you at the expense of the Company or a parent or subsidiary of the Company.

(g)     In the event that your employment is terminated for "cause" (as defined in Section 3(f) above) by the Company or a parent or subsidiary of the Company, this Option shall terminate immediately upon such termination of employment, and in no event shall you have any rights under this Option following such termination of employment.

4.     (a)     Subject to the provisions of the Plan, the Company shall issue certificates for stock purchased pursuant to this Option within a reasonable time after notice of exercise of this Option and payment of the option price.  Each share of stock shall be fully paid and non-assessable.

(b)     You shall not have any rights of a record holder with respect to such shares until such certificates are actually paid for and issued to you.

(c)     You shall assume all risks incident to any change hereafter in the applicable laws or regulations or incident to any change in the market value of any shares issued to you upon the exercise of this Option in whole or in part.

5.     In exchange for the opportunity to participate in the Program, you agree to release all claims which you have, had or might have had against the Company, any of its present or former parents, subsidiaries or affiliated entities, and any of its or their officers, directors, employees, agents, predecessors or successors (the "Releasees") arising out of or related to your employment with the Company and/or Releasees up to the date that you execute this Grant Letter, including, but not limited to, any and all claims for breach of contract or implied contract, or for negligence, retaliation and all torts; any and all claims for attorney fees; any and all claims under Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Age Discrimination in Employment Act ("ADEA"), the Older Workers Benefit Protection Act ("OWBPA"), the Americans with Disabilities Act, the Employment Retirement Income Security Act of 1974, the Family and Medical Leave Act, the Equal Pay Act, the National Labor Relations Act, the Fair Labor Standards Act, and the Sarbanes-Oxley Act of 2002; any and all claims under each and every state or local variation of these federal laws including without limitation the New Jersey Law Against Discrimination, the New Jersey Family Leave Act, the New Jersey Conscientious Employee Protection Act and the New Jersey Civil Rights Act; and any and all claims under any and all other applicable federal, state, and/or local fair employment practices laws, individual or

3

constitutional rights, and wage or discrimination laws.   This release shall not affect any acts giving rise to claims subsequent to the execution of this Grant Letter.   Excluded from this release are any claims which by law cannot be waived; provided, however, while you cannot waive your right to file a charge with or participate in an investigation conducted by certain government agencies, you are waiving and releasing your claim or right to any monetary recovery should any party (such as the Equal Employment Opportunity Commission) pursue any claims on your behalf.

6.      In exchange for the opportunity to participate in the Program, you agree that during the term of your employment, and for a period of eighteen (18) months following termination of your employment for whatever reason, except if you are terminated by the Company without cause, you will not, directly or indirectly (including but not limited to self employment and consulting), perform any work or services for any Competing Enterprise that is similar to or competitive with the work that you performed for the Company during the last twelve (12) months of your employment with the Company.  Competing Enterprise shall mean any entity (i) that operates retail grocery stores selling food or food and general merchandise, or, if you work in the Company's pharmacy organization, any entity that operates retail pharmacies and (ii) that has a store within 15 miles of any one of the Company's stores.  For the same eighteen-month period, you also agree to not contact or solicit employees of the Company for the purpose of inducing such employees to leave the employ of the Company.  If any aspect of this paragraph shall be determined under applicable law to be overly broad in duration, geographical coverage, substantive scope, or otherwise, it shall be deemed narrowed to the broadest term permitted by applicable law and shall be enforced as so narrowed.

7.      You hereby acknowledge that you have and/or will have access to and become acquainted with various trade secrets and proprietary information of the Company and/or Releasees and other confidential information relating to the Company and/or Releasees.  You covenant that you will not, directly or indirectly, disclose or use such information except (i) as is necessary and appropriate in connection with your employment by the Company and/or Releasees, (ii) as is required pursuant to a judicial or administrative subpoena, or (iii) if such information is already in the public domain (other than by reason of your breach of your obligations hereunder).   Subject to the exceptions set forth above, you agree that you will adhere in all respects to the Company's policies against the use or disclosure of such information.

8.      You further agree that your participation in the Program, and the terms and conditions of this Grant Letter, are confidential and that you will not in any manner publish, publicize, disclose or otherwise make known or permit or cause to be made known to any third person your participation in the Program or the terms and conditions of this Grant Letter, even if you decide not to participate.  Nothing in this paragraph shall be construed to prohibit the disclosure of this Grant Letter to your spouse or any legal, tax or financial consultant retained by you, provided that the persons to whom the disclosure is being made agree to be bound by the confidentiality provisions of this paragraph.

4

9. Any controversy or claim arising out of or relating to this Grant Letter, directly or indirectly, or the performance or breach thereof, will be settled by arbitration in accordance with the rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof. The arbitration will be held in Bergen County in New Jersey, or such other place as may be agreed upon at the time by the parties to the arbitration. Other than the fees and costs of the arbitrator and the AAA, which shall be shared equally by the parties, the parties shall bear their own expenses in connection with any arbitration or proceeding arising out of or relating to this Grant Letter, directly or indirectly, or the performance or breach thereof; provided, however, that in the event that you substantially prevail, the Company agrees promptly to reimburse you for all expenses (including costs and fees of witnesses, evidence and attorneys fees and expenses) reasonably incurred by you in investigating, prosecuting, defending, or preparing to prosecute or defend any action, proceeding or claim arising out of or relating to this Grant Letter, directly or indirectly, or performance or breach thereof. You acknowledge and agree that a breach of your obligations under Sections 5, 6, 7 and/or 8 of this Grant Letter could cause irreparable harm for which the Company and/or Releasees would have no adequate remedy at law, and further agree that, notwithstanding the agreement to arbitrate controversies or claims as set forth above, the Company and/or Releasees may apply to a court of competent jurisdiction to seek to enjoin preliminarily or permanently any breach or threatened breach of your obligations under Sections 5, 6, 7 and/or 8 of this Grant Letter.

10. (a) Nothing herein contained shall obligate the Company, or any parent, division, affiliate or subsidiary of the Company, to continue your employment for any particular period or on any particular basis of compensation, or constitute a request to postpone your retirement date.

(b) In the event any provision of this Grant Letter is held to be void or unenforceable by a court of competent jurisdiction, the remaining provisions of this Grant Letter shall nevertheless be binding upon the parties with the same effect as though the void or unenforceable part had been deleted, provided, however, if the Release of Claims in paragraph 5 is deemed invalid, in whole or in part, you shall return any consideration you received hereunder to the Company prior to commencing or pursing any action against the Company and/or the Releasees that, but for the invalidation of the Release of Claims, would have been barred by this Grant Letter.

(c) The validity, interpretation and performance of this Grant Letter will be governed by the laws of the State of New Jersey without regard to the conflict of law provisions.

11. By signing this Grant Letter below, you are acknowledging and agreeing that:

(a) it is your duty and responsibility to report any conduct that you believe is unethical, improper, unlawful, or in violation of the Company's Code of Business Conduct and Ethics, especially any such behavior involving accounting practices, internal accounting controls or fraud, and

(b)     any such conduct must be reported to the General Counsel at (201) 571-8161 or to the Chief Internal Auditor at (201) 571-4148 or to The Network Hotline at 1-888-277-3258, and

(c)     as of the date you sign this Grant Letter you are not aware of any conduct that you believe is unethical, improper, unlawful, or in violation of the Company's Code of Business Conduct and Ethics; or if you are aware of such conduct that you have properly reported it according to paragraph 11 (b) above.

12.     You may consult with an attorney prior to signing this Grant Letter and you have at least twenty-one (21) days during which to review and consider the provisions of this Grant Letter before signing, although you may sign and return it sooner if you so desire. **Your signed Grant Agreement must be returned to Bhakti Desai, A&P Compensation Department, 2 Paragon Drive, Montvale, NJ 07645 on or before October 1, 2010.** You have the right to revoke this Grant Letter for a period of seven (7) days after signing it and this Grant Letter shall not become effective until such seven-day revocation period has expired. You acknowledge and agree that if you wish to revoke this Grant Letter you must do so in writing to Sheryl Martin, A&P, Legal Services, 2 Paragon Drive, Montvale, NJ 07645, and that such revocation must be signed by you and postmarked, or received by A&P, no later than the seventh day after the date on which you signed this Grant Letter. You acknowledge and agree that, in the event that you revoke this Grant Letter, you will not be a qualified participant in the Program and you shall have no right to receive the options described above.

Very truly yours,

Donald Maddi
Vice President, Compensation & Benefits

Agreed and accepted:

By: _____
Signature

Print Name: _Frank Rocco Vitolo_

Date: _9/9/10_

6